**BOUTIN JONES INC.**
James D. McNairy (SBN 230903)
jmcnairy@boutinjones.com
Michael G. Cross (SBN 268999)
mcross@boutinjones.com
Andrew A. Bozant (SBN 305143)
abozant@boutinjones.com
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Telephone: (916) 321-4444
Fax: (916) 441-7597

Attorneys for Defendant Strio Consulting, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROCKETPOWER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STRIO CONSULTING, INC., a Minnesota corporation,<br><br>Defendant. | Case No.<br><br>**DEFENDANT STRIO CONSULTING, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION TO UNITED STATES DISTRICT COURT UNDER 28 U.S.C. § 1441(b)**<br><br>*[County of San Francisco Superior Court Case No. CGC-19-575643]*<br><br>*[Filed Concurrently with Declaration of Caleb Fullhart, Notice of Pendency of Other Action, Certificate of Interested Parties, Disclosure Statement, and Civil Cover Sheet]* |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, PLAINTIFF, AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant, Strio Consulting, Inc. ("Strio") hereby removes the above-captioned action filed by Plaintiff RocketPower, Inc. ("Plaintiff"), from the Superior Court of the State of California, County of San Francisco, to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. § 1441(b).

/ / /

## I.   REMOVAL IS TIMELY

1.    On or about April 30, 2019, Plaintiff filed a Complaint against Strio, entitled *RocketPower, Inc. v. Strio Consulting, Inc.*, Case No. CGC-19-575643 (the "Complaint").   The Complaint alleges three causes of action: (1) Declaratory Judgment; (2) Intentional Interference with Contractual Relations; and (3) Negligent Interference with Prospective Economic Advantage.

2.    Strio was served with the Complaint on April 30, 2019.   A true copy of the filed Complaint, the First Amended Complaint ("FAC"), Summons, Civil Case Cover Sheet, and all other pleadings in the state court action areattached to this Notice of Removal ("Notice") as **Exhibit A**.

3.    On information and belief, no other named Defendants have been properly joined and served in this Action.   On further information and belief, any other defendants, if and when properly served, will consent to this removal.

4.    As required by 28 U.S.C. § 1446(b), Notice was filed within 30 days after Strio was first served with a copy of the Summons and Complaint.

## II.   VENUE IS PROPER

5.    The Superior Court of California, County of San Francisco, is located within the territory of the Northern District of California.   Therefore, venue for the purposes of removal is proper pursuant to 28 U.S.C. § 84(a) because it is the "district and division embracing the place where such action is pending."   28 U.S.C. § 1441(a).

## III.   JURISDICTION

6.    This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332(a), and is one which may be removed to this Court by Strio pursuant to the provisions of 28 U.S.C. § 1441(b) in that it is a civil action between citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

### A.   The Parties Are Diverse

#### 1.   Plaintiff's Citizenship

7.    Plaintiff is incorporated under the laws of the State of Delaware with its principal place of business in San Francisco, California.   FAC ¶ 2.

/ / /

**B. Defendant's Citizenship**

8. Strio is incorporated under the laws of the State of Minnesota with its principal place of business in Lake Elmo, Minnesota. Fullhart Decl. ¶ 2; *see also* FAC ¶ 3 (alleging Strio's principal place of business is in Lake Elmo, Minnesota).

9. As a corporation, Strio is deemed a citizen of "every State…by which it has been incorporated and of the State…where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The term "principal place of business" in the Federal diversity jurisdiction statute refers to the "nerve center" of the corporation, which is "the place where a corporation's officers direct, control, and coordinate the corporation's activities," and is "normally … the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination … and not simply an office where the corporation holds its board meetings." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Strio's headquarters are located at 1390 Neal Avenue North, Lake Elmo, Minnesota. Fullhart Decl. ¶ 2. At the time of the filing of the Complaint in this case, and as of today, Strio's sole corporate officer resides and works in Lake Elmo, Minnesota. When decisions are made about Strio's business, those decisions are made in Lake Elmo, Minnesota. Accordingly, for purposes of determining diversity of citizenship, Strio is a citizen of Minnesota.

**C. The Amount In Controversy More Likely Than Not Exceeds $75,000**

10. The amount in controversy is unclear on the face of the Complaint. However, Plaintiff alleges that "Strio's liability, as set forth in th[e operative] Complaint, exceeds $25,000." FAC ¶ 4. Plaintiff does not otherwise identify a dollar amount of claimed damages.

11. When the amount in controversy is unclear, removal is proper "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a)." 28 U.S.C. § 1446(c)(2)(B); *Guglielmino v. McKee Foods Corporation*, 506 F.3d 696, 700-01 (9th Cir. 2007). Any "sums [that] would entail a payment by [the defendant] … must be included within any amount-in-controversy calculation," including compensatory damages, punitive damages, and attorneys' fees. *Guglielmino*, 506 F.3d at 701.

/ / /

12. Plaintiff alleges it was damaged when Strio caused its clients to breach their agreements with Plaintiff. FAC ¶ 112. Plaintiff alleges that the at-issue clients are "Nuro, Minted, Reflektive and numerous other growing companies." *Id.* ¶ 110.

13. Plaintiff further alleges that Strio's actions were "willful, malicious, and in reckless disregard for the rights of others," for which reason, "RocketPower is entitled to an award of punitive damages …." FAC ¶ 117.

14. Plaintiff also seeks to recover its attorneys' fees. FAC, Prayer ¶ 4.

15. Plaintiff alleges that its relationships with its clients "created a 50% profit split for Strio." FAC ¶ 86.

16. During 2018, Strio's work for Nuro, Minted and Reflektive, the clients identified in Rocket Power's Amended Complaint, generated well in excess of $75,000 in Strio profit. Fullhart Decl. ¶ 3.

17. Because Strio's work for Nuro, Minted and Reflektive generated well over $75,000 in Strio profit, and Plaintiff alleges that it and Strio split the profits of from its clients 50/50, Plaintiff's alleged losses from Reflektive, Minted, and Nuro exceed the jurisdictional limit set forth in 28 U.S.C. § 1332(a).

18. Plaintiff's prayers for punitive damages and attorneys' fees further evidence that the amount in controversy more likely than not exceeds $75,000. *See*, *e.g.*, *Brady v. Mercedes-Benz USA, Inc*., 243 F. Supp. 2d 1004, 1009 (N.D. Cal. 2002) ("The amount in controversy for diversity jurisdiction may include punitive damages if recoverable under state law.") (citations omitted); *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007) (attorneys' fees properly included in amount in controversy calculation).

19. "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 135 S. Ct. 547, 554 (2014). Considering Plaintiff's prayers for lost profits, punitive damages, and attorneys' fees, the amount in controversy in this action can be easily read to aggregate an amount in excess of the requirement for removal pursuant to 28 U.S.C. §1441. Accordingly, removal is proper.

## IV.    SATISFACTION OF PROCEDURAL REQUIREMENTS

20.    Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Strio are exhibits to this Notice.  Pursuant to 28 U.S.C. § 1446(d), a "Notice to Plaintiff and Clerk of the California Superior Court of Removal of Civil Action to the United States District Court" (to include a copy of this Notice of Removal and all Exhibits) will be promptly filed with the Clerk of the Superior Court of California for the City and County of San Francisco, and served on all other parties to this action.  Pursuant to 28 U.S.C. § 1446(b)(2)(A), all properly joined and served defendants have consented to this removal.

21.    Pursuant to Local Rule 3-2(a), Strio is filing a civil cover sheet concurrent with this Notice.

22.    Pursuant to Local Rule 3-13, Strio is filing a Notice of Pendency of Other Action concurrent with this Notice.

23.    Pursuant to Local Rule 3-2(d), Removal and Intradistrict Assignment to the San Francisco or Oakland Division of this Court is proper because this action arose in the County of San Francisco.

## V.    CONCLUSION

24.    This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332(a), and is one which may be removed to this Court by Strio pursuant to the provisions of 28 U.S.C. § 1441(b) in that it is a civil action between citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Accordingly, Strio respectfully requests that the action now pending against it in the Superior Court of California, County of San Francisco, be removed to this Court.

DATED:  May 24, 2019                               Boutin Jones Inc.

                                                   By:      /s/ James D. McNairy
                                                            James D. McNairy
                                                            Attorneys for Defendant
                                                            Strio Consulting, Inc.

# EXHIBIT A

EXHIBIT A

SUM-100

**SUMMONS**
***(CITACION JUDICIAL)***

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

Strio Consulting, Inc., a Minnesota corporation

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

RocketPower, Inc., a Delaware corporation

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

CASE NUMBER: *(Número del Caso):* CGC-19-575643

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Francisco - Civic Center Courthouse
400 McAllister Street
San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael S. Dorsi/Ad Astra Law Group, LLP (415) 795-3579
582 Market Street, 17th Floor San Francisco CA 94104

DATE: *(Fecha)* APR 30 2019 CLERK OF THE COURT Clerk, by *(Secretario)* KALENE APOLONIO, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*:

under: ☑ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

**FILED**
San Francisco County Superior Court
APR 30 2019
CLERK OF THE COURT
BY: [signature]
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**COMPLAINT FOR:**

**(1) DECLARATORY JUDGMENT;**
**(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**
**(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**DAMAGES AND INJUNCTIVE RELIEF REQUESTED**

1. Plaintiff RocketPower, Inc. seeks a declaratory judgment pursuant to California Code of Civil Procedure sections 1060 et seq., that non-compete provisions in employment agreements — agreements that Strio Consulting, Inc. purported to prepare on behalf of RocketPower and Strio — are void and unenforceable against RocketPower and the joint workers of RocketPower and Strio under California law and on other grounds.

## THE PARTIES

2. RocketPower, Inc., is a Delaware corporation, with its primary place of business located at Two Embarcadero Center, San Francisco, California.

3. Strio Consulting, Inc., is a Minnesota corporation with its primary place of business located at 1390 Neal Avenue North, Lake Elmo, Minnesota.

## JURISDICTION AND VENUE

4. This Court has jurisdiction and is the appropriate venue because Strio, through its relationship with RocketPower, availed itself of the protection of the laws of the State of California, and liability arose in San Francisco, California, where RocketPower suffered injury resulting from Strio's conduct. Strio's liability, as set forth in this Complaint, exceeds $25,000.

## GENERAL ALLEGATIONS

5. RocketPower provides talent solutions to rapidly growing companies by: 1) providing recruiting process outsourcing/contract recruiters; 2) providing outsourced/contract staffing for hourly positions such as autonomous vehicle operators and customer service specialists; and 3) executive search services.

6. Strio is a consulting business that provides back office services for RocketPower and RocketPower's clients including payroll, employee benefits, and related services.

7. RocketPower establishes relationships and contracts with clients who are companies in need of workers.

8. RocketPower's clients contract with RocketPower for assistance with finding and hiring, placement, management, and supervision of workers to meet their business needs. All relevant client contracts are between the client and RocketPower. Strio is not a party to any relevant client contracts.

**RocketPower/Strio Joint Employment of Workers**

9. RocketPower and Strio have a verbal agreement to provide different services to RocketPower's clients, with RocketPower being primarily responsible for advertising, screening, and identifying potential employees who will meet their clients' employment needs as follows: 1) in the Recruiting Process Outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the Outsourced/Contract staffing line of business, RocketPower clients direct the operations performance of the employees; and 3) in the Executive Search staffing line of business, RocketPower provides primary operational direction.

10. RocketPower uses Strio services for some of its services to clients, but not all.

11. RocketPower and Strio do not have an exclusive business relationship. RocketPower/Strio's joint workers are not prohibited from working on assignments that involve RocketPower clients with whom Strio has no contacts, involvement, or relationships.

12. When RocketPower's clients identify a hiring need, they contact RocketPower, who then advertises the position and begins soliciting qualified candidates to apply for the position.

13. The team that screens and then extends offers to the applicants is made up of both RocketPower-payroll and Strio-payroll employees. The operational control and business processes are governed by RocketPower. A verbal offer to the candidate is made telephonically by either a RocketPower or Strio employee, who is a member of that team.

14. Following the verbal offer made to the candidate, the written confirmation is sent by the same RocketPower or Strio employee who made the verbal offer to the candidate.

15. The RocketPower or Strio employee who sent the written offer then alerts a recruiting coordinator who is also operationally controlled by RocketPower. Strio employees execute the required final paperwork; those specific internal support Strio employees are paid 50% by RocketPower (even though these Strio employees are not joint workers). The required final paperwork includes a statement of work that defines the scope of the new hire's job responsibilities based on RocketPower's specifications, and an employment agreement. The employment agreements at issue here were drafted by Strio, without RocketPower input. The employment agreement is then executed electronically by the new hire.

16. After the new hire signs the employment agreement, he or she becomes a joint employee of RocketPower and Strio. Strio is responsible for providing payroll services, employee benefits, and other day-to-day services for the new hire, at RocketPower's specification.

17. RocketPower pays 100% of the billable workers' wages. The workers are directed 100% by RocketPower or RocketPower clients.

18. The workers are joint employees of both RocketPower and Strio. Depending on the line of business, RocketPower, or RocketPower's clients, control and supervise the day-to-day activities of the workers. Strio provides limited services and is only responsible for employee relations matters such as disciplinary issues and termination actions, done in collaboration with RocketPower.

19. RocketPower and Strio are joint employers of the workers for at least the following reasons:

a. RocketPower supervises and controls the workers' schedules and conditions of employment;

b. RocketPower determines the rate and method of payment for all of the billable employees. For the few workers who are Strio internal overhead employees only, Strio determines the rate and method of payment with RocketPower's input;

c. Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

d. The Employee Handbook states that the workers are employees of both RocketPower and Strio;

e. Onboarding of the workers is done by both RocketPower and Strio;

f. Both RocketPower and Strio have responded to employee complaints from various agencies as joint-employers;

g. Responsibility under the Agreements could pass from one entity to the other without material changes; and

h. The workers work exclusively for RocketPower clients. As such, Strio cannot enforce the restrictive covenants of the Agreements against RocketPower, its joint-

employer and intended co-beneficiary of the restrictive covenants.

20. Strio does not assign pre-existing Strio employees to RocketPower contracted assignments.

21. RocketPower initiates requests for hiring new employees to work on RocketPower contracted assignments.

22. RocketPower manages the hiring process for hiring new hires for RocketPower contracted assignments.

23. Strio does not assign joint employees to any new projects where Strio has a direct contact with a RocketPower client when a RocketPower contract assignment ends.

24. The joint employment of RocketPower/Strio's employees is made possible exclusively by RocketPower's contracted client relationships.

25. Strio does not provide specialized training to RocketPower/Strio joint employees.

26. There is no Strio proprietary confidential information promised to or given to the joint employees.

27. There are no Strio trade secrets provided to the joint employees.

28. There is no customer goodwill on behalf of Strio retained by the employees; in fact, many RocketPower contracted clients do not even know that Strio exists.

29. RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families.

30. RocketPower and Strio are complementary businesses who do not compete for the same clients.

31. RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

32. RocketPower invoices all of its clients directly for the services its workers provide for them.

33. RocketPower's clients generally submit payment for the invoiced work with 25 to 45 days of receiving the payment.

34. After receiving payment from its clients, RocketPower deposits the funds in a joint account shared by RocketPower and Strio.

35. RocketPower/Strio currently jointly employ approximately 165 workers and approximately 86 of those joint workers reside and work primarily in California.

**The Agreements at Issue**

36. There are at least two types of Employment Agreements that Strio has been presenting to the joint workers for signature.

37. The first is styled "Independent Contractor Agreement" with a "Statement of Work" attached. The second is styled "Consultant Employment Agreement" with a "Statement of Work" attached. The two agreements are referred to hereafter collectively as "the Worker Agreements."

38. Some of Worker Agreements purport to be between the worker and Strio only. Some of the Worker Agreements purport to be between the worker and both Strio and RocketPower.

39. The material provisions of the Worker Agreements are essentially identical.

40. The Worker Agreements provide that the workers are hired as "independent contractors" to serve one or more clients.

41. The workers are also "at will" employees who could be terminated at any time without cause.

42. The Worker Agreements include a non-competition clause that states:

> Non-Competition.[1]
>
> During the term of this Agreement and for one year after the termination of Contractor's relationship with SC/RP[2] for whatever reason, whether such termination was by SC/RP or Contractor, and whether with or without cause, Contractor agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:
>
> 1) Provide or attempt to provide directly or indirectly,

[1] The Strio worker agreement contains the identical provision, but only purports to assert the Non-Competition obligation for the benefit of Strio, not both Strio and RocketPower, as in the other agreements.

[2] As defined in the Worker Agreement, "SC" is "Strio" and "RP" is RocketPower.

> or advise others of the opportunity to provide, any Services to any Client:
>
> a. To which, within six (6) months prior to termination of Contractor's Agreement, Contractor has provided services in any capacity on behalf of SC/RP, or
>
> b. To which, within ninety (90) days prior to such termination of Contractor's Agreement, Contractor has been introduced or about which Contractor has received information through SC/RP or through any Client for which Contractor has performed Services in any capacity on behalf of SC/RP or;
>
> 2) Retain or attempt to retain, directly or indirectly, for Contractor or any other party, the Services of any person, including any of SC/RP's employees, who was providing services to or on behalf of SC/RP within ninety (90) day before the termination of Contractor's Agreement, and to whom Contractor has been introduced or about which Contractor has performed Services in any capacity on behalf of SC/RP. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of SC/RP's Clients for which Contractor performed or was assigned to perform Services under this Agreement.

43. The non-compete provisions contain no geographic or other scope limitations.

44. The exact terms of the Worker Agreements, including restrictive covenants, were not negotiated pre-offer of employment.

45. The Worker Agreements contain a provision that states the agreement "shall be governed, construed and determined according to the laws of the State of Minnesota."

46. The Worker Agreements requires RocketPower/Strio Employees to resolve disputes through arbitration in Minneapolis, Minnesota.

47. In direct conflict, in a separate section, the Worker Agreements also state: "[t]his Agreement will be governed by the law of the state in which the Services are primarily performed."

48. RocketPower did not review or approve the non-competition or choice of law provisions in the Worker Agreements.

49. Section 925 of the California Labor Code prohibits employers from requiring

employees who primarily reside in California to adjudicate claims that arise in California outside of California, or from depriving those employees of "substantive protection[s] of California law with respect to a controversy arising in California."

50. Pursuant to Section 925, such requirements are voidable.

51. Section 925 applies to all employment agreements executed on or after January 1, 2017.

52. All of the Worker Agreements at issue in this case were executed after January 1, 2017.

53. California Business and Professions Code section 16600 provides: "Except as provided in this chapter, every contract by which any one is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

54. Sections 16600 through 16607 do not include an exception allowing RocketPower/Strio to restrain its joint employees residing in California from engaging in their lawful possessions, trades, or businesses in the state of California.

**Strio's Failure to Make Payroll to Joint Employees in December 2018**

55. Strio failed to make payroll for at least 20 of the joint workers on at least two separate occasions: November 30, 2018 and December 14, 2018.

56. On information and belief, on other occasions in or about December 2018/January 2019, Strio grossly overpaid the joint workers and then, in an effort to correct its over-payment, clawed back more than had been overpaid. One example involved a joint worker who reported that she was paid $80,0000.00 for one pay period. When Strio attempted to correct the situation, it withdrew not only the overpayment, but also the amount that was actually due and owing for payroll that pay period.

57. As mentioned, on November 30, 2018, Strio missed payroll for a number of joint workers. RocketPower was required to step in and pay some of the employees directly via PayPal, which it did the following day.

58. Strio was assigned to pay other employees through a similar method, but on information and belief, these payments were made with significant delay and from personal bank

accounts, not from Strio-associated accounts.

**Strio's Threats Against RocketPower with Regard to Joint Employees**

59. On December 14, 2018, Strio's CEO, Caleb Fullhart, sent RocketPower's Chief Executive Officer, Mat Caldwell, the following hostile and threatening text message during a discussion around Strio's repeated failure to make payroll and making accounts receivable/accounts payable more accurate for both firms:

> Caleb: When are you back next week? I am coming out to SFO so we can chat face to face
>
> Mat: Next week won't work. Is Doris contacting Byron.
>
> Caleb: I already messaged him – if you aren't available face to face, we need to talk soon. You fucking pissing me off man. And you are fucking with my money. Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you want the nuclear option you will get it.
>
> Mat: Dude—don't go there. This is not what either of us wants.

60. Minted is a California based employer who has contracted with RocketPower for assistance with employee recruitment and staffing needs.

61. Reflektive is a California based employer that has contracted with RocketPower for assistance with employee recruitment and staffing needs.

62. Paula-Anne Sherron was hired by RocketPower to work for Minted.

63. On July 10, 2018, Sherron signed a Consultant Employment Agreement ("Sherron Agreement").

64. On January 29, 2018, Christine Covert was hired by RocketPower/Strio to work for Reflektive.

65. Ms. Covert's Statement of Work identified Mat Caldwell, CEO of RocketPower, as Reflektive's client contact.

66. On January 29, 2018, Ms. Covert signed a Consultant Employment Agreement

("Covert Agreement").[3]

67. Pursuant to their agreements, Ms. Covert and Ms. Sherron were hired as "independent contractors" to serve one more clients.

68. They were also "at will" employees who could be terminated at any time without cause.

69. Both the Sherron and Covert Agreements contained the non-competition clause set forth in Paragraph 42 above.[4]

70. Both Ms. Sherron and Ms. Covert work in California.

71. Both the Sherron and Covert Agreements contain the resolution of disputes provision and the conflicting choice of law provisions described in Paragraphs 45-47 above.

72. RocketPower did not review or approve the non-competition or choice of law provisions in the Sherron and Covert Agreements.

73. True to his threats, on April 22, 2019, Mr. Fullhart, through Strio's counsel, Kate Bischoff, sent a letter to a client of RocketPower, namely Saki Kravitz of Minted ("Kravitz Letter"), regarding Minted's direct hiring of Ms. Sherron.

74. Minted is a client of RocketPower and does not have a contractual relationship with Strio.

75. Minted is located in San Francisco, California and Ms. Sherron lives in and works primarily in California.

76. Ms. Sherron had previously been a joint employee of RocketPower/Strio, working on a Minted engagement.

77. In the Kravitz Letter, Ms. Bischoff threatened Minted with legal action based on Ms. Sherron's alleged breach of the Sherron Agreement that she had signed when she became a joint employee of RocketPower/Strio.

78. Ms. Bischoff also made negative and disparaging comments about RocketPower's

---

[3] The relevant terms of the Sherron and Covert Employment Agreements that are at issue in this action are identical.

[4] Both the Sherron and Covert Agreements purport to be with Strio only, not RocketPower and Strio, even though Ms. Sherron and Ms. Covert were jointly employed by RocketPower and Strio.

CEO, Mat Caldwell, and misrepresented the nature of Ms. Sherron's relationship with both Strio and RocketPower.

79. Although Ms. Sherron had been a joint employee of RocketPower/Strio, and had been placed with Minted based on RocketPower's contractual relationship with Minted, Ms. Bischoff misrepresented that Ms. Sherron had been the sole employee of Strio. Indeed, Ms. Sherron's cost was paid 100% by RocketPower, even though her work created a 50% profit margin for Strio.

80. Prior to accepting a position with Minted, Ms. Sherron had contacted RocketPower's CEO, Mat Caldwell, and requested permission to accept full-time employment with RocketPower's client.

81. Mr. Caldwell had approved Ms. Sherron's request.

82. Despite the fact that Ms. Sherron had been a joint employee of RocketPower/Strio and had been placed with Minted based on RocketPower's relationship with Minted, Ms. Bischoff asserted that Mr. Caldwell did "not have the authority to approve" a waiver of Ms. Sherron's unenforceable non-compete clause.

83. Ms. Bishoff's letter disparaged Mr. Caldwell by representing that he lacked the authority to allow one of his former employees to accept full time employment with one of his clients, per the standard conversion provision in RocketPower's Master Services Agreement with its clients which from Strio has continuously benefitted, and implying that neither Strio nor Minted had any knowledge of or connection to RocketPower.

84. On April 22, 2019, Ms. Bischoff sent a letter to Ms. Covert indicating that she had breached her Agreement with Strio.

85. Ms. Covert was, in fact, a joint employee of RocketPower/Strio.

86. Ms. Bischoff misrepresented that Ms. Covert had obtained employment at several locations, including Reflektive, Aptible, and Open Door through Strio's "client, RocketPower," when in fact Ms. Covert was a joint employee of RocketPower/Strio. Indeed, each of those clients for whom Ms. Covert was placed to perform services was a client of RocketPower's, not Strio's. Indeed, Ms. Covert's work was paid 100% by RocketPower, even though her work created a 50%

profit margin for Strio.

87. In her letter, Ms. Bischoff threatened RocketPower's employee with legal action for providing services she was contractually entitled to perform.

88. Strio has repeatedly misrepresented that it is the sole employer of RocketPower/Strio's joint employees.

89. On April 17, 2019, counsel for RocketPower sent a letter to Strio and its counsel notifying them that Nuro, one of RocketPower's clients, had informed RocketPower that Robin Schooling from Strio had contacted Nuro and indicated that Nuro's drivers "work for Strio." The Nuro executive had no idea who Ms. Schooling or Strio were and contacted RocketPower to inquire about Ms. Schooling and Strio. RocketPower informed Nuro that Strio provides services for RocketPower's employees. During this conversation with RocketPower, Nuro's executive made clear that Nuro wanted all executive communications to go through RocketPower only.

90. RocketPower's counsel also conveyed to Strio that Strio must not contact RocketPower's clients without first obtaining RocketPower's express permission.

91. RocketPower also warned Strio that contacting RocketPower's clients directly interfered with RocketPower's contractual relationships.

92. Strio's counsel responded with a letter dated April 19, 2019. Enclosed in that letter were the Sherron and Covert Agreements, both joint employees of RocketPower/Strio.

93. Strio's April 19, 2019 letter threatened litigation against RocketPower based on the unenforceable non-competition and non-solicitation clauses in the Sherron and Covert Agreements:

> [M]y client has been made aware of multiple Strio employees and contractors who have been solicited by RocketPower to work on non-Strio projects for which Strio is not being compensated. I have enclosed herewith copies of the contracts between Strio and two of its contractors, Paula-Anne Sherron and Christine Covert, who have been improperly solicited by RocketPower to work on such projects. Be advised that any work performed by Strio employees or contactors on such projects constitutes a breach of their respective contracts with Strio and any efforts by RocketPower to solicit, encourage, or entice Strio employees to work on such projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

94. Strio's relationship with Ms. Sherron, Ms. Covert, and the rest of the joint employees, exists solely because of RocketPower's contractual relationships with its client base.

95. Absent RocketPower's client base, Strio would not have any relationship with any of the joint employees.

96. As joint employees of RocketPower/Strio, Ms. Sherron and Ms. Covert performed work primarily in the state of California.

97. As such, the non-competition clauses of their respective employment agreements are void and unenforceable under California law.

98. Regardless, as its joint employer, RocketPower has the authority to waive any restrictive covenants Strio attempted to impose on their joint employees.

99. Upon information and belief, Strio has contacted other RocketPower clients and employees and made disparaging comments about RocketPower, Mr. Caldwell, and other RocketPower employees.

**FIRST CAUSE OF ACTION**

**(Declaratory Judgment)**

100. RocketPower realleges and incorporates paragraphs 1–99 of this Complaint as if fully set forth herein.

101. A justiciable controversy exists as to whether the restrictive covenants and choice of law provisions of the Worker Agreements are enforceable.

102. There is a present and actual controversy between RocketPower and Strio.

103. The parties' interests are adverse.

104. Strio is threatening to enforce a restrictive covenant, including non-compete and non-solicitation provisions, against joint-employees of Strio and RocketPower without RocketPower's consent. Strio is also claiming that RocketPower has intentionally interfered with Strio's contractual relationships with Strio's purported employees and contractors, including those restrictive covenants (even though those workers are jointly employed by both RocketPower and Strio).

105. RocketPower contends that the restrictive covenant provisions of the Agreements are

unenforceable as they relate to RocketPower and the joint workers for at least the following reasons:

a. The non-compete provisions of the Agreements are unenforceable under California law and cannot be enforced against any California worker pursuant to California Business and Professions Code section 16600, irrespective of any choice of law provision, under California Labor Code section 925;

b. RocketPower and Strio are joint employers of the workers for at least the following reasons:

i. RocketPower supervises and controls the workers' schedules and conditions of employment;

ii. RocketPower determines the rate and method of payment for all of the billable employees. For the few employees who are Strio internal overhead only, Strio determines the rate and method of payment with RocketPower's input;

iii. Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

iv. The Employee Handbook states that the workers are employees of both RocketPower and Strio;

v. Onboarding of employees is done by both RocketPower and Strio;

vi. Both have responded to employee complaints from various agencies as joint-employers;

vii. Responsibility under the Agreements could pass from one entity to the other without material changes; and

viii. The workers work exclusively for RocketPower clients. As such, Strio cannot enforce the restrictive covenants of the Worker Agreements against RocketPower, its joint-employer and intended co-beneficiary of the restrictive covenants;

c. The non-compete provisions of the Worker Agreements are overbroad, and contain

no geographical or other scope limitations;

d. The restrictive covenant and choice of law provisions of the Worker Agreements were not negotiated pre-offer of employment;

e. The restrictive covenant provisions of the Worker Agreements are not supported by additional consideration;

f. Strio cannot enforce the Worker Agreements pursuant to the doctrines of unclean hands and/or first breach, due to its failure to make payroll for the workers on at least two occasions in November and December 2018;

g. The Worker Agreements are vague and ambiguous in at least the following ways:

i. The Worker Agreements purport to be both an "independent contractor" agreement and "employment" agreement;

ii. The Worker Agreements contain two inconsistent choice of law provisions, one stating that the Worker Agreements "shall be governed, construed, and determined according to the laws of the State of Minnesota," and the other stating that the Worker Agreements "will be governed by the law of the state in which the Services are primarily performed";

h. Strio does not provide specialized training to RocketPower/Strio joint employees;

i. There is no Strio proprietary confidential information promised to or given to the joint employees;

j. There are no Strio trade secrets provided to the joint employees;

k. There is no customer goodwill on behalf of Strio retained by the employees, in fact many RocketPower contracted clients do not even know that Strio exists;

l. The majority of RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families;

m. RocketPower and Strio are complementary businesses who do not compete for the same clients; and

n. RocketPower and Strio do not have a non-solicitation or non-compete agreement

with each other.

106. RocketPower has a legally protectable interest in its employment relationship with the workers and in its contractual relationship with its clients and seeks to preserve those interests through this declaratory judgment.

107. These issues are ripe for the Court's determination.

108. Accordingly, RocketPower seeks a declaratory judgment from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

**SECOND CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations)**

109. RocketPower realleges and incorporates paragraphs 1–108 of this Complaint as if fully set forth herein.

110. RocketPower has binding and enforceable agreements with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies to provide advertising, screening, and identifying potential employees that will meet their clients' employment needs as follows: 1) in the recruiting process outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the staffing line of business, RocketPower directs the operations performance of the employees; and 3) in the staffing line of business, the clients provide primary operational direction.

111. Strio knew of these contracts as part of its work with RocketPower.

112. Upon information and belief, Strio has intentionally caused or induced RocketPower's clients to breach their agreements with RocketPower by, among other things, threatening litigation against them, defaming and disparaging Mat Caldwell, CEO of RocketPower, and misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

113. Strio's actions were without justification.

114. Strio acted wrongfully, with an improper purpose, and by improper means.

115. As a result of Strio's interference with the contractual and business relations,

RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

116. Because Strio's interference with RocketPower's contractual relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

117. Because Strio's interference with RocketPower's contractual and business relations was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**(Negligent Interference with Prospective Economic Advantage)**

118. RocketPower realleges and incorporates the foregoing paragraphs of the Complaint.

119. RocketPower has business relationships with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies concerning advertising, screening, and identifying potential employees that will meet their clients' employment needs. These relationships resulted in economic benefit to RocketPower.

120. Strio knew of these economic relationships as part of its work with RocketPower.

121. Strio knew or should have known that these relationships would be disrupted if it failed to act with reasonable care.

122. Strio failed to act with reasonable care by, among other things threatening litigation against RocketPower's clients, defaming and disparaging Mat Caldwell, CEO of RocketPower, and misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

123. Strio's actions were without justification.

124. RocketPower's relationships with its clients were disrupted.

125. Strio acted wrongfully, with an improper purpose, and by improper means.

126. As a result of Strio's interference with the contractual and business relations, RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

127. Because Strio's interference with RocketPower's prospective economic relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

128. Because Strio's interference with RocketPower's prospective advantage was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

**PLAINTIFF'S NEED FOR INJUNCTIVE RELIEF**

129. To prevent further intentional interference with RocketPower's contractual and prospective economic relations, it is reasonable and necessary that Strio be temporarily and permanently enjoined from misrepresenting the status of the workers' relationship with RocketPower, from disparaging and defaming Mat Caldwell, CEO of RocketPower, from contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants, and from seeking to enforce the invalid restrictive covenants of the Agreement against RocketPower and the joint workers.

130. As discussed in, among others, paragraphs 109 through 128, RocketPower will prevail on the merits on its common-law claims.

131. As discussed in, among others, paragraphs 116, 127, and 129, RocketPower will suffer immediate and irreparable harm, and cannot be sufficiently compensated by a judgment.

132. While RocketPower will suffer immediate and irreparable harm in the absence of preliminary and permanent injunctive relief, Strio will suffer no comparable loss from the imposition of injunctive relief.

133. The imposition of preliminary and permanent injunctive relief will serve public policy goals, including but not limited to fair competition and the freedom of employees to move without restraint on future work, as codified in California Business and Professions Code section 16600.

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff RocketPower respectfully requests judgment against Defendant Strio as follows:

1. A declaratory judgment that from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

2. For all actual damages, plus interest, in an amount to be determined at trial;

3. For punitive damages;

4. For attorneys' fees and costs as allowed by law;

5. For all costs and expenses of collection incurred through the collection of judgment, including reasonable attorneys' fees and legal expenses;

6. For a temporary and permanent injunction prohibiting Strio from: (1) misrepresenting the status of the workers' relationship with RocketPower; (2) disparaging and defaming Mat Caldwell, CEO of RocketPower; (3) contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants; (4) seeking to enforce the invalid restrictive covenants of the Agreement against RocketPower and the joint workers; (6) further interfering with RocketPower's current and prospective business relations; and (7) from engaging in other conduct that the Court may restrict in aid of these injunctions.

7. For such other relief as the Court deems just and proper.

Dated: April 30, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________
Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David Nied (SBN 136413) / Michael S. Dorsi (281865)
Ad Astra Law Group, LLP
582 Market Street, 17th Floor San Francisco CA 94104
TELEPHONE NO.: (415) 795-3579 FAX NO.: (415) 276-1976
ATTORNEY FOR (Name): RocketPower, Inc.

FOR COURT USE ONLY

FILED
San Francisco County Superior Court
APR 30 2019
CLERK OF THE COURT
BY: [signature] Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
RocketPower, Inc. v. Strio Consulting, Inc.

**CIVIL CASE COVER SHEET**

☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less)

**Complex Case Designation**
☐ Counter ☐ Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: CGC-19-575643
JUDGE:
DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. ☑ monetary b. ☑ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify)*: Three
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 30, 2019
Michael S. Dorsi
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller
    - Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

CASE NUMBER: CGC-19-575643 ROCKETPOWER INC. VS. STRIO CONSULTING, INC.

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **OCT-02-2019**

**TIME:** **10:30AM**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
05/10/2019
Clerk of the Court
BY: JUDITH NUNEZ
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

| | |
|---|---|
| ROCKETPOWER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STRIO CONSULTING, INC., a Minnesota corporation,<br><br>Defendant. | CASE NO.: CGC-19-575643<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY JUDGMENT;**<br>**(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br>**(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND**<br>**(4) UNFAIR COMPETITION**<br><br>**DAMAGES AND INJUNCTIVE RELIEF REQUESTED** |

1. Plaintiff RocketPower, Inc. seeks a declaratory judgment pursuant to California Code of Civil Procedure sections 1060 et seq., that non-compete provisions in employment agreements — agreements that Strio Consulting, Inc. purported to prepare on behalf of RocketPower and Strio — are void and unenforceable against RocketPower and the joint workers of RocketPower and Strio under California law and on other grounds.

**THE PARTIES**

2. RocketPower, Inc., is a Delaware corporation, with its primary place of business located at Two Embarcadero Center, San Francisco, California.

3. Strio Consulting, Inc., is a Minnesota corporation with its primary place of business located at 1390 Neal Avenue North, Lake Elmo, Minnesota.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction and is the appropriate venue because Strio, through its relationship with RocketPower, availed itself of the protection of the laws of the State of California, and liability arose in San Francisco, California, where RocketPower suffered injury resulting from Strio's conduct. Strio's liability, as set forth in this First Amended Complaint, exceeds $25,000.

**GENERAL ALLEGATIONS**

5. RocketPower provides talent solutions to rapidly growing companies by: 1) providing recruiting process outsourcing/contract recruiters; 2) providing outsourced/contract staffing for hourly positions such as autonomous vehicle operators and customer service specialists; and 3) providing executive search services.

6. Strio is a consulting business that provides back office services for RocketPower and RocketPower's clients including payroll, employee benefits, and related services.

7. RocketPower establishes relationships and contracts with clients who are companies in need of workers.

8. RocketPower's clients contract with RocketPower for assistance with finding and hiring, placement, management, and supervision of workers to meet their business needs. All relevant client contracts are between the client and RocketPower. Strio is not a party to any relevant client contracts.

**RocketPower/Strio Joint Employment of Workers**

9.     RocketPower and Strio have a verbal agreement to provide different services to RocketPower's clients, with RocketPower being primarily responsible for advertising, screening, and identifying potential employees who will meet their clients' employment needs as follows: 1) in the Recruiting Process Outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the Outsourced/Contract staffing line of business, RocketPower clients direct the operations performance of the employees; and 3) in the Executive Search staffing line of business, RocketPower provides primary operational direction.

10.     RocketPower uses Strio services for some of its services to clients, but not all.

11.     RocketPower and Strio do not have an exclusive business relationship. RocketPower/Strio's joint workers are not prohibited from working on assignments that involve RocketPower clients with whom Strio has no contacts, involvement, or relationships.

12.     When RocketPower's clients identify a hiring need, they contact RocketPower, who then advertises the position and begins soliciting qualified candidates to apply for the position.

13.     The team that screens and then extends offers to the applicants is made up of both RocketPower-payroll and Strio-payroll employees.  The operational control and business processes are governed by RocketPower.  A verbal offer to the candidate is made telephonically by either a RocketPower or Strio employee, who is a member of that team.

14.     Following the verbal offer made to the candidate, the written confirmation is sent by the same RocketPower or Strio employee who made the verbal offer to the candidate.

15.     The RocketPower or Strio employee who sent the written offer then alerts a recruiting coordinator who is also operationally controlled by RocketPower.  Strio employees execute the required final paperwork; those specific internal support Strio employees are paid 50% by RocketPower (even though these Strio employees are not joint workers).  The required final paperwork includes a statement of work that defines the scope of the new hire's job responsibilities based on RocketPower's specifications, and an employment agreement.  The employment agreements at issue here were drafted by Strio, without RocketPower input.  The employment agreement is then executed electronically by the new hire.

16. After the new hire signs the employment agreement, he or she becomes a joint employee of RocketPower and Strio. Strio is responsible for providing payroll services, employee benefits, and other day-to-day services for the new hire, at RocketPower's specification.

17. RocketPower funds 100% of the billable workers' wages. The workers are directed 100% by RocketPower or RocketPower clients.

18. The workers are joint employees of both RocketPower and Strio. Depending on the line of business, RocketPower, or RocketPower's clients, control and supervise the day-to-day activities of the workers. Strio provides limited services and is only responsible for employee relations matters such as disciplinary issues and termination actions, done in collaboration with RocketPower.

19. RocketPower and Strio are joint employers of the workers for at least the following reasons:

    a. RocketPower supervises and controls the workers' schedules and conditions of employment;

    b. RocketPower determines the rate and method of payment for all of the billable employees. For the few workers who are Strio internal overhead employees only, Strio determines the rate and method of payment with RocketPower's input;

    c. Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

    d. The Employee Handbook states that the workers are employees of both RocketPower and Strio;

    e. Onboarding of the workers is done by both RocketPower and Strio;

    f. Both RocketPower and Strio have responded to employee complaints from various agencies as joint-employers;

    g. Responsibility under the Agreements could pass from one entity to the other without material changes; and

    h. The workers work exclusively for RocketPower clients. As such, Strio cannot enforce the restrictive covenants of the Agreements against RocketPower, its joint-

employer and intended co-beneficiary of the restrictive covenants.

20.     Strio does not assign pre-existing Strio employees to RocketPower contracted assignments.

21.     RocketPower initiates requests for hiring new employees to work on RocketPower contracted assignments.

22.     RocketPower manages the hiring process for hiring new hires for RocketPower contracted assignments.

23.     Strio does not assign joint employees to any new projects where Strio has a direct contact with a RocketPower client when a RocketPower contract assignment ends.

24.     The joint employment of RocketPower/Strio's employees is made possible exclusively by RocketPower's contracted client relationships.

25.     Strio does not provide specialized training to RocketPower/Strio joint employees.

26.     There is no Strio proprietary confidential information promised to or given to the joint employees.

27.     There are no Strio trade secrets provided to the joint employees.

28.     There is no customer goodwill on behalf of Strio retained by the employees; in fact, many RocketPower contracted clients do not even know that Strio exists.

29.     RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families.

30.     RocketPower and Strio are complementary businesses who do not compete for the same clients.

31.     RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

32.     RocketPower invoices all of its clients directly for the services its workers provide for them.

33.     RocketPower's clients generally submit payment for the invoiced work with 25 to 45 days of receiving the payment.

34. After receiving payment from its clients, RocketPower deposits the funds in a joint account shared by RocketPower and Strio.

35. RocketPower/Strio currently jointly employ approximately 165 workers and approximately 86 of those joint workers reside and work primarily in California.

**The Agreements at Issue**

36. There are at least two types of Employment Agreements that Strio has been presenting to the joint workers for signature.

37. The first is styled "Independent Contractor Agreement" with a "Statement of Work" attached. The second is styled "Consultant Employment Agreement" with a "Statement of Work" attached. The two agreements are referred to hereafter collectively as "the Worker Agreements."

38. Some of Worker Agreements purport to be between the worker and Strio only. Some of the Worker Agreements purport to be between the worker and both Strio and RocketPower.

39. The material provisions of the Worker Agreements are essentially identical.

40. The Worker Agreements provide that the workers are hired as "independent contractors" to serve one or more clients.

41. The workers are also "at will" employees who could be terminated at any time without cause.

42. The Worker Agreements include a non-competition clause that states:

> Non-Competition.[1]
> During the term of this Agreement and for one year after the termination of Contractor's relationship with SC/RP[2] for whatever reason, whether such termination was by SC/RP or Contractor, and whether with or without cause, Contractor agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:
> 1) Provide or attempt to provide directly or indirectly,

[1] The Strio worker agreement contains the identical provision, but only purports to assert the Non-Competition obligation for the benefit of Strio, not both Strio and RocketPower, as in the other agreements.

[2] As defined in the Worker Agreement, "SC" is "Strio" and "RP" is RocketPower.

> or advise others of the opportunity to provide, any Services to any Client:
>
> a. To which, within six (6) months prior to termination of Contractor's Agreement, Contractor has provided services in any capacity on behalf of SC/RP, or
>
> b. To which, within ninety (90) days prior to such termination of Contractor's Agreement, Contractor has been introduced or about which Contractor has received information through SC/RP or through any Client for which Contractor has performed Services in any capacity on behalf of SC/RP or;
>
> 2) Retain or attempt to retain, directly or indirectly, for Contractor or any other party, the Services of any person, including any of SC/RP's employees, who was providing services to or on behalf of SC/RP within ninety (90) day before the termination of Contractor's Agreement, and to whom Contractor has been introduced or about which Contractor has performed Services in any capacity on behalf of SC/RP. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of SC/RP's Clients for which Contractor performed or was assigned to perform Services under this Agreement.

43. The non-compete provisions contain no geographic or other scope limitations.

44. The exact terms of the Worker Agreements, including restrictive covenants, were not negotiated pre-offer of employment.

45. The Worker Agreements contain a provision that states the agreement "shall be governed, construed and determined according to the laws of the State of Minnesota."

46. The Worker Agreements requires RocketPower/Strio employees to resolve disputes through arbitration in Minneapolis, Minnesota.

47. In direct conflict, in a separate section, the Worker Agreements also state: "[t]his Agreement will be governed by the law of the state in which the Services are primarily performed."

48. RocketPower did not review or approve the non-competition or choice of law provisions in the Worker Agreements.

49. Section 925 of the California Labor Code prohibits employers from requiring

employees who primarily reside in California to adjudicate claims that arise in California outside of California, or from depriving those employees of "substantive protection[s] of California law with respect to a controversy arising in California."

50. Pursuant to Section 925, such requirements are voidable.

51. Section 925 applies to all employment agreements executed on or after January 1, 2017.

52. All of the Worker Agreements at issue in this case were executed after January 1, 2017.

53. California Business and Professions Code section 16600 provides: "Except as provided in this chapter, every contract by which any one is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

54. Sections 16600 through 16607 do not include an exception allowing RocketPower/Strio to restrain its joint employees residing in California from engaging in their lawful possessions, trades, or businesses in the state of California.

**Strio's Failure to Make Payroll to Joint Employees in December 2018**

55. Strio failed to make payroll for at least 20 of the joint workers on at least two separate occasions: November 30, 2018 and December 14, 2018.

56. On information and belief, on other occasions in or about December 2018/January 2019, Strio grossly overpaid the joint workers and then, in an effort to correct its over-payment, clawed back more than had been overpaid. One example involved a joint worker who reported that she was paid $80,0000.00 for one pay period. When Strio attempted to correct the situation, it withdrew not only the overpayment, but also the amount that was actually due and owing for payroll that pay period.

57. As mentioned, on November 30, 2018, Strio missed payroll for a number of joint workers. RocketPower was required to step in and pay some of the employees directly via PayPal, which it did the following day.

58. Strio was assigned to pay other employees through a similar method, but on information and belief, these payments were made with significant delay and from personal bank

accounts, not from Strio-associated accounts.

**Strio's Threats Against RocketPower with Regard to Joint Employees**

59. On December 14, 2018, Strio's CEO, Caleb Fullhart, sent RocketPower's Chief Executive Officer, Mat Caldwell, the following hostile and threatening text message during a discussion around Strio's repeated failure to make payroll and making accounts receivable/accounts payable more accurate for both firms:

> Caleb: When are you back next week? I am coming out to SFO so we can chat face to face
>
> Mat: Next week won't work. Is Doris contacting Byron.
>
> Caleb: I already messaged him – if you aren't available face to face, we need to talk soon. You fucking pissing me off man. And you are fucking with my money. Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you want the nuclear option you will get it.
>
> Mat: Dude—don't go there. This is not what either of us wants.

60. Minted is a California based employer who has contracted with RocketPower for assistance with employee recruitment and staffing needs.

61. Reflektive is a California based employer that has contracted with RocketPower for assistance with employee recruitment and staffing needs.

62. Paula-Anne Sherron was hired by RocketPower to work for Minted.

63. On July 10, 2018, Sherron signed a Consultant Employment Agreement ("Sherron Agreement").

64. On January 29, 2018, Christine Covert was hired by RocketPower/Strio to work for Reflektive.

65. Ms. Covert's Statement of Work identified Mat Caldwell, CEO of RocketPower, as Reflektive's client contact.

66. On January 29, 2018, Ms. Covert signed a Consultant Employment Agreement

("Covert Agreement").[3]

67. Pursuant to their agreements, Ms. Covert and Ms. Sherron were hired as "independent contractors" to serve one more clients.

68. They were also "at will" employees who could be terminated at any time without cause.

69. Both the Sherron and Covert Agreements contained the non-competition clause set forth in Paragraph 42 above.[4]

70. Both Ms. Sherron and Ms. Covert work in California.

71. Both the Sherron and Covert Agreements contain the resolution of disputes provision and the conflicting choice of law provisions described in Paragraphs 45-47 above.

72. RocketPower did not review or approve the non-competition or choice of law provisions in the Sherron and Covert Agreements.

73. True to his threats, on April 22, 2019, Mr. Fullhart, through Strio's counsel, Kate Bischoff, sent a letter to a client of RocketPower, namely Saki Kravitz of Minted ("Kravitz Letter"), regarding Minted's direct hiring of Ms. Sherron.

74. Minted is a client of RocketPower and does not have a contractual relationship with Strio.

75. Minted is located in San Francisco, California and Ms. Sherron lives in and works primarily in California.

76. Ms. Sherron had previously been a joint employee of RocketPower/Strio, working on a Minted engagement.

77. In the Kravitz Letter, Ms. Bischoff threatened Minted with legal action based on Ms. Sherron's alleged breach of the Sherron Agreement that she had signed when she became a joint employee of RocketPower/Strio.[5]

---

[3] The relevant terms of the Sherron and Covert Employment Agreements that are at issue in this action are identical.

[4] Both the Sherron and Covert Agreements purport to be with Strio only, not RocketPower and Strio, even though Ms. Sherron and Ms. Covert were jointly employed by RocketPower and Strio.

[5] RocketPower includes this allegation not because RocketPower seeks to impose liability based on threats of litigation — it does not. Rather, RocketPower seeks to provide a full picture of events.

78. Ms. Bischoff also made negative and disparaging comments about RocketPower's CEO, Mat Caldwell, and misrepresented the nature of Ms. Sherron's relationship with both Strio and RocketPower.

79. Although Ms. Sherron had been a joint employee of RocketPower/Strio, and had been placed with Minted based on RocketPower's contractual relationship with Minted, Ms. Bischoff misrepresented that Ms. Sherron had been the sole employee of Strio. Indeed, Ms. Sherron's cost was paid 100% by RocketPower, even though her work created a 50% profit split for Strio.

80. Prior to Ms. Sherron accepting a full-time position with Minted, Minted contacted RocketPower's CEO, Mat Caldwell, and requested permission to offer Ms. Sherron full-time employment with Minted.

81. Mr. Caldwell approved Minted's request.

82. Despite the fact that Ms. Sherron had been a joint employee of RocketPower/Strio and had been placed with Minted based on RocketPower's relationship with Minted, Ms. Bischoff asserted that Mr. Caldwell did "not have the authority to approve" a waiver of Ms. Sherron's unenforceable non-compete clause.

83. Ms. Bishoff's letter disparaged Mr. Caldwell by representing that he lacked the authority to allow one of his clients to offer former employees full time employment with one of RocketPower's clients, per the standard conversion provision[6] in RocketPower's Master Services Agreement with its clients which from Strio has continuously benefitted, and implying that neither Strio nor Minted had any knowledge of or connection to RocketPower.

84. On April 22, 2019, Ms. Bischoff sent a letter to Ms. Covert indicating that she had breached her Agreement with Strio.

85. Ms. Covert was, in fact, a joint employee of RocketPower/Strio.

86. Ms. Bischoff misrepresented that Ms. Covert had obtained employment at several locations, including Reflektive, Aptible, and Open Door through Strio's "client, RocketPower,"

[6] The Master Services Agreement gives RocketPower the authority, and imposes a contractual obligation on RocketPower, to allow its clients to offer full time employment to workers that RocketPower has placed with its clients.

when in fact Ms. Covert was a joint employee of RocketPower/Strio. Indeed, each of those clients for whom Ms. Covert was placed to perform services was a client of RocketPower's, not Strio's. Indeed, Ms. Covert's work was paid 100% by RocketPower, even though her work created a 50% profit split for Strio.

87. In her letter, Ms. Bischoff threatened RocketPower's employee with legal action for providing services she was contractually entitled to perform.

88. Strio has repeatedly misrepresented that it is the sole employer of RocketPower/Strio's joint employees.

89. On April 17, 2019, counsel for RocketPower sent a letter to Strio and its counsel notifying them that Nuro, one of RocketPower's clients, had informed RocketPower that Robin Schooling from Strio had contacted Nuro and indicated that Nuro's drivers "work for Strio." The Nuro executive had no idea who Ms. Schooling or Strio were and contacted RocketPower to inquire about Ms. Schooling and Strio. RocketPower informed Nuro that Strio provides services for RocketPower's employees. During this conversation with RocketPower, Nuro's executive made clear that Nuro wanted all executive communications to go through RocketPower only.

90. RocketPower's counsel also conveyed to Strio that Strio must not contact RocketPower's clients without first obtaining RocketPower's express permission.

91. RocketPower also warned Strio that contacting RocketPower's clients directly interfered with RocketPower's contractual relationships.

92. Strio's counsel responded with a letter dated April 19, 2019. Enclosed in that letter were the Sherron and Covert Agreements, both joint employees of RocketPower/Strio.

93. Strio's April 19, 2019 letter threatened litigation against RocketPower based on the unenforceable non-competition and non-solicitation clauses in the Sherron and Covert Agreements:

> [M]y client has been made aware of multiple Strio employees and contractors who have been solicited by RocketPower to work on non-Strio projects for which Strio is not being compensated. I have enclosed herewith copies of the contracts between Strio and two of its contractors, Paula-Anne Sherron and Christine Covert, who have been improperly solicited by RocketPower to work on such projects. Be advised that any work performed by Strio employees or contactors on such projects constitutes a breach of their respective contracts with Strio and any efforts by RocketPower to solicit,

> encourage, or entice Strio employees to work on such projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

94. Ms. Sherron and Ms. Covert, and the rest of the joint employees, were joint employees of RocketPower and Strio solely because of RocketPower's contractual relationships with its client base.

95. Absent RocketPower's client base, Ms. Sherron, Ms. Covert and the rest of the joint employees would not have been joint employees of RocketPower and Strio.

96. As joint employees of RocketPower/Strio, Ms. Sherron and Ms. Covert performed work primarily in the state of California.

97. As such, the non-competition clauses of their respective employment agreements are void and unenforceable under California law.

98. Regardless, as its joint employer, RocketPower has the authority to waive any restrictive covenants Strio attempted to impose on their joint employees.

99. Upon information and belief, Strio has contacted other RocketPower clients and employees and made disparaging comments about RocketPower, Mr. Caldwell, and other RocketPower employees.

**FIRST CAUSE OF ACTION**

**(Declaratory Judgment)**

100. RocketPower realleges and incorporates paragraphs 1–99 of this First Amended Complaint as if fully set forth herein.

101. A justiciable controversy exists as to whether the restrictive covenants and choice of law provisions of the Worker Agreements are enforceable.

102. There is a present and actual controversy between RocketPower and Strio.

103. The parties' interests are adverse.

104. Strio is threatening to enforce a restrictive covenant, including non-compete and non-solicitation provisions, against joint-employees of Strio and RocketPower without RocketPower's consent. Strio is also claiming that RocketPower has intentionally interfered with Strio's contractual relationships with Strio's purported employees and contractors, including those

restrictive covenants (even though those workers are jointly employed by both RocketPower and Strio).

105. RocketPower contends that the restrictive covenant provisions of the Agreements are unenforceable as they relate to RocketPower and the joint workers for at least the following reasons:

a. The non-compete provisions of the Agreements are unenforceable under California law and cannot be enforced against any California worker pursuant to California Business and Professions Code section 16600, irrespective of any choice of law provision, under California Labor Code section 925;

b. RocketPower and Strio are joint employers of the workers for at least the following reasons:

i. RocketPower supervises and controls the workers' schedules and conditions of employment;

ii. RocketPower determines the rate and method of payment for all of the billable employees. For the few employees who are Strio internal overhead only, Strio determines the rate and method of payment with RocketPower's input;

iii. Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

iv. The Employee Handbook states that the workers are employees of both RocketPower and Strio;

v. Onboarding of employees is done by both RocketPower and Strio;

vi. Both have responded to employee complaints from various agencies as joint-employers;

vii. Responsibility under the Agreements could pass from one entity to the other without material changes; and

viii. The workers work exclusively for RocketPower clients. As such, Strio cannot enforce the restrictive covenants of the Worker Agreements against

RocketPower, its joint-employer and intended co-beneficiary of the restrictive covenants;

c. The non-compete provisions of the Worker Agreements are overbroad, and contain no geographical or other scope limitations;

d. The restrictive covenant and choice of law provisions of the Worker Agreements were not negotiated pre-offer of employment;

e. The restrictive covenant provisions of the Worker Agreements are not supported by additional consideration;

f. Strio cannot enforce the Worker Agreements pursuant to the doctrines of unclean hands and/or first breach, due to its failure to make payroll for the workers on at least two occasions in November and December 2018;

g. The Worker Agreements are vague and ambiguous in at least the following ways:

i. The Worker Agreements purport to be both an "independent contractor" agreement and "employment" agreement;

ii. The Worker Agreements contain two inconsistent choice of law provisions, one stating that the Worker Agreements "shall be governed, construed, and determined according to the laws of the State of Minnesota," and the other stating that the Worker Agreements "will be governed by the law of the state in which the Services are primarily performed";

h. Strio does not provide specialized training to RocketPower/Strio joint employees;

i. There is no Strio proprietary confidential information promised to or given to the joint employees;

j. There are no Strio trade secrets provided to the joint employees;

k. There is no customer goodwill on behalf of Strio retained by the employees, in fact many RocketPower contracted clients do not even know that Strio exists;

l. The majority of RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families;

    m. RocketPower and Strio are complementary businesses who do not compete for the same clients; and

n. RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

106. RocketPower has a legally protectable interest in its employment relationship with the workers and in its contractual relationship with its clients and seeks to preserve those interests through this declaratory judgment.

107. These issues are ripe for the Court's determination.

108. Accordingly, RocketPower seeks a declaratory judgment from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

**SECOND CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations)**

109. RocketPower realleges and incorporates paragraphs 1–108 of this First Amended Complaint as if fully set forth herein.

110. RocketPower has binding and enforceable agreements with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies to provide advertising, screening, and identifying potential employees that will meet their clients' employment needs as follows: 1) in the recruiting process outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the staffing line of business, RocketPower directs the operations performance of the employees; and 3) in the staffing line of business, the clients provide primary operational direction.

111. Strio knew of these contracts as part of its work with RocketPower.

112. Upon information and belief, Strio has intentionally caused or induced RocketPower's clients to breach their agreements with RocketPower by, among other things, defaming and disparaging Mat Caldwell, CEO of RocketPower, and misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

113. Strio's actions were without justification.

114. Strio acted wrongfully, with an improper purpose, and by improper means.

115. As a result of Strio's interference with the contractual and business relations, RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

116. Because Strio's interference with RocketPower's contractual relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

117. Because Strio's interference with RocketPower's contractual and business relations was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**(Negligent Interference with Prospective Economic Advantage)**

118. RocketPower realleges and incorporates paragraphs 1–117 of this First Amended Complaint as if fully set forth herein.

119. RocketPower has business relationships with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies concerning advertising, screening, and identifying potential employees that will meet their clients' employment needs. These relationships resulted in economic benefit to RocketPower.

120. Strio knew of these economic relationships as part of its work with RocketPower.

121. Strio knew or should have known that these relationships would be disrupted if it failed to act with reasonable care.

122. Strio failed to act with reasonable care by, among other things defaming and disparaging Mat Caldwell, CEO of RocketPower, and misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

123. Strio's actions were without justification.

124. RocketPower's relationships with its clients were disrupted.

125. Strio acted wrongfully, with an improper purpose, and by improper means.

126. As a result of Strio's interference with the contractual and business relations, RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

127. Because Strio's interference with RocketPower's prospective economic relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

128. Because Strio's interference with RocketPower's prospective advantage was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Unfair Competition — Business & Professions Code § 17200 et seq.)**

129. RocketPower realleges and incorporates paragraphs 1–128 of this First Amended Complaint as if fully set forth herein.

130. Strio, by engaging in the wrongful conduct alleged in this First Amended Complaint, engaged in unlawful, unfair, and/or fraudulent business practices within the meaning of California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law").

131. Use of covenants not to compete, in violation of Business and Professions Code section 16600, is an unlawful business practice actionable as unfair competition under the Unfair Competition Law.

132. Soliciting employees to sign covenants not to compete, which are void under Business and Professions Code section 16600, without informing the employees that the provision is void, is an unfair and/or fraudulent business practice under the Unfair Competition Law.

133. Requiring employees who primarily reside in California to adjudicate claims that arise in California outside of California, or from depriving those employees of "substantive protection[s] of California law with respect to a controversy arising in California," violates California Labor Code, section 925.

134. Requiring employees to adjudicate claims outside of California and depriving

employees of the substantive protections of California law, in violation of California Labor Code section 925, is an unfair and/or fraudulent business practice under the Unfair Competition Law.

135. Strio sought and obtained employee signatures on agreements containing covenants not to compete that are void under Business and Professions Code section 16600.

136. Strio sought and obtained employee signatures on agreements containing restrictions contrary to Labor Code section 925.

137. RocketPower lost money and/or property as a result of Strio's unlawful, unfair, and/or fraudulent business practices concerning covenants not to compete and deprivation of the California forum and law, impairing RocketPower's business relationships and its ability to place talented individuals with client companies.

138. Strio's violation of the Unfair Competition Law entitles RocketPower to restitution and disgorgement of profit and revenue obtained by Strio as a result of such wrongful business conduct, in an amount according to proof.

139. RocketPower is entitled to declaratory and injunctive relief under the Unfair Competition Law. It lacks an adequate remedy at law because of the irreparable and unquantifiable ongoing injury that results from Strio's unfair competition. California law authorizes injunctive relief to protect businesses from unfair competition.

## PLAINTIFF'S NEED FOR INJUNCTIVE RELIEF

140. To prevent further intentional interference with RocketPower's contractual and prospective economic relations, it is reasonable and necessary that Strio be temporarily and permanently enjoined from misrepresenting the status of the workers' relationship with RocketPower, from disparaging and defaming Mat Caldwell, CEO of RocketPower, and from contacting RocketPower clients and joint employees seeking to solicit signatures on agreements containing unenforceable restrictive covenants.

141. As discussed in, among others, paragraphs 109 through 128, RocketPower will prevail on the merits on its common-law claims.

142. As discussed in, among others, paragraphs 116, 127, and 129, RocketPower will suffer immediate and irreparable harm, and cannot be sufficiently compensated by a judgment.

143. While RocketPower will suffer immediate and irreparable harm in the absence of preliminary and permanent injunctive relief, Strio will suffer no comparable loss from the imposition of injunctive relief.

144. The imposition of preliminary and permanent injunctive relief will serve public policy goals, including but not limited to fair competition and the freedom of employees to move without restraint on future work, as codified in California Business and Professions Code section 16600.

**PRAYER FOR RELIEF**

WHEREFORE, RocketPower respectfully requests judgment against Strio as follows:

1. A declaratory judgment that from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

2. For all actual damages, plus interest, in an amount to be determined at trial;

3. For punitive damages;

4. For attorneys' fees and costs as allowed by law;

5. For all costs and expenses of collection incurred through the collection of judgment, including reasonable attorneys' fees and legal expenses;

6. For a temporary and permanent injunction prohibiting Strio from: (1) misrepresenting the status of the workers' relationship with RocketPower; (2) disparaging and defaming Mat Caldwell, CEO of RocketPower; (3) contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants; (4) further interfering with RocketPower's current and prospective business relations; and (5) from engaging in other conduct that the Court may restrict in aid of these injunctions.

7. For such other relief as the Court deems just and proper.

Dated: May 10, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________

Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
05/10/2019
Clerk of the Court
BY: VANESSA WU
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED DIVISION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**NOTICE OF ASSOCIATED CASE**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that there is a case pending associated with this case. The associated case is *Strio Consulting, Inc., v. Rocket Power, Inc.*, United States District Court for the District of Minnesota case no. 0:19-cv-01048, filed on April 17, 2019. The action in Minnesota was filed before this action. Both actions arise out of the business relationship between plaintiff RocketPower and defendant Strio.

Plaintiff RocketPower offers this notice for notice purposes only. This Court should not take any action relating or otherwise coordinating these cases because the two cases arise in separate states and court systems, and a stay or dismissal of this case based on the doctrine of *foreign non conveniens* would not be appropriate.

Dated: May 10, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________

Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**05/10/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**PLAINTIFF'S EX PARTE MOTION FOR ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

Date: May 13, 2019
Time: 11:00 a.m.
Dept: 302
Judge: Hon. Ethan P. Schulman

Complaint filed: April 30, 2019

**EX PARTE MOTION**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

On Monday May 13, 2019, at 11:00 a.m., in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California, 94102, plaintiff RocketPower, Inc. will and does hereby move, ex parte, for an order to show cause why a preliminary injunction should not be issued. Plaintiff's Motion is supported by the attached Memorandum of Points and Authorities, the Declaration of Michael S. Dorsi, the attached Exhibit, and any other materials this Court may consider.

The underlying request for a preliminary injunction is supported by the separately filed Memorandum of Points and Authorities in Support of Issuance of a Preliminary Injunction, the supporting declarations, the exhibits attached to those declarations, and any other materials this Court may consider.

This application seeks an order to show cause why a preliminary injunction should not issue, with the preliminary injunction requiring Defendant Strio Consulting, Inc., by its own actions and/or by directing its agents, to refrain from: (1) misrepresenting the status of the workers' relationship with RocketPower; (2) disparaging and defaming Mat Caldwell, CEO of RocketPower; (3) contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants; and (4) further interfering with RocketPower's current and prospective business relations. Plaintiff asks that this Court set June 11, 2019, as the hearing date, and set a briefing schedule for the Order to Show Cause in accord with California Code of Civil Procedure section 1005.[1]

Dated: May 10, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________
Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

---

[1] At this time, Plaintiffs are not requesting a Temporary Restraining Order or an evidentiary hearing.

## MEMORNADUM OF POINTS AND AUTHORITIES

### I. BACKGROUND

On April 30, 2019, plaintiff RocketPower, Inc. filed its Complaint. The Complaint alleges that defendant Strio Consulting, Inc. is engaging in an ongoing pattern of interference with Plaintiff's relationships with businesses and employees. Specifically, Strio seeks to impose and enforce covenants not to compete that are contrary to California law. Strio's conduct continued unabated after the filing of the Complaint. RocketPower now seeks a preliminary injunction. RocketPower had Strio personally served with the Complaint and gave notice of this ex parte appearance by email. Strio has not yet appeared, necessitating this ex parte appearance.

### II. LEGAL ARGUMENT

A party seeking a preliminary injunction may ordinarily elect between a noticed motion and a specially-scheduled order to show cause. However, if the defendant has not appeared, the plaintiff must obtain an order to show cause. Cal. R. Ct. 3.1150(a); *see also* Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, ¶9:573 (The Rutter Group 2018). Defendant Strio has not made any appearance, necessitating RocketPower using the Order to Show Cause procedure.

Strio is actively attempting to interfere with RocketPower's contracts. Strio's conduct, aimed at non-compete provisions, runs counter to California's public policy against non-compete agreements and favoring the adjudication of employment agreements in California. *See* Cal. Bus. & Prof. Code § 16600, Cal. Labor Code § 925. As explained in the merits briefing, RocketPower cannot reasonably wait for Strio to appear before seeking relief. Waiting for Strio to appear could more than double the time before RocketPower can obtain preliminary relief. Accordingly, RocketPower requests that this Court set a hearing on June 11, 2019, with briefing set on the ordinary schedule set out in Code of Civil Procedure section 1005.

Dated: May 10, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________

Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

**DECLARATION OF MICHAEL S. DORSI**

I, Michael S. Dorsi, declare:

1. I am an attorney licensed to practice in the State of California, and Associate for Ad Astra Law Group, LLP, attorneys for plaintiff RocketPower, Inc. I have personal knowledge of the facts stated in this Declaration and, if called as a witness, could and would testify competently thereto.

2. On Thursday, May 9, 2019, I emailed Caleb Fullhart, CEO of Strio, and Tyler Brimmer of the law firm of Fafinski Mark & Johnson, who I understand is counsel for Strio in other matters. In the email message, I gave notice of this ex parte appearance, offered to assist with arrangements for Strio to appear by telephone, and stated that I would not be seeking a temporary restraining order at this time. Attached to this Declaration as Exhibit A is a true and correct copy of this email message.

3. After emailing Mr. Fullhart and Mr. Brimmer, I received a response from James D. McNairy of the law firm of Boutin Jones Inc. in Sacramento, California. Mr. McNairy informed me that his firm represents Strio in this matter. I have been in contact with Mr. McNairy and will be able to update the Court on our discussions, including any appropriate modifications to the briefing date and hearing schedule, at the hearing on Monday, May 13, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 10th day of May, 2019, at San Francisco, California.

By ______________________
Michael S. Dorsi

# Exhibit A

Exhibit A

**Michael Dorsi**

**From:** Michael Dorsi
**Sent:** Friday, May 10, 2019 8:53 AM
**To:** Caleb@strioconsulting.com
**Cc:** Tyler Brimmer; Lisa Petersen
**Subject:** RocketPower v. Strio: Notice of Ex Parte Appearance

Mr. Fullhart:

I represent RocketPower, Inc. in the civil lawsuit titled *RocketPower, Inc. v. Strio, Inc.*, San Francisco Superior Court case no. CGC-19-575643. I have copied Tyler Brimmer, who I know is your attorney in another matter. If Mr. Brimmer will represent you in this matter, please let me know. If you have a different attorney who I should contact, please deliver this message to your attorneys and ask them to contact me directly.

This message is to give you notice that I will be appearing in court next Monday to obtain an Order to Show Cause re preliminary injunction. This is a procedure used in California courts to schedule certain hearings, including early hearings on preliminary injunctions.

Accordingly, PLEASE TAKE NOTICE that on Monday, May 13, 2019, at 11:00 a.m. in San Francisco Superior Court, Department 302, San Francisco, California, 94102, plaintiff RocketPower, Inc. will appear ex parte seeking an order to show cause why a preliminary injunction should not be issued. We will be asking the Court to set a hearing on our motion for a preliminary injunction on June 11, 2019. If the Court sets that date and imposes the ordinary California state court briefing schedule, your written opposition papers will be due on May 29, 2019. To be clear, on Monday we are seeking a scheduling order with a briefing schedule, not an immediate temporary restraining order. Only after the preliminary injunction would Strio be restrained by a court order.

Please let me know if you plan to oppose this motion.

If you or your attorney wishes to appear at the hearing by telephone, please let me know and I will attempt to make arrangements with the court. Alternatively, if you prefer a different hearing date within the same week, please contact me and we should be able to work out an agreed schedule.

Last, we understand that Strio may remove this matter to the United States District Court for the Northern District of California on the basis of diversity of citizenship. If Strio intends to remove, we ask that you do so right away. Otherwise we will make filings in state court, which will complicate the federal court's initial handling of the case.

Regards,

Michael S. Dorsi
Ad Astra Law Group, LLP
582 Market St., 17th Floor
San Francisco, CA 94104
(415) 795-3579 Telephone
(415) 276-1976 Fax

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**05/13/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**NOTICE OF RESCHEDULED EX PARTE HEARING ON PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Date: May 14, 2019
Time: 11:00 a.m.
Dept: 302
Judge: Hon. Ethan P. Schulman

Complaint filed: April 30, 2019

**NOTICE OF RESCHEDULED EX PARTE HEARING**

On May 10, 2019, Plaintiff RocketPower, Inc. filed its papers for an ex parte appearance to set hearing on an order to show cause why a preliminary injunction should not be issued. The moving papers indicated that RocketPower would appear on Monday, May 13, 201, at 11:00 a.m. Since sending notice and preparing papers, counsel have been in contact. To facilitate pre-hearing discussions, RocketPower elected to re-set its the ex parte motion for a later date and hereby notifies the Court as follows:

On Tuesday, May 14, 2019, at 11:00 a.m., in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California, 94102, plaintiff RocketPower, Inc. will and does hereby move, ex parte, for an order to show cause why a preliminary injunction should not be issued. To the extent that discussions between counsel result in any change to the request, RocketPower's attorney will be prepared to discuss those changes and will bring appropriate proposed order(s) to the hearing.

RocketPower only notice and only seeks an Order to Show Cause with an ordinary law and motion hearing date and briefing schedule. At this time, RocketPower is not requesting a temporary Restraining Order or an evidentiary hearing.

Dated: May 13, 2019

**AD ASTRA LAW GROUP, LLP**

By ______________________

Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**05/13/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED DIVISION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**PROOF OF SERVICE**

**PROOF OF SERVICE**

I am a citizen of the United States. My business address is 582 Market Street, 17th Floor, San Francisco, California, 94104. I am employed in the county of San Francisco where this service occurs. I am over the age of 18 years and am not a party to the within cause.

On May 13, 2019, I served the following document(s) described as:

**NOTICE OF RESCHEDULED EX PARTE HEARING ON PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

**PLAINTIFF'S EX PARTE MOTION FOR ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**[PROPOSED] ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**

**NOTICE OF ASSOCIATED CASE**

**PROOF OF SERVICE OF SUMMONS** ***[re: initial Complaint]***

**FIRST AMENDED COMPLAINT FOR (1) DECLARATORY JUDGMENT; (2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND (4) UNFAIR COMPETITION**

**NOTICE TO PLAINTIFF**

**ADR INFORMATION PACKAGE**

❖ **BY CERTIFIED MAIL**: I am readily familiar with my employer's normal business practice of collection and processing of correspondence for mailing. Under that practice, correspondence is deposited with the U.S. Postal Service that same day in a sealed envelope(s) with certified mail postage thereon fully prepaid at San Francisco, California, in the ordinary course of business.

❖ **BY ELECTRONIC SERVICE**: I served said document(s) by transmitting true and complete copies of same to each of the parties named below, sending the electronic files to the e-mail addresses below through their Internet Service Provider.

James D. McNairy
Boutin Jones Inc.
555 Capitol Mall, Suite 1500
Sacramento, CA 95814

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 13, 2019, at San Francisco, California.

Kate Morin

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
Superior Court of California,
County of San Francisco
05/14/2019
Clerk of the Court
BY: KALENE APOLONIO
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**

Date:
Time:
Dept: 302
Judge: Hon. Ethan P. Schulman

Complaint filed: April 30, 2019

## TABLE OF CONTENTS

**I. Introduction** ........ 1

**II. Statement of Facts** ........ 1

A. General Background ........ 1

B. The Agreements at Issue ........ 3

C. Strio's Threats Against Rocketpower with Regard to Joint Employees ........ 4

**III. Argument** ........ 8

A. Legal Standards ........ 8

B. Rocketpower Will Prevail on the Merits ........ 8

*1. Rocketpower is Likely to Prevail on the Merits Because the Covenant Not to Compete and Choice of Law Provisions are Unenforceable.* ........ 8

*2. Rocketpower is Likely to Prevail on its Interference with Economic Relations Claims Against Strio.* ........ 10

*3. Rocketpower is Likely to Prevail on its Unfair Competition Claim.* ........ 12

C. Rocketpower Will Suffer Irreparable Harm Absent an Injunction ........ 13

D. Purported Harm to Strio Carries No Weight Because Strio Seeks to Engage in Conduct Contrary to Public Policy ........ 14

**IV. Conclusion** ........ 14

-i-

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. CGC-19-575643

# TABLE OF AUTHORITIES

## CASES

*Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881 (1998) .......... 12
*Butt v. State of California*, 4 Cal.4th 668 (1992) .......... 8
*Common Cause v. Board of Supervisors*, 49 Cal.3d 432 (1989) .......... 8
*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244 (1968) .......... 14
*Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853 (1994) .......... 14
*Nutro Prod., Inc. v. Cole Grain Co.*, 3 Cal. App. 4th 860 (1992) .......... 8
*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118 (1990). .......... 11

## STATUTES

Cal. Bus. & Prof. Code § 16600 .......... 9, 10, 13
Cal. Bus. & Prof. Code § 17200 et seq .......... 1, 12
Cal. Lab. Code § 925 .......... 9, 10, 14

## I. INTRODUCTION

California law protects the free movement of employees from one business to another. Plaintiff RocketPower, Inc. ("RocketPower"), relies on California's employee mobility for its talent solutions business, providing outsourced recruiters, staffing, and executive searches. RocketPower's back office services consultant, Strio Consulting, Inc., and RocketPower jointly employed approximately 165 workers, 86 of whom work in the State of California, to provide services to RocketPower clients.

Strio actively interfered with RocketPower's business relationships by, among other things, threatening to enforce non-compete agreements against RocketPower, the workers, and RocketPower clients. Without authority or approval from RocketPower, Strio coerced their joint workers into signing agreements with unenforceable non-compete and venue selection provisions. These coercive activities place intolerable strain on RocketPower's relationships with its workers and clients.

To remedy this ongoing harm, RocketPower seeks a preliminary injunction enjoining Strio from seeking to enforce the non-compete and choice of law provisions in certain Worker Agreements on the grounds that (1) those provisions are void and unenforceable under California law and for many other legal reasons, including the joint-employment relationship; (2) Strio's attempts to enforce those agreements and to communicate with RocketPower clients and workers constitute intentional interference; and 3) Strio's actions constitute unlawful, unfair, and/or fraudulent business practices within the meaning of California Business and Professions Code Section 17200, et seq. RocketPower also seeks a preliminary injunction enjoining Strio from further interfering with its contractual relationships with its clients and workers.

## II. STATEMENT OF FACTS

### A. General Background

RocketPower, Inc., is a Delaware corporation, with its primary place of business located at Two Embarcadero Center, San Francisco, California. RocketPower provides talent solutions to rapidly growing companies by: (1) providing recruiting process outsourcing/contract recruiters; (2)

providing outsourced/contract staffing for hourly positions such as autonomous vehicle operators and customer service specialists; and (3) executive search services. RocketPower establishes relationships and contracts with clients who are companies in need of workers. RocketPower's clients contract with RocketPower for assistance with finding and hiring, placement, management, and supervision of workers to meet their business needs. All relevant client contracts are between the client and RocketPower. Declaration of Mathew Caldwell, May 14, 2019 ("Caldwell Decl.") at ¶¶ 1-2, 4-5.

Strio Consulting, Inc. ("Strio"), is a Minnesota corporation with its primary place of business located at 1390 Neal Avenue North, Lake Elmo, Minnesota. Strio provides back office services for RocketPower and RocketPower's clients including payroll, employee benefits, and related services. Caldwell Decl. at ¶ 3.

RocketPower and Strio have a verbal agreement to provide different services to RocketPower's clients, with RocketPower being primarily responsible for advertising, screening, and identifying potential employees who will meet their clients' employment needs as follows: (1) in the Recruiting Process Outsourcing line of business, RocketPower directs the operational performance of the employees; (2) in the Outsourced/Contract staffing line of business, RocketPower clients direct the operations performance of the employees; and 3) in the Executive Search staffing line of business, RocketPower provides primary operational direction. Caldwell Decl. at ¶ 6. RocketPower exclusively interfaces with the clients; many RocketPower clients do not know Strio exists. RocketPower and Strio's relationship is not exclusive; RocketPower uses Strio services for some of its services to clients, but not all. Caldwell Decl. at ¶¶ 5-7.

The workers are joint employees of both RocketPower and Strio. Depending on the line of business, RocketPower, or RocketPower's clients, control and supervise the day-to-day activities of the workers. Strio provides limited services and is only responsible for employee relations matters such as disciplinary issues and termination actions, done in collaboration with RocketPower. Caldwell Decl. at ¶ 10. RocketPower funds 100% of the billable workers' wages and the workers are directed 100% by RocketPower or RocketPower clients. Caldwell Decl. at ¶ 9.

RocketPower invoices its clients directly for the services its workers provide for them.

Caldwell Decl. at ¶ 23. RocketPower/Strio currently jointly employ approximately 165 workers and approximately 86 of those joint workers reside and work primarily in California. Caldwell Decl. at ¶ 24.

B. The Agreements at Issue

Without authority or approval from RocketPower, Strio required the joint workers to sign employment and independent contractor agreements (hereafter referred to collectively as "Worker Agreements") that run counter to the joint employment relationship, RocketPower's business model, and California law. Caldwell Decl. at ¶ 44. While the benefit to Strio is unclear, RocketPower finds itself burdened by these legally dubious agreements. The non-compete provisions contain no geographic or other scope limitations. Caldwell Decl. at ¶ 30. The exact terms of the Worker Agreements, including restrictive covenants, were not negotiated pre-offer of employment. Caldwell Decl. at ¶ 29. Many of the agreements do not reflect the nature of the joint employer relationship and purport to be for the benefit of Strio only. Caldwell Decl. at ¶ 27. Sample Worker Agreements are attached to the Caldwell Decl. as Ex. B.

Some of Worker Agreements purport to be between the worker and Strio only; others purport to be between the worker and both Strio and RocketPower. Caldwell Decl. at ¶ 27. But the material provisions of the Worker Agreements are essentially identical. Caldwell Decl. at ¶ 26. The Worker Agreements provide that the workers are hired as "independent contractors" to serve one or more clients. The workers are also identified as "at will" employees who could be terminated at any time without cause. Caldwell Decl. at ¶ 28.

The Worker Agreements include a non-competition clause purporting to prevent the workers from providing services to any "Client" for a period of one year after termination of the working relationship. Caldwell Decl. at ¶ 30. In one section, the Worker Agreements contain a provision that states the agreement "shall be governed, construed and determined according to the laws of the State of Minnesota," and require RocketPower/Strio Employees to resolve disputes through arbitration in Minneapolis, Minnesota. Caldwell Decl. at ¶ 42. But in a separate section, the Worker Agreements also state: "[t]his Agreement will be governed by the law of the state in which the Services are primarily performed." Caldwell Decl. at ¶ 43.

RocketPower did not review or approve the non-competition or choice of law provisions before they were submitted to the workers for signature. Caldwell Decl. at ¶ 44. There can be no question that the workers are jointly employed by both RocketPower and Strio. Caldwell Decl. at ¶ 10. RocketPower supervises and controls the workers' schedules and conditions of employment. Caldwell Decl. at ¶ 13. RocketPower determines the rate and method of payment for all of the billable workers. Caldwell Decl. at ¶ 13. Many of the Worker Agreements expressly state that the workers are employees of both RocketPower and Strio. Caldwell Decl. at ¶ 27. The Employee Handbook states that the workers are employees of both RocketPower and Strio. Caldwell Decl. at ¶ 13, and Ex. A thereto. Onboarding of workers is done by both RocketPower and Strio. Caldwell Decl. at ¶ 13. Both RocketPower and Strio have responded to employee complaints from various agencies as joint-employer. Caldwell Decl. at ¶ 13. Responsibility under the Agreements could pass from one entity to the other without material changes. Caldwell Decl. at ¶ 13. The workers work exclusively for RocketPower clients. Caldwell Decl. at ¶ 15.efl

C. Strio's Threats Against RocketPower with Regard to Joint Employees

On December 14, 2018, Strio's CEO, Caleb Fullhart, sent RocketPower's founder and Managing Partner, Mat Caldwell, the following hostile and threatening text message during a discussion around Strio's repeated failure to make payroll and making accounts receivable/accounts payable more accurate for both firms:

> Caleb: When are you back next week? I am coming out to SFO so we can chat face to face
>
> Mat: Next week won't work. Is Doris contacting Byron.
>
> Caleb: I already messaged him – if you aren't available face to face, we need to talk soon. You f****** pissing me off man. And you are f****** with my money. Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you want the nuclear option you will get it.
>
> Mat: Dude—don't go there. This is not what either of us wants.

Caldwell Decl. at ¶ 32, and Ex. C thereto.

Minted is a California based employer who has contracted with RocketPower for assistance with employee recruitment and staffing needs. Caldwell Decl. at ¶ 33. Reflektive, Aptible, Open

Door, and Gong are California based employers that have contracted with RocketPower for assistance with employee recruitment and staffing needs. Caldwell Decl. at ¶ 34. Strio does not have a contract with any of the clients relevant to this dispute. Caldwell Decl. at ¶ 15.

Paula-Anne Sherron was hired by RocketPower to work for Minted. On July 10, 2018, Sherron signed a Consultant Employment Agreement ("Sherron Agreement"). Caldwell Decl. at ¶ 35. On January 29, 2018, Christine Covert was hired by RocketPower/Strio to work for Reflektive. Caldwell Decl. at ¶ 36. Ms. Covert's Statement of Work identified Mat Caldwell, founder and Managing Partner of RocketPower, as Reflektive's client contact. Caldwell Decl. at ¶ 37. On January 29, 2018, Ms. Covert signed a Consultant Employment Agreement ("Covert Agreement").[1] Caldwell Decl. at ¶ 36. Pursuant to their agreements, Ms. Covert and Ms. Sherron were hired as "independent contractors" to serve one more of RocketPower's clients. Caldwell Decl. at ¶ 38. They were also "at will" employees who could be terminated at any time without cause. Caldwell Decl. at ¶ 39.

Both the Sherron and Covert Agreements contained the non-competition clause described above.[2] Caldwell Decl. at ¶ 40. Both Ms. Sherron and Ms. Covert work in California. Caldwell Decl. at ¶ 41. Both the Sherron and Covert Agreements contain the resolution of disputes provision and the conflicting choice of law provisions described above. Caldwell Decl. at ¶¶ 42-43. RocketPower did not review or approve the non-competition or choice of law provisions in the Sherron and Covert Agreements before they were submitted to them for signature. Caldwell Decl. at ¶ 44.

True to his threats, on April 22, 2019, Mr. Fullhart, through Strio's counsel, Kate Bischoff, sent a letter to a client of RocketPower, namely Saki Kravitz of Minted ("Kravitz Letter"), regarding Minted's direct hiring of Ms. Sherron. Caldwell Decl. at ¶ 51, and Ex. F thereto. In the Kravitz Letter, Ms. Bischoff threatened to enforce the unenforceable non-compete agreement against Minted. Caldwell Decl. at ¶ 52. Ms. Bischoff also made negative and disparaging

---

[1] The relevant terms of the Sherron and Covert Agreements that are at issue in this action are identical.

[2] Both the Sherron and Covert Agreements purport to be with Strio only, not RocketPower and Strio, even though Ms. Sherron and Ms. Covert were jointly employed by RocketPower and Strio.

comments about RocketPower's Founder and CEO, Mat Caldwell, and misrepresented the nature of Ms. Sherron's relationship with both Strio and RocketPower. Caldwell Decl. at ¶ 52.

Although Ms. Sherron had been a joint employee of RocketPower/Strio, and had been placed with Minted based on RocketPower's contractual relationship with Minted, Ms. Bischoff misrepresented that Ms. Sherron had been the sole employee of Strio. Caldwell Decl. at ¶ 52. Indeed, Ms. Sherron's cost was paid 100% by RocketPower, even though her work created a 50% profit split for Strio. Caldwell Decl. at ¶ 57.

Prior to accepting a position with Minted, Ms. Sherron had contacted RocketPower's founder and managing partner, Mathew Caldwell, and requested permission to accept full-time employment with RocketPower's client. Caldwell Decl. at ¶ 48. Mr. Caldwell had approved Ms. Sherron's request. Caldwell Decl. at ¶ 50. Despite the fact that Ms. Sherron had been a joint employee of RocketPower/Strio and had been placed with Minted based on RocketPower's relationship with Minted, Ms. Bischoff asserted that Mr. Caldwell did "not have the authority to approve" a waiver of Ms. Sherron's unenforceable non-compete clause. Caldwell Decl. at ¶ 52.

Ms. Bishoff's letter disparaged Mr. Caldwell by representing that he lacked the authority to allow one of his former employees to accept full time employment with one of his clients, per the standard conversion provision in RocketPower's Master Services Agreement with its clients which from Strio has continuously benefitted, and implying that neither Strio nor Minted had any knowledge of or connection to RocketPower. Caldwell Decl. at ¶ 49.

On April 22, 2019, Ms. Bischoff sent a letter to Ms. Covert indicating that she had breached her Agreement with Strio. Caldwell Decl. at ¶ 55, and Ex. G thereto. Ms. Covert was, in fact, a joint employee of RocketPower/Strio. Caldwell Decl. at ¶¶ 53-54. Ms. Bischoff misrepresented that Ms. Covert had obtained employment at several locations, including Reflektive, Aptible, and Open Door through Strio's "client, RocketPower," when in fact Ms. Covert was a joint employee of RocketPower/Strio. Caldwell Decl. at ¶ 55. Indeed, each of those clients for whom Ms. Covert was placed to perform services was a client of RocketPower's, not Strio's. Caldwell Decl. at ¶ 54. In fact, Ms. Covert's work was paid 100% by RocketPower, even though her work created a 50% profit split for Strio. Caldwell Decl. at ¶ 57. Ms. Bischoff also demanded that Ms. Covert cease

and desist working for Rocket Power directly. Caldwell Decl. at ¶ 55. In her letter, Ms. Bischoff threatened RocketPower's employee to enforce the unenforceable non-Competition against RocketPower and Ms. Covert. Caldwell Decl. at ¶ 55.

On April 17, 2019, counsel for RocketPower sent a letter to Strio and its counsel notifying them that Nuro, one of RocketPower's clients, had informed RocketPower that Robin Schooling from Strio had contacted Nuro and indicated that Nuro's drivers "work for Strio." Declaration of Lisa R. Petersen, May 14, 2019 ("Petersen Decl."), at ¶ 2 and Ex. A thereto. The Nuro executive had no idea who Ms. Schooling or Strio were and contacted RocketPower to inquire about Ms. Schooling and Strio. Caldwell Decl. at ¶ 58. RocketPower informed Nuro that Strio provides services for RocketPower's workers. Caldwell Decl. at ¶ 58. During this conversation with RocketPower, Nuro's executive made clear that Nuro wanted all executive communications to go through RocketPower only. Caldwell Decl. at ¶ 58.

RocketPower's counsel also conveyed to Strio that Strio must not contact RocketPower's clients without first obtaining RocketPower's express permission. Petersen Decl. ¶ 2. RocketPower also warned Strio that contacting RocketPower's clients directly interfered with RocketPower's contractual relationships. Petersen Decl. ¶ 2. Strio's counsel responded with a letter dated April 19, 2019. Petersen Decl. ¶ 3, and Ex. B thereto.

Strio's April 19, 2019 letter threatened to enforce the unenforceable non-competition and non-solicitation clauses in the Sherron and Covert Agreements against RocketPower and its clients, stating:

> any efforts by RocketPower to solicit, encourage, or entice Strio employees to work on [RocketPower client] projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

Petersen Decl. ¶ 3, and Ex. B thereto. But Strio's relationship with Ms. Sherron, Ms. Covert, and the rest of the joint employees, exists solely because of RocketPower's contractual relationships with its client base. Caldwell Decl. at ¶ 61. As joint employees of RocketPower/Strio, Ms. Sherron and Ms. Covert performed work primarily in the state of California. Caldwell Decl. at ¶ 56. RocketPower is informed that Strio has contacted other RocketPower clients and workers and made disparaging comments about RocketPower, Mr.

Caldwell, and other RocketPower workers. Caldwell Decl. at ¶ 62.

Most recently as Monday, May 6, 2019, Strio's CEO, Caleb Fullhart, sent a response to a letter raising potential ADA claims from a joint employee of RocketPower and Strio, Christophe D. Michaels, informing him that he had no ADA claim. Caldwell Decl. at ¶ 63. The employee sent a letter to Mat Caldwell, CEO of RocketPower, as well as to Caleb Fullhart, CEO of Strio. Caldwell Decl. at ¶ 63. Mr. Fullhart sent his response to the letter without consulting with, or receiving any input from, anyone at RocketPower. Caldwell Decl. at ¶ 63, and Ex. H thereto.

Strio sent this response despite being asked specifically to run any responses to employment disputes arising from joint employees of RocketPower and Strio past RocketPower before sending a response. Caldwell Decl. at ¶ 64. RocketPower was still investigating Mr. Michaels' allegations when Strio sent its response. Caldwell Decl. at ¶ 65. RocketPower did not have an opportunity to complete its investigations to the best of its ability prior to Strio sending its response. Caldwell Decl. at ¶ 66.

## III. ARGUMENT

### A. Legal Standards

When considering preliminary injunctions and temporary restraining orders, "a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction." *Butt v. State of California,* 4 Cal.4th 668, 677–678 (1992) (citing *Common Cause v. Board of Supervisors*, 49 Cal.3d 432, 441–442 (1989)). "The purpose of a preliminary injunction is to preserve the status quo until a final determination following a trial." *Nutro Prod., Inc. v. Cole Grain Co.*, 3 Cal. App. 4th 860, 865 (1992) (internal quotation omitted).

### B. RocketPower Will Prevail on the Merits

#### *1. RocketPower Is Likely to Prevail on the Merits Because the Covenant Not to Compete and Choice of Law Provisions Are Unenforceable.*

Strio's efforts, at their core, depend on conduct contrary to California law. The Non-compete provisions of the Worker Agreements are unenforceable for at least all of the following reasons: 1) they are unenforceable under California law pursuant to California Business and

Professions Code Section 16600 and California Labor Code Section 925; 2) RocketPower and Strio are joint employers of the workers and, as such, Strio cannot enforce the restrictive covenants of the Worker Agreements against RocketPower, its joint-employer and intended co-beneficiary of the restrictive covenants; 3) they are overbroad, and contain no geographical or other scope limitations; 4) they were not negotiated pre-offer of employment; 5) they are not supported by additional consideration; 6) they are vague and ambiguous; 7) Strio does not provide specialized training to the workers; 8) no Strio proprietary or confidential information is promised or given to the workers; 9) no trade secrets are provided to the workers; 10) no Strio customer goodwill on behalf of Strio is retained by the workers; 11) the majority of RocketPower/Strio joint employees are low to middle income hourly employees and the enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families; 12) RocketPower and Strio are complementary businesses who do not compete for the same clients; and 13) RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

Most specifically here, and for purposes of the instant motion, the choice of law and Non-compete provisions contained in the employment agreements of RocketPower/Strio's joint workers are unenforceable against the joint employees under California law. Section 925 of the California Labor Code provides in the pertinent part:

> (a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
>
> (1) Require the employee to adjudicate outside of California a claim arising in California.
>
> (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.
>
> (b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.

Cal. Lab. Code § 925 ("Section 925").

Section 925 applies to all contracts "entered into, modified, or extended on or after January 1, 2017." Id. § 925(f). Each of the Worker Agreements was executed after January 1, 2017.

Caldwell Decl. at ¶ 31. Despite this, the Worker Agreements contain a "Choice of Law/Forum Selection and Consent to Personal Jurisdiction" clause is unenforceable against the joint employees of RocketPower and Strio residing in California. There is no valid basis for Strio to seek to enforce these agreements. Section 925 unambiguously prohibits employers from requiring employees who primarily reside and work in California to adjudicate claims arising in California outside the state of California. Additionally, Section 925 provides that any contractual provisions that violate Section 925 are voidable by the employee. Consistent with this statutory obligation, RocketPower allows workers it has placed with its clients to become full time employees of RocketPower's clients, without penalty.[3] There are currently approximately 86 joint employees of RocketPower and Strio residing and working primarily in California.

Further, unless an exception applies, section 16600 of the California Business and Professions Code prohibits employers from imposing covenants not to compete on California employees. Cal. Bus. & Prof. Code § 16600 ("Section 16600"). The Non-Competition clause of the Worker Agreements provides that the employee may not compete with Strio and (sometimes) RocketPower for a period of one year. Caldwell Decl. at ¶ 30. Section 16600 prohibits employers from imposing non-competition clauses on employees. As such, the non-competition covenant is unenforceable against all RocketPower and Strio joint employees residing and working in California. Because this clause is unambiguously unenforceable, there is a substantial likelihood that RocketPower will prevail on its request for declaratory relief.

Because the non-compete and choice of law provisions violate California law and for all of the other above stated reasons, RocketPower is likely to succeed on the merits of its action seeking to have these contractual provisions declared unenforceable and void as a matter of law.

2. *RocketPower Is Likely to Prevail on Its Interference with Economic Relations Claims Against Strio.*

---

[3] This is the case with both Ms. Covert, who has worked for multiple clients of RocketPower, including Reflektive, Aptible, Open Door, and Gong. *See* April 22, 2109 letter to Christine Covert. Similarly, Ms. Sherron, who was a joint employee of RocketPower and Strio, asked RocketPower's CEO, Mathew Caldwell, for permission to accept a position with Minted. Consistent with the limitations imposed by Sections 16600 and 925, Mr. Caldwell waived the unenforceable non-compete and choice of law provisions in Ms. Sherron's joint employment agreement.

To prevail on an intentional interference with contract claim, a plaintiff must prove there is:

> (1) a valid contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

Here, it is indisputable the RocketPower has binding enforceable agreements with its clients, including but not limited to Nuro, Minted, Relfektive, Aptible, Gong, Open Door, and numerous other growing California companies. RocketPower contacted Strio for assistance with meeting RocketPower's contractual obligations that it owes to its clients. RocketPower is the contracting party with its clients, and Strio does not have contractual relationships with RocketPower's clients. In fact, many of RocketPower's clients have no idea who or what Strio is. This is the case for RocketPower's clients where RocketPower and Strio's joint workers are currently placed. Yet, despite the fact that Strio has no contractual relationship with any of RocketPower's clients, Strio has sent harassing letters misrepresenting its relationship with RocketPower, RocketPower's clients, and the joint workers. These letters have been sent intentionally and without any justification.

On April 22, 2019, Strio, through Kate Bischoff, sent a threatening letter to Minted, one of RocketPower's clients. In that letter, Ms. Bischoff misrepresented the nature of Strio's relationship with Ms. Sherron, who had been a joint worker of RocketPower and Strio. She disparaged RocketPower by misrepresenting that because RocketPower's CEO, Mr. Caldwell, was not employed Strio, that he lacked the authority to approve Ms. Sherron's request to waive her non-compete clause. In fact, because Ms. Sherron had been a joint worker of RocketPower and Strio, Mr. Caldwell did have the authority to waive the unenforceable non-compete clause. Strio also threatened RocketPower's client, Minted, with enforcement of the Worker Agreements. These intentional actions by Strio disparaged Mr. Caldwell and RocketPower, were done without any justification, and have damaged Strio's relationship with Minted.

Strio has also interfered with RocketPower's relationships with its current workers. On April 22, 2019, Ms. Bischoff sent another letter to Christine Covert asserting that she was in breach

of her employment agreement with Strio. Ms. Covert was, in fact, a joint worker of RocketPower and Strio. She had contracted to work as an independent contractor for RocketPower and Strio. Based on the nature of her employment, RocketPower can reassign her to work for companies that do not require RocketPower to use the services of Strio. RocketPower and Strio do not have a non-compete or non-solicitation agreement for the joint workers that they share, and RocketPower is not prohibited in any way from reassigning its contracted workers to other jobs, even those jointly employed with Strio.

Despite this, Strio's attorney misrepresented that Ms. Covert had been placed with Reflektive, Aptible, and Open Door "through a client of Strio – RocketPower." In fact, Ms. Covert had been placed with those companies as a joint worker of RocketPower and Strio.[4] By sending Ms. Covert a letter threatening her with legal action and demanding that Ms. Covert "cease and desist" her current assignment, Strio intentionally interfered with RocketPower's contractual relationship with both Ms. Covert and RocketPower's client. These intentional actions by Strio are disrupting and interfering with RocketPower's contractual relationships, damaging its reputation, and causing it immediate and irreparable harm.

3. *RocketPower Is Likely to Prevail on Its Unfair Competition Claim.*

RocketPower is likely to succeed on its unfair competition claim pursuant to California Business & Professions Code § 17200, et seq. ("Unfair Competition Law"). It is well-established that a plaintiff who suffers economic injury as a result of violations of Section 16600 may avail itself of the remedies provided by Section 17200. *See, e.g., Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 906–07 (1998). Strio, by engaging in the wrongful conduct described above, engaged in unlawful, unfair, and/or fraudulent business practices. Use of

[4] Even assuming for the sake of argument that RocketPower was a client of Strio (versus a joint employer), the services Strio provides are back office services for workers whom RocketPower has placed for employment with RocketPower clients. The only relationship Strio has with RocketPower's clients is to provide back office and employee support services, like payroll. Strio does not select where the joint workers of RocketPower and Strio will work, RocketPower does. Because RocketPower and Strio do not have an exclusive relationship, RocketPower may reassign one of the shared workers to assignments that do not require Strio's services, like Gong. As a result, Ms. Bischoff's letter can only be read as an attempt to intentionally interfere with RocketPower's contractual relationship Gong, and with at least one of RocketPower's employees, Ms. Covert.

covenants not to compete, in violation of Business and Professions Code Section 16600, is an unlawful business practice actionable as unfair competition under the Unfair Competition Law. Soliciting workers to sign covenants not to compete, which are void under Business and Professions Code Section 16600, without informing the workers that the provision is void, is an unfair and/or fraudulent business practice under the Unfair Competition Law. Furthermore, requiring employees who primarily reside in California to adjudicate claims that arise in California outside of California, or depriving those employees of "substantive protections[s] of California law with respect to a controversy arising in California," violates California Labor Code, Section 925, and constitutes an unfair and/or fraudulent business practice under the Unfair Competition Law. RocketPower is entitled to declaratory and injunctive relief under the Unfair Competition Law.

C. <u>RocketPower Will Suffer Irreparable Harm Absent an Injunction</u>

RocketPower will suffer irreparable interim harm unless Strio is enjoined from attempting to enforce the non-compete and choice of law clauses, and from further interfering with RocketPower's contractual relationships.

The interim harm RocketPower will suffer justifies enjoining Strio from further interfering with RocketPower's contractual relationships with its clients and workers. First, by trying to enforce unenforceable and legally void contractual provisions, Strio will further harm RocketPower by interfering with its ability to meet the contractual obligation to its clients by misrepresenting that nature of Strio and RocketPower's relationship, the nature of their joint employees, and the enforceability of the invalid employment agreement provisions. This conduct creates a substantial risk that RocketPower's clients will look elsewhere. Those clients have good reason to look elsewhere when RocketPower's competitors will deliver services without Strio's interference.

Similarly, Strio's repeated threats of litigation, intentional misrepresentations about the status of its joint workers' relationships with RocketPower, and disparaging comments about Mat Caldwell and RocketPower will cause RocketPower irreparable reputational and financial harm, which cannot be compensated by a judgment. Because Strio does not have contractual relationships with RocketPower's clients, enjoining it from interfering with RocketPower's contractual relationships, it will not suffer any harm by being enjoined from further interference.

D. Purported Harm to Strio Carries No Weight Because Strio Seeks to Engage in Conduct Contrary to Public Policy

Strio's purported interest is in enforcing covenants not to compete and related enforcement clauses. This interest carries no weight because it is contrary to public policy. "California courts have consistently declared this [Section 16600 to be] an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 859 (1994). ""The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 255 (1968). When weighing the balance of hardships, the Court should consider the lack of weight that other courts have placed on employers' interests in unenforceable non-compete agreements in other contexts.

The Court's decision on this Motion will impact not only RocketPower and Strio, but also their employees. California law takes account of their interest in formulating employee protections including the bar on non-compete agreements in Section 16600 and the forum protections in Section 925. It would be contrary to public policy for this Court to give weight to Strio's interest in engaging in unlawful activity while disregarding the rights of RocketPower and Strio's employees.

## IV. CONCLUSION

RocketPower has demonstrated it is likely to prevail on the merits of its claims and that it will suffer relative harm pending resolution of the issues and causes of action set forth in its complaint. Accordingly, RocketPower requests the court grant a preliminary injunction consistent with the relief requested in its complaint.

Dated: May 14, 2019

**AD ASTRA LAW GROUP, LLP**

By [signature]

Michael S. Dorsi, Esq.
Attorneys for Plaintiff RocketPower, Inc.

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
05/14/2019
Clerk of the Court
BY: KALENE APOLONIO
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

| | |
|---|---|
| ROCKETPOWER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STRIO CONSULTING, INC., a Minnesota corporation,<br><br>Defendant. | CASE NO.: CGC-19-575643<br><br>**DECLARATION OF MATHEW CALDWELL IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**<br><br>Date: May 14, 2019<br>Time: 11:00 a.m.<br>Dept: 302<br>Judge: Hon. Ethan P. Schulman<br><br>Complaint filed: April 30, 2019 |

I, Mathew Caldwell, declare and say:

1. I am the founder and C.E.O. of RocketPower, Inc. ("RocketPower"), a Delaware corporation, with its primary place of business located at Two Embarcadero Center, San Francisco, California. I have personal knowledge of the facts contained in this declaration and, if called to testify as to the matters set forth herein, I could and would do so competently.

2. RocketPower provides talent solutions to rapidly growing companies by: 1) providing recruiting process outsourcing/contract recruiters; 2) providing outsourced/contract staffing for hourly positions such as autonomous vehicle operators and customer service specialists; and 3) executive search services.

3. Strio Consulting, Inc. ("Strio"), is a Minnesota corporation with its primary place of business located at 1390 Neal Avenue North, Lake Elmo, Minnesota. Strio is a consulting business that provides back office services for RocketPower and RocketPower's clients including payroll, employee benefits, and related services with its primary office in Minnesota.

4. RocketPower establishes relationships and contracts with clients who are companies in need of workers.

5. RocketPower's clients contract with RocketPower for assistance with finding and hiring, placing, managing, and supervising workers to meet their business needs. All relevant client contracts are between the client and RocketPower. Strio is not a party to any relevant client contracts.

6. RocketPower and Strio have a verbal agreement to provide different services to RocketPower's clients, with RocketPower being primarily responsible for advertising, screening, and identifying potential employees who will meet their clients' employment needs as follows: 1) in the Recruiting Process Outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the Outsourced/Contract staffing line of business, RocketPower clients direct the operations performance of the employees; and 3) in the Executive Search staffing line of business, RocketPower provides primary operational direction.

7. RocketPower uses Strio services for some of its services to clients, but not all.

8. RocketPower and Strio do not have an exclusive business relationship.

RocketPower/Strio's joint workers are not prohibited from working on assignments that involve RocketPower clients with whom Strio has no contacts, involvement, or relationships.

9. RocketPower funds 100% of the billable workers' wages. The workers are directed 100% by RocketPower or RocketPower clients.

10. The workers are joint employees of both RocketPower and Strio. Depending on the line of business, RocketPower, or RocketPower's clients, control and supervise the day-to-day activities of the workers. Strio provides limited services and is only responsible for employee relations matters such as disciplinary issues and termination actions, done in collaboration with RocketPower.

11. Strio does not assign pre-existing Strio employees to RocketPower contracted assignments.

12. RocketPower initiates requests for hiring new employees to work on RocketPower contracted assignments.

13. RocketPower manages the hiring process for hiring new hires for RocketPower contracted assignments. RocketPower supervises and controls the workers' schedules and conditions of employment. RocketPower determines the rate and method of payment for all of the billable joint workers. The Employee Handbook states that the workers are employees of both RocketPower and Strio. A true and correct copy of the Employee Handbook is attached hereto as Exhibit "A." Both RocketPower and Strio have responded to employee complaints from various agencies as joint-employer. Responsibility under the Agreements could pass from one entity to the other without material changes.

14. Strio does not assign joint employees to any new projects where Strio has a direct contact with a RocketPower client when a RocketPower contract assignment ends.

15. The joint employment of RocketPower/Strio's workers is made possible exclusively by RocketPower's contracted client relationships. Strio does not have a contract with any of the clients relevant to this dispute.

16. Strio does not provide specialized training to RocketPower/Strio joint workers.

17. There is no Strio proprietary confidential information promised to or given to the

joint employees.

18. There are no Strio trade secrets provided to the joint employees.

19. There is no customer goodwill on behalf of Strio retained by the joint employees; in fact, many RocketPower contracted clients do not even know that Strio exists.

20. Many RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families.

21. RocketPower and Strio are complementary businesses who do not compete for the same clients.

22. RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

23. RocketPower invoices all of its clients directly for the services the joint employees of RocketPower and Strio provide for RocketPower's clients.

24. RocketPower/Strio currently jointly employ approximately 165 workers and approximately 86 of those joint workers reside and work primarily in California.

25. There are at least two types of Employment Agreements that Strio has been presenting to the joint workers for signature.

26. The first is styled "Independent Contractor Agreement" with a "Statement of Work" attached. The second is styled "Consultant Employment Agreement" with a "Statement of Work" attached. The two agreements are referred to hereafter collectively as "the Worker Agreements." The material provisions of the Worker Agreements are essentially identical. True and correct copies of exemplars of the Worker Agreements are attached as Exhibit "B."

27. Some of Worker Agreements purport to be between the worker and Strio only. Some of the Worker Agreements purport to be between the worker and both Strio and RocketPower.

28. The Worker Agreements provide that the workers are hired as "independent contractors" to serve one or more clients. The workers are "at will" employees who could be terminated at any time without cause.

29. The exact terms of the Worker Agreements, including restrictive covenants, were not negotiated pre-offer of employment.

30. RocketPower did not review or approve the non-competition or choice of law provisions in the Worker Agreements. The Non-compete provisions contain no geographic or other scope limitations. The Worker Agreements include a non-competition clause purporting to prevent the workers from providing services to any "Client" for a period of one year after termination of the working relationship.

31. All of the Worker Agreements at issue in this case were executed after January 1, 2017.

32. On December 14, 2018, Strio's CEO, Caleb Fullhart, sent me, the following hostile and threatening text message during a discussion around Strio's repeated failure to make payroll and making accounts receivable/accounts payable more accurate for both firms:

> Caleb: When are you back next week? I am coming out to SFO so we can chat face to face
> Mat: Next week won't work. Is Doris contacting Byron.
> Caleb: I already messaged him – if you aren't available face to face, we need to talk soon. You fucking pissing me off man. And you are fucking with my money. Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you want the nuclear option you will get it.
> Mat: Dude—don't go there. This is not what either of us wants.

A true and correct copy of a transcript of the text string and the actual the text string is attached as Exhibit "C."

33. Minted is a California based employer located in San Francisco, that has contracted with RocketPower for assistance with employee recruitment and staffing needs.

34. Reflektive, Aptible, Open Door, and Gong are all California based employers that have contracted with RocketPower for assistance with employee recruitment and staffing needs.

35. On July 10, 2018, Paula-Anne Sherron ("Ms. Sherron") was hired by RocketPower to work for Minted. A true and correct copy of Ms. Sherron's statement of work and employment agreement are attached as Exhibit "D."

36. On January 29, 2018, Christine Covert ("Ms. Covert") was hired by RocketPower/Strio to work for Reflektive. A true and correct copy of Ms. Covert's statement of

work and employment agreement are attached as Exhibit "E."

37. Ms. Covert's Statement of Work identified me, Mat Caldwell, as Reflektive's client contact.

38. Ms. Covert and Ms. Sherron were hired as "independent contractors" to serve one or more of RocketPower's clients.

39. Ms. Covert and Ms. Sherron were also hired as "at will" employees who could be terminated at any time.

40. Both the Ms. Covert's and Ms. Sherron's employment agreements contain non-competition clauses.

41. Both Ms. Covert and Ms. Sherron work primarily in California.

42. Both of their agreements contain provisions that require them to resolve disputes through binding arbitration in Minneapolis, Minnesota, and under the laws of Minnesota.

43. Their agreements also contain a conflicting provision that says "[t]his Agreement will be governed by the law of the state in which the Services are primarily performed.

44. Neither I, nor anyone working for RocketPower, reviewed or approved the choice of law and non-competition provisions in Ms. Covert's, Ms. Sherron's, or any other joint employees' Worker Agreements before they were submitted to the workers for signature.

45. Minted is a client of RocketPower and does not have a contractual relationship with Strio.

46. Ms. Sherron had previously been a joint employee of RocketPower and Strio and had been working on a Minted engagement.

47. Ms. Sherron worked primarily in California for Minted.

48. Prior to Ms. Sherron accepting a full time position with Minted, Minted contacted me and requested permission to offer Ms. Sherron full time employment with Minted, a RocketPower client.

49. Pursuant to the terms of RocketPower's Master Services Agreement that we execute with our clients, any worker placed with a RocketPower client may accept a position as a full time employee with our clients.

50. Consistent with the terms of our Master Services Agreement with Minted, I approved Minted's request to offer Ms. Sherron full time employment.

51. On April 22, 2019, Strio, though its counsel, Kate Bischoff sent a letter to RocketPower's client, Minted regarding Minted's hiring of Ms. Sherron. A true and correct copy of Ms. Bischoff's April 22, 2019 letter to Minted is attached as Exhibit "F."

52. In her letter, Ms. Bischoff threatened Minted with legal action based on Ms. Sherron's alleged breach of her employment agreement that she had signed when she became a joint employee of RocketPower and Strio to perform services for Minted. See Ex. F. Ms. Bischoff made negative and disparaging comments about me and misrepresented the nature of Ms. Sherron's relationship with both Strio and RocketPower. Ms. Bischoff misrepresented that Ms. Sherron had been the sole employee of Strio. Ms. Bischoff also asserted that I did "not have authority to approve" a waiver of Ms. Sherron's unenforceable non-compete clause.

53. Christine Covert was a joint employee of RocketPower and Strio.

54. RocketPower and Strio employed Ms. Covert to perform services for several of RocketPower's clients including, Reflektive, Aptible, Open Door, and Gong.

55. On April 22, 2019, Ms. Bischoff sent a letter to Ms. Covert indicating that she had breached her agreement with Strio. A true and correct copy of Ms. Bischoff's letter to Ms. Covert is attached as Exhibit "G." Ms. Bischoff misrepresented that Ms. Covert had obtained employment at several locations, through Strio's "client, RocketPower," when in fact Ms. Covert was a joint employee of RocketPower and Strio. Ms. Bischoff also demanded that Ms. Covert cease and desist working for RocketPower directly and threatened to enforce the Non-compete agreement against both RocketPower and Ms. Covert.

56. The work Ms. Sherron and Ms. Covert performed for Reflektive, Aptible, Open Door, and Gong was primarily in California.

57. Both Ms. Sherron's and Ms. Covert's work were funded 100% by RocketPower, even though their work created a 50% profit split for Strio.

58. In mid to late-April 2019, I learned that a client of RocketPower, Nuro, contacted RocketPower to inform us that Strio had been in contact with Nuro, representing that the joint

employees of RocketPower and Strio were the sole employees of Strio. The Nuro executive had no idea who Ms. Schooling or Strio were and contacted RocketPower to inquire about them. Nuro was informed that Strio provides services for RocketPower's workers. The Nuro executive made clear that he wanted all executive communications to go through RocketPower only.

59. All employees that RocketPower and Strio have placed with Nuro are joint employees of RocketPower and Strio.

60. Ms. Covert and Ms. Sherron, along with all the other joint employees are joint employees of RocketPower and Strio because of RocketPower's contractual relationships with its clients.

61. Absent RocketPower's client base, Ms. Sherron, Ms. Covert, and the rest of the joint employees would not have been joint employees of RocketPower and Strio.

62. On information and blief, I understand that Strio has contacted other RocketPower clients and workers and made disparaging comments about me, RocketPower, and other RocketPower workers.

63. On May 6, 2019, Strio's CEO, Caleb Fullhart, responded to an ADA complaint filed by Christophe D. Michaels, a joint employee of RocketPower and Strio. A true and correct copy of Mr. Fullhart's response to Mr. Michaels is attached as Exhibit "H." The employee sent a letter to me, as well as to Mr. Fullhart. Mr. Fullhart sent his response letter without consulting with, or receiving any input from, anyone at RocketPower.

64. Prior to Mr. Fullhart responding to Mr. Michaels's ADA complaint, I had personally requested that Strio obtain approval from RocketPower before responding to employee complaints.

///

///

///

///

///

///

65. RocketPower was still investigating Mr. Michaels's ADA complaint when Strio sent its unapproved written response.

66. RocketPower had not had an opportunity to complete its investigation to the best of its ability prior to Strio sending its response.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of May, 2019, at San Francisco, California.

By */s/ Mathew Caldwell*
Mathew Caldwell

As the attorney e-filing this document, attorney Michael S. Dorsi attests that Mathew Caldwell has concurred in the filing of this document. */s/ Michael S. Dorsi*

-8-

DECLARATION OF MATHEW CALDWELL IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. CGC-19-575643

**INDEX OF EXHIBITS TO DECLARATION OF MATHEW CALDWELL**

Exhibit A: Strio Consulting – RocketPower Employee Handbook
First Edition: December 2018

Exhibit B: Strio Consulting – RocketPower Employment & Independent Contractor Agreements
Dated November 20, 2018

Exhibit C: Transcript and Image of Text Messages Between C. Fullhart and M. Caldwell
Dated December 14, 2018

Exhibit D: Statement of Work and Consultant Employment Agreement for P. A. Sheron
Dated July 10, 2018

Exhibit E: Statement of Work and Consultant Employment Agreement for C. Covert
Dated January 29, 2018

Exhibit F: Letter from K. Bischoff to S. Kravitz at Minted
Dated April 22, 2019

Exhibit G: Letter from K. Bischoff to C. Covert
Dated April 22, 2019

Exhibit H: Email Containing Letter from C. Fullart to C. Michaels
Dated May 6, 2019

# Exhibit A

Exhibit A

# Strio Consulting | Rocket Power

# Employee Handbook

**First Edition: December 2018**

# Welcome to Strio Consulting | Rocket Power

**Talent will always be the engine that drives the growth of our company**

At **Strio Consulting | Rocket Power** we believe that a great team is a great community. We value the unique talents that each person brings to SC | RP and want to provide you with every opportunity to develop your professional capabilities and achieve your personal goals.

We believe in the value of collaboration and continual learning and encourage you to interact with your co-workers, ask questions of each other, and share best practices. **You** are the most important component to our success designing solutions that assist our clients in reaching their goals.

We're excited you've joined our team and look forward to a great partnership!

Caleb Fullhart
Chief Executive Officer

Mathew Caldwell
Chief Executive Officer

**WHAT WE DO** *We help companies grow and we help people get jobs*

**WHY WE DO IT** *Serving the clients' best interest is OUR best interest*

**HOW WE DO IT** *HR & Talent Consulting | Recruiting & Search | HR Technology*

# Purpose of this Handbook

This handbook has been prepared to inform you of the policies and procedures of SC | RP and to outline our expectations. This handbook, while it may seem lengthy, is not all-inclusive nor is it intended to provide strict interpretations of our policies. This is not a contract, expressed or implied, nor does it guarantee employment for any length of time.

We reserve the right to unilaterally revise, suspend, revoke, terminate or change any of our policies, in whole or in part, whether described within this handbook or elsewhere, at our sole discretion. We'll always do our best to keep you informed of SC | RP policies, however we can't guarantee that you'll always receive all revisions.

It is your responsibility to read, understand, and comply with all provisions outlined in this handbook. If you have questions, feel free to either ask your manager or contact the HR/People Team.

# TABLE OF CONTENTS

**The Foundation**

Employment at Will
Communication
Commitment to Diversity and Inclusion
Equal Employment Opportunity
Americans with Disabilities Act (ADA)
Workplace Harassment
Workplace Health, Safety and Security
Drug Free Workplace
Background Checks and Verifications

**The Employment Relationship**

Employment Classification
Work Week, Time Reporting and Payroll
Employment of Relatives & Domestic Partners
Separation from Employment

**The Guidelines**

Professional Conduct
Conflicts of Interest
Confidential Information
Being at Work
Bullying/Workplace Violence
Dress and Grooming
Technology and Social Media
Code of Conduct
Corrective Action

**The Way Time Off Works**

Holidays, Vacation and Sick Leave
Life Events
Edge Cases
Leaves of Absence
Family and Medical Leave (FMLA)
Pregnancy & Related Conditions
Leave to Vote
Military Leave
General Leave of Absence Guidelines

# The Foundation

***"In a way, you've already won in this world because you're the only one who can be you."***
*Fred Rogers*

**Employment at Will**

Employment at SC |RP is on an at-will basis unless otherwise stated in a written individual employment agreement signed by the Chief Executive Officer.

This means that either you or SC | RP may terminate the employment relationship at any time, for any reason, with or without notice. In other words - you have the right to quit and we have the right to release you whenever either of us determine it's time to take either of those actions.

Nothing in this handbook creates, or is intended to create, an employment agreement. In addition, nothing contained in this, or any other document provided to you, is intended to be, nor should it be, construed as a contract that your employment or any benefits will be continued for any period of time. Please also note that no company representative is authorized to modify this policy for any employee, nor is any company representative authorized to enter into any agreement, oral or written, that changes this at-will relationship.

Any salary figures provided to you in annual or monthly terms are stated for convenience; these stated salary figures don't create, nor are they intended to create, an employment contract for any specific period of time.

Nothing in this statement is intended to interfere with, restrain, or prevent concerted activity, including employee communications regarding wages, hours or other terms and conditions of employment, as protected by the National Labor Relations Act.

**Communication**

We're a distributed company where people work remotely and we're committed to open and interactive communication. Through the use of asynchronous communication including various platforms and chat channels, we encourage the facilitation of smooth communication in our ever-growing geographically dispersed company.

We believe not just in having an "open door" culture; we also strive to have a "no door" culture. This means that whether you have an issue or concern - or if you just want to chat - you have access to every other team member in the company.

**Commitment to Diversity & Inclusion**

We believe that a diverse team contributes to our success in helping companies grow and helping people get jobs. We further believe we can best achieve this when we bring together a team of people with varying backgrounds, cultural experiences, expertise, personalities, talents, ideas and opinions.

We believe in nurturing an inclusive work environment where all people feel welcome and can be their authentic selves. We encourage conversations and ongoing learning to ensure all people are able to express themselves and live their best lives.

We model our commitment to diversity & inclusion by taking responsibility for driving out bias, engaging in inclusive behavior such as actively listening to all team members, encouraging different points of view, providing equal access to success, and celebrating the individual uniqueness of all employees.

**Equal Employment Opportunity**

SC | RP provides equal employment opportunities to all employees and applicants for employment without regard to race, color, ancestry, national origin, gender, sexual orientation, marital status, religion, age, disability, gender identity, results of genetic testing, service in the military or any other protected characteristics. Equal employment opportunity applies to all terms and conditions of employment, including hiring, placement, promotion, termination, layoff, recall, transfer, leave of absence, compensation, and training.

We expressly prohibit any form of unlawful employee harassment or discrimination based on any of the characteristics mentioned above and improper interference with the ability of other employees to perform their expected job duties is not tolerated.

If you have questions or concerns about equal employment opportunities in the workplace we encourage you to bring these issues to the attention of the HR/People Team and please note that SC |RP will not allow any form of retaliation against individuals who raise issues of equal employment opportunity.

Retaliation can be described as adverse conduct because an individual reported an actual or perceived violation of this policy, opposed practices prohibited by

this policy, or participated in the reporting and investigation process. Adverse conduct includes, but is not limited to, the following:

- shunning and avoiding an individual who reports harassment, discrimination or retaliation;
- express or implied threats or intimidation intended to prevent an individual from reporting harassment, discrimination or retaliation; or
- denying employment benefits because an applicant or employee reported harassment, discrimination or retaliation or participated in the reporting and investigation process.

If you believe you have been subject to or witnessed illegal discrimination, you are encouraged to report this to either your manager, a member of the HR/People Team, or any member of SC | RP management. Similarly, if you observe acts of discrimination toward another employee, you are requested and encouraged to report this to one of the individuals listed above. SC |RP takes all such complaints seriously and a member of the HR/People Team will promptly investigate any incidents brought forth.

No reprisal, retaliation, or other adverse action will be taken against an employee for making a complaint or report of discrimination, or for assisting in the investigation of any such complaint or report. Any suspected retaliation or intimidation should be reported immediately to one of the persons identified above.

**Americans with Disabilities Act (ADA)**

The ADA requires, among other things, that an employer provide reasonable accommodation to qualified individuals with disabilities, unless doing so would cause undue hardship for the employer. SC | RP complies with the ADA (and applicable state disability laws) in the provision of reasonable accommodations to its employees. If you believe that you require an accommodation in order to perform your job, please speak with your manager and or contact the HR/People Team.

## Workplace Harassment

Everyone at SC | RP has a responsibility to prevent and stop harassment. Some of us work as members of remote teams so much of our interaction is by video call and written communication including email, shared documents or via collaborative online channels. Some of us, particularly at client sites, are working side-by-side with other team members and clients. No matter how we work and no matter the method of communication, it's expected that everyone will contribute to an inclusive and collaborative working environment and respect each other at all times. Should you become aware of or witness any form of harassment or behavior that violates this policy, please report the incident directly to a member of the HR/People Team immediately for thorough investigation.

Sexual and other unlawful harassment is a violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, as well as state and municipality laws. Harassment based on characteristics such as race, color, ancestry, national origin, gender, sex, sexual orientation, gender identity, marital status, religion, age, disability, veteran status, or any other characteristic protected by state or federal law, is prohibited.

At SC |RP we are committed to providing a work environment free of sexual and other harassment. To that end, harassment of SC |RP employees by management, supervisors, coworkers, or non-employees who are in the workplace is absolutely prohibited. Further, any retaliation against an individual who has complained about sexual or other harassment or retaliation against individuals for cooperating with an investigation of a harassment complaint is similarly unlawful and will not be tolerated. The Company will take all steps necessary to prevent and eliminate unlawful harassment.

**Definition of Unlawful Harassment.** "Unlawful harassment" is conduct that has the purpose or effect of creating an intimidating, hostile, or offensive work environment; has the purpose or effect of substantially and unreasonably interfering with an individual's work performance; or otherwise adversely affects an individual's employment opportunities because of the individual's membership in a protected class.

Unlawful harassment includes, but is not limited to, epithets; slurs; jokes; pranks; innuendo; comments; written or graphic material; stereotyping; or

other threatening, hostile, or intimidating acts based on race, color, ancestry, national origin, gender, sex, sexual orientation, marital status, religion, age, disability, veteran status, or other characteristic protected by state or federal law.

**Definition of Sexual Harassment.**  "Sexual harassment" is generally defined under both state and federal law as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature where:

- Submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of any individual's employment or as a basis for employment decisions; *or*
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Other sexually oriented conduct, whether intended or not, that is unwelcome and has the effect of creating a work environment that is hostile, offensive, intimidating, or humiliating to employees may also constitute sexual harassment.

While it is not possible to list all those additional circumstances that may constitute sexual harassment, the following are some examples of conduct that, if unwelcome, may constitute sexual harassment depending on the totality of the circumstances, including the severity of the conduct and its pervasiveness:

- Physical assaults or the attempt to commit an assault of a sexual nature. This physical conduct can include touching, pinching, patting, grabbing, brushing against or poking another team member's body.
- Unwelcome sexual advances, propositions or other sexual comments, such as sexually oriented gestures, noises, remarks, gossip regarding one's sex life, comments about an individual's body, jokes or comments about a person's sexuality or sexual experience.
- Preferential treatment or promises of preferential treatment to an employee for submitting to sexual conduct, including soliciting or attempting to solicit any employee to engage in sexual activity for compensation or reward.

- Subjecting, or threats of subjecting an employee to unwelcome sexual attention or conduct or intentionally making performance of the employee's role more difficult because of that employee's sex.
- Creating displays, communications, or publications including content of a sexually offensive nature.
- Purposely misgendering people, consistently referring to someone as 'he' after repeated requests to call someone a 'she' or vice versa.

**Reporting Alleged Harassment**

- If you believe you have been the target of harassment of any kind, you are encouraged to immediately and directly address the harasser, letting them know that their behavior is unwelcome, offensive and must stop immediately.
- If you do not wish to address the harasser directly or the behavior doesn't cease, you should report the misconduct to your manager, the Head of People, or any member of SC | RP management.
- Once reported, an impartial investigation will be conducted by the HR/People Team or by an independent third party, depending on the severity and circumstances of the complaint.
- Individual(s) reporting an incident or pattern of behavior may be asked to provide a written account of any action(s) causing concern, dates and times such actions occurred, and names of anyone involved, including participants and witnesses. All complaints or concerns of alleged harassment or discrimination will be taken seriously and handled confidentially.

**The Role of Managers**

If managers become aware of misconduct, they must deal expeditiously, seriously, confidentially and fairly with any allegations, whether or not there has been a written or formal complaint made. Managers are expected to:

- Take all complaints or concerns of alleged harassment seriously no matter how minor or who is involved.
- Ensure that any form of harassment or misconduct is immediately reported to the Head of People.

- Take appropriate action to prevent retaliation or the alleged misconduct from recurring during and after an investigation.

Managers who knowingly allow or tolerate any form of harassment or retaliation, including the failure to immediately report such misconduct to the Head of People, are in violation of this policy and subject to disciplinary action, including termination.

## The Role of Individual Contributors

All employees have the responsibility to help create and maintain a work environment free of harassment and can help by:

- Being aware of how their own behavior may affect others and changing it if necessary
- Treating their colleagues with dignity and respect
- Taking a stand if they think inappropriate jokes or comments are being made to others
- Making it clear to others where they find their behavior unacceptable
- Intervening, if possible, to stop harassment or bullying occurring
- Reporting promptly, to their manager or the HR/People Team, any incident of harassment they've witnessed

## The Role of the HR/People Team

The Head of People and HR/People Operations Generalists are responsible for:

- Ensuring that any individual filing a complaint and any accused individual(s) is made aware of the seriousness of misconduct
- Explaining SC | RP's no tolerance harassment policy and investigation procedures to all individuals included in a complaint
- Arranging for an immediate investigation of alleged misconduct
- Notifying appropriate authorities (police, FBI, etc.) when criminal activities are alleged
- Exploring informal means of resolving potential harassment if a formal complaint is not made when verbal allegations are shared

## Workplace Health, Safety and Security

You are expected to follow all safety rules and practices, cooperate with officials or client representatives who enforce these rules and practices, and attend required safety training. You should immediately report all accidents, injuries and unsafe practices or conditions to either your manager or a member of the HR/People Team.

## Drug Free Workplace

SC | RP is committed to providing a safe, quality-oriented and productive work environment and we respect the commitment of our clients to maintaining Drug Free Workplaces in accordance with their operating principles and policies.

We expect you to report to work fit for duty and free of any adverse effects of illegal drugs or alcohol. This policy does not prohibit you from the lawful use and possession of prescribed medications however, you should consult with your physician about the medications' effect on fitness for duty and ability to work safely. You are required to promptly disclose any work restrictions due to use of any medication. SC | RP prohibits all employees from manufacturing, distributing, dispensing, possessing or using an illegal drug in or on client premises or while conducting company business.

**Required Testing**

***Pre-employment (post offer)*** Applicants being offered employment may be required, based on client need or request, to pass a drug test before beginning work. Refusal to submit to testing will result in disqualification of further employment consideration.

***Reasonable suspicion*** Employees may, based on client operating principles or policies, be subject to testing based on (but not limited to) observations of apparent workplace use, possession or impairment. Refusal by an employee will be treated as a positive drug test result and will result in immediate termination of employment

***Post-accident*** Employees are subject to testing when, based on client operating principles or policies, they are involved in an accident, with or

without property damage, or cause or contribute to accidents that result in serious damage. Refusal by an employee will be treated as a positive drug test result and will result in immediate termination of employment.

**Confidentiality**

Information and records relating to medical results will be kept confidential to the extent required by law and maintained in secure files.

**Background Checks and Verifications**

Certain offers of employment at SC | RP are contingent upon clear results of a thorough background check. Based on client need or request, background or reference checks may be conducted on candidates as deemed necessary.

Background checks may include some or all of the following: Social Security Verification, Prior Employment Verification, Personal and Professional References, Educational Verification, Criminal History and Motor Vehicle Records.

# The Employment Relationship

***"Success is best when it's shared."***
*Howard Schultz, Chairman and CEO, Starbucks*

## Employment Classifications

Your employment classification helps determine your employment status, your eligibility for overtime pay, and your eligibility for certain benefits. Depending on your job, you are either "non-exempt" or "exempt" from certain federal and state wage and hour laws.

- **Exempt employees** are excluded from the overtime pay requirements of the Fair Labor Standards Act (FLSA). Exempt employees are paid on a salary basis and may work beyond their normal hours, whenever necessary, to accomplish required job duties. Exempt employees are not eligible to receive overtime compensation.
- **Non-exempt employees** are eligible for overtime pay of 1.5 times the regular hourly rate of pay for all hours worked over 40 hours per week in accordance with the FLSA. Non-exempt employees are paid on an hourly basis. Non-exempt employees may also be eligible for overtime pay based on different factors depending upon the state/municipality in which they work.
- **Part Time employees** are regularly scheduled to work less than 30 hours per week.
- **Full Time employees** are regularly scheduled to work more than 30 hours per week.
- **Temporary employees** are individuals hired for a specific project or a defined period of time. These employees may work any number of hours and are generally scheduled to terminate by a certain date. If they remain on duty past the scheduled end date, SC |RP may determine that the classification will remain in this category.

## Work Week, Time Reporting and Payroll

The work week begins at 12:00 AM on Monday and ends at 11:59 PM on Sunday. You will be paid on Friday, on a bi-weekly basis, for the previous two weeks worked. You can view the payroll schedule/pay dates in the HRIS self-service system.

You are required to report all time worked for the previous work week no later than each Monday by Noon (Central Time). If you're a non-exempt/hourly employee, you are responsible for accurately recording the hours you work as

we're required to keep accurate records in compliance with the Fair Labor Standards Act (FLSA).

Time should be recorded, on a daily basis, in the recording system of record; site and/or client managers are responsible for reviewing and approving time no later than Noon (Central Time) each Monday.

You are not allowed to alter your time record after the time has been reported. Falsification of time records is not allowed nor is recording another employees' time on their behalf.

If you fail to accurately record your time by the payroll deadline it may result in you defaulting to a "no pay" status for the workweek, payroll period or day not recorded. This, which no one wants, may result in your paycheck not being available on payday.

And remember - it's not OK to just work whenever you want. If you're a non-exempt employee any overtime work must be approved in advance by a manager.

Scheduled hours, including break times, may vary depending on client, work location, and job responsibilities. SC | RP follows all applicable state and federal laws regarding break times.

**Employment of Relatives & Domestic Partners**

Want your sister, partner, or mother to work at SC | RP? We like employee referrals so that may be possible but just keep a few things in mind:

- the people involved (i.e. you and your mom) cannot work in a direct supervisory relationship; and
- the employment relationship must not pose difficulties for supervision, security, safety, or morale.

As with any employment decision, SC | RP reserves the right to make hiring decisions after consideration of all relevant factors.

**Separation from Employment**

Sometimes all good things come to an end and, should the day arrive when we end our employee/employer relationship, we'll look to manage it as follows:

- if you're resigning we ask that you provide us with as much advance notice as possible. While 2 weeks is a nice "rule of thumb," we realize that may not work for everyone. We just hope you let us know before you walk out the door for the last time.
- either your manager or a member of the HR/People team will follow up to discuss last day logistics, transfer of duties, and any other bits and pieces of information necessary to a successful offboarding experience.

When your employment ends you will receive your final paycheck in accordance with applicable state laws.

# The Guidelines

***"Real integrity is doing the right thing, knowing that nobody's going to know whether you did it or not."***
*Oprah Winfrey*

**Professional Conduct**

SC | RP empowers you to make decisions that impact our reputation. As a company, we strive to make every interaction with our clients exceptional and **you** are at the front line of delivery.

**Conflicts of Interest**

We expect you to conduct yourself and complete company business in a manner that reflects the highest standards of ethical conduct, and in accordance with all federal, state, and local laws and regulations. This includes avoiding real and potential conflicts of interests.

Exactly what constitutes a conflict of interest or an unethical business practice is both a moral and a legal question, and we recognize and respect that you possess an individual right to engage in activities outside of employment which are private in nature and do not in any way conflict with or reflect poorly on SC | RP.

As it is not possible to define all the circumstances and relationships that might create a conflict of interest, if a situation arises where there is a potential conflict of interest, you should discuss this with a manager for advice and guidance on how to proceed. While not all inclusive, here are some types of activity that may indicate improper behavior, unacceptable personal integrity, or unacceptable ethics:

- Simultaneous employment by another firm that is a competitor of or supplier to either SC | RP or our clients.
- Holding a substantial interest in, or participating in the management of, a firm to which SC | RP makes sales or from which it makes purchases.
- Accepting substantial gifts or excessive entertainment from an outside organization or agency. A gift should not be accepted if it might create a sense of obligation, compromise your professional judgment or create the appearance of doing so.
- Participating in civic or professional organization activities in a manner that divulges confidential company information.
- Misusing privileged information or revealing confidential data to outsiders.
- Using one's position in the company or knowledge of its affairs for personal gains.

## Confidential Information

The protection of confidential business information is vital to the interests and success of SC | RP. Confidential information is any and all information disclosed to or known by you because of employment with the company; further details regarding confidential information can be found in the Employment Agreement you signed at time of hire.

If you improperly use or disclose confidential business information, you may be subject to corrective action up to and including termination of employment even if you don't actually benefit from the disclosed information.

This provision is not intended to, and should not be interpreted to, prohibit you from discussing wages and other terms and conditions of employment if you so choose.

## Being at Work

It's called a "job" for a reason; there's actual work to be done. Therefore, we expect you to show up on time and be ready to work. If an emergency comes up, you caught the flu or just need to leave early, refer to *"The Way Time off Works"* later in this handbook. For some employees, there may be specific guidelines, requirements, and attendance expectations as outlined by the client to which you need to adhere.

A few important things:

- if you fail to report to work for 3 consecutive work days without notifying your manager, we're going to consider that a voluntary resignation.
- excessive tardiness or absenteeism will lead us to have a conversation. Continued tardiness or absenteeism may, depending upon circumstances, result in corrective action up to and including termination.

## Bullying / Workplace Violence

SC | RP does not tolerate violent acts or threats of violence. We will not tolerate fighting, bullying, coercion or use of abusive or threatening words directed to, about, or against a co-worker, lead, manager, executive, candidate, client/customer or vendor. No individual employed by SC | RP should commit, or threaten to commit, any violent act or discuss committing such offenses, even in a joking manner.

## Dress and Grooming

Bathe and shower regularly. Wear clean, non-wrinkled clothes. If you're working from home and will only be seen from the waist up, feel free to wear your pajama pants all day.

Of course, if you're working onsite with a client we expect you to dress appropriately while adhering to any norms and expectations for the role and the location.

Common sense is the guideline.

## Technology and Social Media

We rely on the use of technology to get our jobs done including email, social platforms, and other tools. Be aware that all communications made using company or client provided equipment, services or accounts is subject to inspection so you shouldn't have any expectation of privacy in your use of these tools and platforms.

Many of us, in the course of performing our jobs, use social media channels to find information, share ideas and learn from others. When using social media or commenting publicly on any of these channels or other sites, we ask that you keep a few simple guidelines in mind:

- use common sense
- be aware of privacy & confidentiality issues
- play nice

Nothing in this policy is designed to interfere with, restrain, or prevent employee communications regarding wages, hours, or other terms and conditions of employment as protected under the National Labor Relations Act. Employees have the right to engage in or refrain from such activities.

## Code of Conduct

A company is a collection of people who have gathered together in order to collectively work towards a common goal. At SC | RP we focus on providing exceptional service to our clients in order to help them achieve success.

Doing our best work means that we are:

- Friendly and welcoming
- Patient
- Thoughtful
- Respectful
- Caring and empathetic

It's also important that we avoid destructive behavior. While this list is not all inclusive, these are the types of behaviors that are not acceptable:

- theft or dishonesty
- falsifying records
- excessive absenteeism/tardiness
- insubordination or flagrant disobedience
- engaging in acts of bullying, violence, fighting, assault or threats
- willful destruction or abuse of property or equipment
- unsatisfactory performance or conduct
- disobeying safety rules or regulations
- verbal, behavioral and environmental indignities that communicate hostile, derogatory or negative slights and insults to a person or group
- violation of the harassment policy
- any other actions or behaviors deemed unacceptable by the company

The above list is descriptive only; it is not intended to be an exclusive list of misconduct which may warrant immediate termination or other forms of corrective action. This does not restrict the company's right to terminate an employee for any lawful reason at its sole discretion.

## Corrective Action

Our expectation is that you will comply with the SC | RP standards of behavior and performance and, when alerted to non-conformance, you will work to correct any noncompliance.

We believe it's important to let people know when there's an area where they can correct their behavior thus giving them every opportunity to improve,

however we do retain the right to administer corrective action in any manner we determine appropriate.

Depending upon the nature and/or severity of a conduct violation we may utilize any of the following corrective actions:

- Conversation/Warning
- Written Admonition
- Suspension (with or without pay)
- Termination/Separation from Service

This policy does not modify the status of employees as employees-at-will nor does it restrict the company's right to take action. The company retains the right to take action, including termination of employment, at any time, with or without cause or advance notice.

# The Way Time Off Works

***"Here it is the groove slightly transformed,***
***Just a bit of a break from the norm,***
***Just a little somethin' to break the monotony…"***
*Will Smith, "Summertime"*

Time off is about the time you need and not about a quota.

At SC | RP we don't allocate a certain number of days nor do we track your time off unless required by client request or state/municipal requirements. Some of our employees, based on location, may have accrued sick leave available; others do not. Some of our employees, based on role, may have paid vacation agreements in place. Some of our employees are provided with the flexibility to take time off as needed although it may not be paid time off.

We believe that a quota or number of days limits the conversation around "how we work" as the concept of work isn't always dependent upon time and place. We aim for a healthy balance at SC | RP while ensuring that meeting obligations to our clients and each other remains our top priority.

**Holidays**

While there are common national holidays, we are the type of company with teams who have work that can be done at any time and from any place. There are SC | RP employees who may be required to work on holidays and there are SC | RP employees who wish to take off the day after Thanksgiving while others wish to take off on Yom Kippur or Diwali. We believe that people have an obligation to their loved ones (and themselves!) to not only work hard but also to take the time to observe and/or celebrate days that are important to them.

For the average company, including for many of our clients, most people are off on the big national holidays. Being off or working on a holiday may be dependent upon the needs of the client or your role or, in some cases, being off on a holiday may be your choice. Being off on a holiday is neither a right nor an obligation, so feel free to make it work while making sure business needs are met.

**Vacation**

We fully support people taking time off and disconnecting from work; numerous studies show that there is increased productivity when we can disconnect and come back to the office revived and engaged.

At SC | RP we have a discretionary "Flexible Vacation" policy. Exempt and salaried non-exempt employees are eligible for paid vacation while non-exempt hourly employees are eligible for vacation time that is unpaid. Scheduling time off is subject to approval; this is where you work in conjunction with both your manager and the clent.

For the exempt employees receiving paid vacation, this is a discretionary flexible vacation policy meaning days are neither accrued nor earned and there is no 'balance' to be paid out when you leave or resign. As stated above, we believe that a quota or number of days limits the conversation around "how we work." However – and this is important – all of us need to be mindful of what is both 'reasonable' and fair to the team.

As we are a fast-paced and growing organization with responsibilities to get the job done and meet the needs of our clients, we adhere to the following 'rules of thumb;'

- Please provide your team and manager with as much advance notice as possible
    - 2-3 months notice is a reasonable expectation for vacations longer than a week
    - For the occasional day off (here and there) we expect you to use your judgement on what will be both appropriate and will minimize disruption to your team/client
- When you're out of the office, we encourage you to disconnect so think about:
    - Who is your backup for all your day to day responsibilities? If something comes up, we need to know who to contact in your absence.
    - If you choose to check email, Skype, Slack or take phone calls, that's your choice and is not expected. What **is** expected is that your business function doesn't stop moving. Please let your manager, your co-workers, and your client know what needs to happen to keep the train on the tracks while you're out of the office.

**Sick Leave**

You're sick and that sucks. Take care of yourself. Let your manager, your team, and your client contact know that you're sick and when you expect to feel better and return. Then, if getting back on your feet is taking longer than expected, please update everyone so we know you're still at home focused on getting better. For those of you in certain jobs, we may need you to provide a return-to-work letter from your medical provider when you come back; we ask for this because we want to make sure you're OK to get back in the saddle. Please note: in some instances your leave of absence may be governed by either federal, state or local requirements and we'll work with you to ensure you understand both your rights and obligations.

Depending upon your work location you may be eligible for mandated paid sick leave. If this is the case we'll let you know when you're hired, update you on eligibility rules, and let you know your available balance at all times.

**Life Events**

Life happens. You're getting married or having a baby. Your car broke down or your dog ran away. We understand these are the sorts of things that happen and require your attention. Follow the general time off guidelines listed below to handle your life.

Sometimes, because it's life, sad things happen. Unfortunately, most organizations don't give you time off for funerals that are not for immediate family members (with "immediate" being defined by someone sitting in a corporate office somewhere). At SC | RP we don't believe a "list" can be consulted to determine when a funeral is important to you. Rather we want you to refer to the general time off guidelines (below) and take the time you need.

Naturally, for some of these life events, you may be entitled to other types of leave; refer to the Leave of Absence section (below) for details.

### Edge Cases

Want or need to take more than two weeks off at a time? Planning a sabbatical to hike in the Grand Canyon or visit the Far East? Check with your manager as far in advance as possible.

### General Time Off Guidelines

Rather than create a list, based on rules made up by someone else, our guidance for taking off, (whether that be for vacation, holiday or some other reason), is as follows:

- Evaluate your work load, deadlines and commitments
- Review obligations to clients including operational demands and practices
- Agree on your time off with your manager, team lead and/or your team
- Put your time off on your calendar
- Activate "out of office" messages as appropriate
- Relax, refresh, and recharge

## Leaves of Absence

### Family and Medical Leave Act

We comply with the federal Family and Medical Leave Act (FMLA), which requires employers to grant unpaid leaves of absence to qualified workers for certain medical and family-related reasons. We also abide by any state and local leave laws, and the more generous of the laws will apply to the employee if the employee is eligible under both federal and state laws. *Please note there are many requirements, qualifications, and exceptions under these laws, and each employee's situation is different. You should contact the HR/People Team to discuss options.*

The FMLA requires private employers with 50 or more employees and all public agencies, including state, local, and federal employers, and local education agencies (schools), to provide eligible employees up to 12 weeks of unpaid, job-protected leave in any 12-month period for certain family

and medical reasons. The 12-month period is a rolling period (note: SC | RP uses a "rolling year") measured backward from the date an employee uses any FMLA leave, except for leaves to care for a covered servicemember with a serious illness or injury. For those leaves, the leave entitlement is 26 weeks in a single 12-month period, measured forward from the date an employee first takes that type of leave.

**Basic Leave Entitlement.** The FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible employees for the following reasons: (1) for incapacity due to pregnancy, prenatal medical care, or child birth; (2) to care for the employee's child after birth or placement for adoption or foster care; (3) to care for the employee's spouse, son or daughter, or parent who has a serious health condition; or (4) for a serious health condition that makes the employee unable to work.

**Military Family Leave Entitlements.** Eligible employees with a spouse, son, daughter, or parent on active duty or called to active duty status in the National Guard or Reserves in support of a contingency operation may use their 12-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include addressing issues that arise from (1) short notice of deployment (limited to up to seven days of leave); (2) attending certain military events and related activity; (3) arranging childcare and school activities; (4) addressing certain financial and legal arrangements; (5) attending certain counseling sessions; (6) spending time with covered military family members on short-term temporary rest and recuperation leave (limited to up to five days of leave); (7) attending post-deployment reintegration briefings; (8) arranging care for or providing care to a parent who is incapable of self-care; and (9) any additional activities agreed upon by the employer and employee that arise out of the military member's active duty or call to active duty.

The FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is a current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty that may render the servicemember medically unfit to perform his or her duties and for which the

servicemember is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list.

**Benefits and Protections During FMLA Leave.** During FMLA leave, SC | RP will maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees will be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms. However, an employee on FMLA leave does not have any greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.

Certain highly compensated key employees also may be denied reinstatement when necessary to prevent "substantial and grievous economic injury" to the company's operations. A "key" employee is an eligible salaried employee who is among the highest paid ten percent of the company's employees within 75 miles of the worksite. Employees will be notified of their status as a key employee, when applicable, after they request FMLA leave.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Employee Eligibility.** The FMLA defines eligible employees as employees who: (1) have worked for the company for at least 12 months; (2) have worked for the company for at least 1,250 hours in the previous 12 months; and (3) work at or report to a worksite which has 50 or more employees or is within 75 miles of company worksites that taken together have a total of 50 or more employees.

**Definition of Serious Health Condition.** A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job or prevents the qualified family member from participating in school, work, or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Use of Leave.** An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced work schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies also may be taken on an intermittent or reduced work schedule basis.

**Employee Responsibilities.** Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with the company's normal call-in procedures. The company may delay leave to employees who do not provide proper advance notice of the foreseeable need for leave, absent unusual circumstances preventing the notice.

Employees must provide sufficient information for the company to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the company if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also are required to provide a certification and periodic recertification supporting the need for leave. The company also may require a second, and if necessary, a third opinion (at the company's expense) and, when the leave is a result of the employee's own serious health condition, a fitness for duty report to return to work. The company also may delay or deny approval of leave for lack of proper medical certification.

**Company Responsibilities.** The company will inform employees requesting leave whether they are eligible under the FMLA. If they are, the notice will specify any additional information required as well as the employees' rights and responsibilities. If employees are not eligible, the company will provide a reason for the ineligibility.

The company will inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's FMLA leave entitlement. If the company determines that the leave is not FMLA-protected, the company will notify the employee.

**Other Provisions.** Under an exception to the Fair Labor Standards Act (FLSA) in the FMLA regulations, hourly amounts may be deducted for unpaid leave from the salary of executive, administrative, and professional employees; outside sales representatives; certain highly-skilled computer professionals; and certain highly compensated employees who are exempt from the minimum wage and overtime requirements of the FLSA, without affecting the employee's exempt status. This special exception to the "salary basis" requirements for the FLSA's exemptions extends only to eligible employees' use of FMLA leave.

**Unlawful Acts by Employers.** The FMLA makes it unlawful for any employer (1) to interfere with, restrain, or deny the exercise of any right provided under the FMLA; or (2) to discharge or discriminate against any person for opposing any practice made unlawful by the FMLA or for involvement in any proceeding under or relating to the FMLA.

**Enforcement.** An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

The FMLA does not affect any federal or state law prohibiting discrimination or supersede any state or local law or collective bargaining agreement which provides greater family or medical leave rights.

## Pregnancy and Related Medical Conditions

SC | RP complies with applicable federal and state laws pertaining to pregnancy, childbirth and related medical conditions including, where required, the provision of reasonable accommodations and leaves of

absence to its employees. If you believe that you require an accommodation in order to perform your job, or a leave of absence, please contact the HR/People Team. SC | RP prohibits retaliation against an employee who has requested reasonable accommodation under this policy.

**Leave to Vote**

Many states have different statutes defining requirements granting employees time off to vote. Our experience tells us that most employees vote before or after work since the polls are usually open at these times. If you have difficulty voting before or after your work schedule, check with your manager or the HR/People Team for specific information about your state's available voting hour.

**Military Leave**

The company supports the military obligations of all employees and will grant a leave of absence from work if you are absent because you are serving in the US uniformed services in accordance with the Uniformed Services and Reemployment Rights Act (USERRA). You must provide advance notice of your military service and a copy of your orders, unless military necessity prevents advance notice or it is otherwise impossible or unreasonable.

Continuation of health insurance benefits is available as required by USERRA based on the length of the leave and subject to the terms, conditions and limitations of the applicable plans for which you are otherwise eligible.

If you are on a military leave for up to 30 days, you must return to work on the first regularly scheduled work period after your service ends (allowing for reasonable travel time). If you are on military leave for more than 30 days, you must apply for reinstatement in accordance with USERRA and applicable state laws.

When you return from military leave (depending on the length of your military service in accordance with USERRA) you will be placed either in the

position you would have attained if you had stayed continuously employed or in a comparable position.

If you have questions about military leave, please contact a member of the HR/People Team.

**General Leave of Absence Policies**

Please note that certain leaves of absence may run concurrently including workers' compensation, FMLA, or state mandated leaves of absence. You will be notified, at the time of an approved leave of absence, which leaves are being designated and how the leave time is being tracked and calculated. Other leaves may be governed by state or local law, such as Jury Duty leave, and SC |RP will comply with all applicable requirements.

In some instances your leave of absence may be governed by either federal, state or local requirements and we'll work with you to ensure you understand both your rights and obligations.

SC |RP adheres to all leave obligations and requirements in accordance with the laws and regulations for the states and/or municipalities in which we operate.

# The End

## EMPLOYEE HANDBOOK ACKNOWLEDGMENT AND RECEIPT

I hereby acknowledge receipt of the employee handbook of **Strio Consulting | Rocket Power.** I understand and agree that it is my responsibility to read and comply with the policies in the handbook.

I understand that the handbook and all other written and oral materials provided to me are intended for informational purposes only. Neither this handbook, company practices, nor other communications create an employment contract. I understand that the policies and benefits, both in the handbook and those communicated to me in any other fashion, are subject to interpretation, review, removal, and change by management at any time without notice.

I further understand that I am an at-will employee and that neither this document nor any other communication shall bind the company to employ me now or hereafter and that my employment may be terminated by me or the company without reason at any time. I understand that no representative of the company, other than the CEO, has any authority to enter into any agreement for employment for any specified period of time or to assure any other personnel action or to assure any benefits or terms or conditions of employment, or make any agreement contrary to the foregoing.

____________________________________

Employee's Name in Print

____________________________________

Signature of Employee

________________________

Date Signed by Employee

# Exhibit B

Exhibit B





# EMPLOYMENT AGREEMENT

This Agreement is entered into as of ________ between ________________________ ("Employee") and Strio Consulting/Rocket Power ("SC/RP").

**SERVICES TO BE PERFORMED/NATURE AND SCOPE OF SERVICES**

Employee agrees to perform the services described in the Statement of Work which is attached to this Agreement. The services to be performed by the Employee for either SC/RP or a Client are described in greater detail on the attached Statement of Work and are subject to all terms and conditions of this Agreement.

Except as otherwise explicitly provided in this Agreement (including but not limited to any project specifications or other desired results included in a Statement of Work for a Client), or as Client may otherwise agree in a written agreement, SC/RP shall have the right to direct and supervise all details and means used by Employee in providing services to achieve the results desired by a Client.

(1) Each Client has the right to give direction and has ultimate authority with regard to:
  (a) any major policy decision relating to the Client's business, including without limitation any proposed merger, acquisition, recapitalization, financial strategy or restructuring; and
  (b) any products produced and services provided by the Client to its customers;
(2) SC/RP does not maintain any such right; and
(3) Employee will not make any such decisions or assume any such authority.

Employee's services will be reviewed by SC/RP. This review will be based primarily on reports by Clients about the delivery of services and performance by Employee, and also on the reports provided by Employee. Employee agrees to promptly submit to SC/RP periodic written or oral reports including, but not limited to, time worked/billable hours and progress of the work as reasonably requested by SC/RP to allow SC/RP to:

(1) exercise its right to direct and supervise details and means used by Employee and
(2) evaluate Employee's delivery of services and performance.

SC/RP's evaluation shall be based on the standards stated in the following section and may also be based on standards specified by a Client and approved by SC/RP in the applicable Statement of Work or a separate written agreement between SC/RP and the Client.

- All Services provided by Employee shall be of the highest professional standards, quality and workmanship.
- Employee shall perform all services in a timely manner and will exert his/her best efforts.
- Employee shall immediately notify SC/RP if Employee is asked to perform Services for a Client outside the scope of the description on the Statement of Work for the Client, or if Employee is not qualified or capable of providing any of the Services required under the Statement of Work.
- Employee is not authorized to render opinions on financial statements on behalf of SC/RP or any Client, nor is the Employee authorized to affix either Employee's name or the name of SC/RP to financial statements or tax returns.
- Employee shall abide by SC/RP's rules, policies, practices and procedures at all times. Employee shall also abide by Client's rules, policies, practices and procedures at all times, to the extent that they reasonably apply to the Employee providing Services, but not to the extent that they conflict with those of SC/RP. Employee shall promptly report to SC/RP any such conflict, which SC/RP will resolve with the Client.
- Employee represents and warrants that Employee's execution and delivery of this Agreement and the performance of his or her duties hereunder do not, and will not, breach or conflict with any obligation of Employee to a previous employer or any obligation to keep confidential any information acquired by Employee prior to the date hereof.
- Employee further represents and warrants that he/she will not make use of any proprietary information, ideas or material of others in connection with Employee's engagement with SC/RP.
- Employee understands that the employment relationship is "at-will" and may be ended be either party at any time, with or without notice, and with or without cause.

**TERM OF AGREEMENT**

Employee acknowledges and agrees that this Agreement may be terminated at any time by either party and that nothing in this Agreement (including, without limitation, any attached Statement(s) of Work) or otherwise shall confer upon Employee any right to continue as an Employee with SC/RP or restrict the right of SC/RP to terminate this Agreement at any time.

**CONFIDENTIAL INFORMATION AND CLIENT INTELLECTUAL PROPERTY**

Definition of Confidential Information. Employee acknowledges that in the course of performing services as outlined in this Agreement and the accompanying Statement of Work that he/she may be provided with or have access to Confidential Information belonging to SC/RP, Clients or other parties with whom any of them has a business relationship. "**Confidential Information**" means any and all trade secrets and other information that any of those persons may consider proprietary or otherwise wish to keep confidential; including, without limitation, customer lists, cost or profit figures and projections, credit information, information about current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, litigation documents and procurement requirements, and technical information included in or on tracings, flowcharts, software program code, drawings, field notes, calculations, specifications or engineering data. However, this confidentiality clause shall not apply to:

(1) information that is in the public domain,

(2) information that was previously known to Employee before the engagement,

(3) information received from a third party having the right to lawfully possess and disclose such information without breaching this Agreement,

(4) information approved for release by prior written authorization of the person with proprietary rights to the information, or

(5) information required to be disclosed by a court of competent jurisdiction, but only to the extent expressly required and only after alerting SC/RP of such disclosure requirement.

Protection of Confidential Information. Employee agrees to hold in strict confidence all Confidential Information that Employee uses or to which Employee gains access during the course of performing Services; and not to use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance of Employee's engagement to a Client that has a legally justified interest in the Confidential Information. Employee also agrees not to disclose, indirectly or directly, to SC/RP or any Client, any Confidential Information or other data the disclosure of which would constitute a violation of any obligation to, or infringe the rights of, any third party.

A. Definition of Client Intellectual Property. "**Client Intellectual Property**" means, with respect to a Client, any inventions, works of authorship and mask works, including without limitation improvements, discoveries, ideas, technologies, know-how, working product, concept, materials, disclosures, software programs, computer languages, programming aids, or documentation conceived, developed, originated, fixed or reduced to practice by Employee (or under Employee's direction), that relate in time and conception or reduction of practice to (1) the business of the Client or the

Services performed for the Client, or (2) actual or demonstrably anticipated research or development of the Client.

B. Protection of Client Intellectual Property. Employee agrees that any Client Intellectual Property shall be the sole and complete property of the applicable Client or its customer, as applicable, whether as a work made for hire or otherwise. Employee hereby assigns and conveys Employee's entire right, title and interest to any and all copyrights, patents and trade secrets included in any Client Intellectual Property to the Client or to its customer, as the case may be. Employee agrees to execute all applications or registrations for patents and copyrights, and any other instruments deemed necessary or helpful for a Client to secure and enforce its rights under this provision. Employee shall make no charge or claim for additional compensation or any other consideration for signing any such documents. Employee shall promptly and fully, and without prior request, disclose any and all such Client Intellectual Property to the applicable Client and shall treat all such Client Intellectual Property as if it were Confidential Information furnished by such Client.

C. Obligations upon Termination of Client Engagement. Upon the termination of Employee's engagement with any Client under this Agreement, Employee shall immediately return to the Client all of the Client's Confidential Information and other documents, magnetically encoded materials and other materials supplied by, or obtained from such Client (including, but not limited to, software, drawings, flow charts, structure charts, calculations, worksheets, documentation and magnetic media), along with all copies thereof in Consultant's possession and control. Employee shall turn over to SC/RP all materials developed or written by Employee in the performance of Employee's Services unless otherwise specified in writing by SC/RP or unless such disclosure would violate a Client's rights with respect to Confidential Information or Client Intellectual Property. Employee may retain copies of materials provided by a Client only if Employee has received written permission of the Client. Employee may retain copies of Employee's own works, for Employee's files, in compliance with the standards of Employee's profession and the rights of each Client with respect to Confidential Information and Client Intellectual Property. Employee agrees, upon request by SC/RP or a Client, to execute agreements as may be reasonably required to provide for the protection of Confidential Information, and for the disclosure and assignments of rights in or to Client Intellectual Property.

D. Binding Obligation. Employee agrees that the provisions of this Section 4 shall be binding upon not only on Employee, but on Employee's heirs, executors, administrators, successors and assigns; and that such provisions shall survive the termination of this Agreement for any reason.

**NON-SOLICITATION AND NON-COMPETITION**

**Non-Solicitation**

Employee shall neither induce nor attempt to induce any SC/RP employee, independent Employee or Client to end his, her or its relationship with SC/RP during the term of this Agreement, nor during the first 12 months after the date of termination of this Agreement.

**Protection of SC/RP Relationships with Clients**

While on an engagement with a Client, Employee acknowledges and agrees that he or she is acting as an employee and agent of SC/RP. In that capacity, Employee agrees to keep all of the Client's consulting, employment or staffing needs confidential and will only bring such needs to the attention of SC/RP. Employee shall not, directly or indirectly, recommend to Client that it employ or consider for employment, whether on a temporary, permanent or contractual basis, either Employee or any individual or independent Employee without prior written approval of SC/RP. Nor shall Employee recommend to any individual or independent Employee that such person seek employment with any Client, whether on a temporary, permanent or contractual basis, without prior written approval of SC/RP.

**Non-Competition**

During the term of this Agreement and for one year after the termination of Employee's relationship with SC/RP for whatever reason, whether such termination was by SC/RP or Employee, and whether with or without cause, Employee agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent Employee, employee or in any other individual representative capacity:

- Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:
    - To which, within six (6) months prior to termination of Employee's Agreement, Employee has provided services in any capacity on behalf of SC/RP, or
    - To which, within ninety (90) days prior to such termination of Employee's Agreement, Employee has been introduced or about which Employee has received information through SC/RP or through any Client for which Employee has performed Services in any capacity on behalf of SC/RP or;
- Retain or attempt to retain, directly or indirectly, for Employee or any other party, the Services of any person, including any of SC/RP's employees, who was providing services to or on behalf of SC/RP within ninety (90) day before the termination of Employee's Agreement, and to whom Employee has been introduced or about which Employee has performed Services in any capacity on behalf of SC/RP. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of SC/RP's Clients for which Employee performed or was assigned to perform Services under this Agreement.

**REMEDIES**

Arbitration. Any and all disputes and claims arising out of or relating to this Agreement, other than claims for specific performance or injunctive relief, shall be settled and determined by arbitration before the Commercial Panel of the American Arbitration Association in accordance with the Commercial Arbitration Rules. Any arbitration proceedings will be held in Minneapolis, Minnesota. Each party shall bear its own attorneys' fees and expenses in any such arbitration. However, in any arbitration proceeding arising under this Agreement, the arbitrators shall not have the power to change, modify or alter any express condition, term or provision of this Agreement. The arbitration award shall be final and binding upon the parties and judgment may be entered in any court of competent jurisdiction.

E. Equitable Remedies. Employee acknowledges and agrees that (1) the disclosure of any Confidential Information or any other violation of the terms of Sections 5 or 6 would cause immediate and irreparable injury, loss and damage to SC/RP, the affected Client and/or its customers; (2) an adequate remedy at law for such injury, loss and damage may not exist; and (3) in the event of such disclosure or threatened disclosure, or any other such violation, SC/RP, the affected Client and/or its customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce any applicable provision of this Agreement, without the necessity of proof of actual damage or loss.

F. Attorneys' Fees and Other Costs. If SC/RP prevails in any such action for injunctive relief against Employee, SC/RP shall be entitled to recover from Employee any costs or expenses incurred in obtaining injunctive relief against such breach of this Agreement by Employee, including, without limitation, attorneys' fees and costs. If any other dispute arises under this Agreement, the prevailing party in the dispute shall be entitled to collect its reasonable attorney's fees and expenses, in addition to any award to which the prevailing party may become entitled.

G. Choice of Law/Forum Selection and Consent to Personal Jurisdiction. This Agreement shall be governed, construed and determined according to the laws of the State of Minnesota without reference to principles of conflicts of law. Any claims for specific performance or injunctive relief relating to or arising out of this Agreement shall be heard solely in Hennepin County District Court in the State of Minnesota. Employee and SC/RP consent to the exclusive jurisdiction of Hennepin County District Court for such claims. It shall be a violation of this Agreement for Employee or SC/RP to bring any action in any other court if that action relates to or arises out of this Agreement in any manner.

**MISCELLANEOUS**

This Agreement may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this Agreement. Please keep in mind that we are not obligating ourselves to revise the results of any revision to these forward-looking statements in light of new information or future events.

This Agreement and the exhibits attached supersede any and all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral and written, with respect to that subject matter.

This Agreement may be amended or modified only by written consent of the parties. This Agreement will be governed by the law of the state in which the Services are primarily performed.

******************

IN WITNESS WHEREOF, the parties hereto have caused this Employment Agreement to be executed as of the date first written above.

**ACCEPTED AND AGREED:**

| **EMPLOYEE** | **STRIO CONSULTING/ROCKET POWER** |
| --- | --- |
| By: ______________________ | By: ______________________ |
| | Its: ______________________ |
| Date: ______________________ | Date: ______________________ |





STATEMENT OF WORK
INDEPENDENT CONTRACTOR AGREEMENT

| CONTRACTOR NAME | DATE OF AGREEMENT |
|---|---|
| Regan Felix Howell | 11/20/2018 |

This Statement of Work is issued pursuant to the Independent Contractor Agreement between Contractor and **Strio Consulting | Rocket Power** and relates specifically to the following engagement:

| CLIENT NAME: Nuro | |
|---|---|
| STRIO CONSULTING \| ROCKET POWER CONTACT: Jeff Baumgarten | |
| CONTRACTOR START DATE: 11/26/2018 | CONTRACTOR APPROXIMATE END DATE: |
| HOURLY RATE (1099): $55 | |
| DESCRIPTION OF WORK TO BE PERFORMED: General Program Operations and Support | |

**ACKNOWLEDGEMENT**

**CONTRACTOR**

By: Regan Felix Howell

Signature
CONTRACTOR NAME

Date: 11/21/2018

**STRIO CONSULTING | ROCKET POWER**

By: Robin Schooling

Signature
STRIO | ROCKET POWER REPRESENTATIVE

Date: 11/20/2018





# INDEPENDENT CONTRACTOR AGREEMENT

This Agreement is entered into as of 11/20/2018 between Regan Felix Howell ("Contractor") and Strio Consulting/Rocket Power ("SC/RP").

## SERVICES TO BE PERFORMED/NATURE AND SCOPE OF SERVICES

Contractor agrees to perform the services described in the Statement of Work which is attached to this Agreement. The services to be performed by the Contractor for either SC/RP or a Client are described in greater detail on the attached Statement of Work and are subject to all terms and conditions of this Agreement.

Except as otherwise explicitly provided in this Agreement (including but not limited to any project specifications or other desired results included in a Statement of Work for a Client), or as Client may otherwise agree in a written agreement provided to Contractor, SC/RP shall have the right to direct and supervise all details and means used by Contractor in providing services to achieve the results desired by a Client.

(1) Each Client has the right to give direction and has ultimate authority with regard to:

(a) any major policy decision relating to the Client's business, including without limitation any proposed merger, acquisition, recapitalization, financial strategy or restructuring; and

(b) any products produced and services provided by the Client to its customers;

(2) SC/RP does not maintain any such right; and

(3) Contractor will not make any such decisions or assume any such authority.

Contractor's services will be reviewed by SC/RP. This review will be based primarily on reports by Clients about the delivery of services and performance by Contractor, and also on the reports provided by Contractor. Contractor agrees to promptly submit to SC/RP periodic written or oral reports including, but not limited to, time worked/billable hours and progress of the work as reasonably requested by SC/RP to allow SC/RP to:

(1) exercise its right to direct and supervise details and means used by Contractor and

(2) evaluate Contractor's delivery of services and performance.

SC/RP's evaluation shall be based on the standards stated in the following section and may also be based on standards specified by a Client and approved by SC/RP in the applicable Statement of Work or a separate written agreement between SC/RP and the Client.

- All Services provided by Contractor shall be of the highest professional standards, quality and workmanship.
- Contractor shall perform all services in a timely manner and will exert his/her best efforts.
- Contractor shall immediately notify SC/RP if Contractor is asked to perform Services for a Client outside the scope of the description on the Statement of Work for the Client, or if Contractor is not qualified or capable of providing any of the Services required under the Statement of Work.
- Contractor is not authorized to render opinions on financial statements on behalf of SC/RP or any Client, nor is the Contractor authorized to affix either Contractor's name or the name of SC/RP to financial statements or tax returns.
- Contractor shall abide by SC/RP's rules, policies, practices and procedures at all times. Contractor shall also abide by Client's rules, policies, practices and procedures at all times, to the extent that they reasonably apply to the independent contractors providing Services, but not to the extent that they conflict with those of SC/RP. Contractor shall promptly report to SC/RP any such conflict, which SC/RP will resolve with the Client.
- Contractor represents and warrants that Contractor's execution and delivery of this Agreement and the performance of his or her duties hereunder do not, and will not, breach or conflict with any obligation of Contractor to a previous employer or any obligation to keep confidential any information acquired by Contractor prior to the date hereof.
- Contractor further represents and warrants that he/she will not make use of any proprietary information, ideas or material of others in connection with Contractor's engagement with SC/RP.

**INDEPENDENT CONTRACTOR STATUS**

Contractor is an independent contractor, and neither Contractor nor Contractor's employees or contract personnel are, or shall be deemed, employees of either SC/RP or any SC/RP Clients for whom services are performed.

**Business Licenses, Permits, and Certificates**

Contractor represents and warrants that Contractor and Contractor's employees and contract personnel will comply with all federal, state, and local laws requiring drivers and other licenses, business permits, and certificates required to carry out the services to be performed under this Agreement.

**State and Federal Taxes**

SC/RP will **not:**

- withhold FICA (Social Security and Medicare taxes) from Contractor's payments or make FICA payments on Contractor's behalf
- make state or federal unemployment compensation contributions on Contractor's behalf, or
- withhold state or federal income tax from Contractor's payments.

Contractor shall pay all taxes incurred while performing services under this Agreement—including all applicable income taxes and, if Contractor is not a corporation, self-employment (Social Security) taxes. Upon demand, Contractor shall provide SC/RP with proof that such payments have been made.

**Fringe Benefits**

Contractor understands that neither Contractor nor Contractor's employees or contract personnel are eligible to participate in any fringe benefit plan of SC/RP.

**Unemployment Compensation**

SC/RP shall make no state or federal unemployment compensation payments on behalf of Contractor or Contractor's employees or contract personnel. Contractor will not be entitled to these benefits in connection with work performed under this Agreement.

**Workers' Compensation**

SC/RP shall not obtain workers' compensation insurance on behalf of Contractor or Contractor's employees.

**Insurance**

SC/RP shall not provide insurance coverage of any kind for Contractor or Contractor's employees or contract personnel. Contractor shall obtain the applicable insurance coverage, as listed on any attachments, and maintain it during the entire term of this Agreement.

**Indemnification**

Contractor shall indemnify and hold SC/RP harmless from any loss or liability arising from performing services under this Agreement.

**COMPENSATION**

In consideration for the services to be performed by Contractor, SC/RP agrees to pay Contractor at the rate of $55 per hour and for hours actually worked in performing Services for a Client as indicated on the Statement of Work for that Client.

Contractor is responsible for submitting all billable hours for the previous week (Monday through Sunday) no later than each Monday by Noon (Central Time). Billable hours should be recorded, on a daily basis, in the recording system of record; site and/or client managers are responsible for reviewing and approving these billable hours.

Contractor shall not divulge to a Client any information concerning Contractor's rate of pay from SC/RP.

Contractor will be issued a Form 1099 summarizing compensation and providing other information required under applicable laws for that year.

**EXPENSES**

Contractor shall be responsible for all expenses incurred while performing services under this Agreement including but not limited to automobile and other travel expenses, cell phone and office supply expenses and meals.

SC/RP may reimburse Contractor for some expenses that are attributable directly to work performed under this Agreement and the attached Statement of Work and/or at Client request.

**TERM OF AGREEMENT**

This agreement will become effective when signed by both parties and will terminate on the earlier of the date Contractor completes the services required by this Agreement or the date a party terminates the Agreement as provided below.

Contractor acknowledges and agrees that this Agreement may be terminated at any time by either party and that nothing in this Agreement (including, without limitation, any attached Statement(s) of Work) or otherwise shall confer upon Contractor any right to continue as a Contractor with SC/RP or restrict the right of SC/RP to terminate this Agreement at any time.

**CONFIDENTIAL INFORMATION AND CLIENT INTELLECTUAL PROPERTY**

Definition of Confidential Information. Contractor acknowledges that in the course of performing services as outlined in this Agreement and the accompanying Statement of Work that he/she may be provided with or have access to Confidential Information belonging to SC/RP, Clients or other parties with whom any of them has a business relationship. "**Confidential Information**" means any and all trade secrets and other information that any of those persons may consider proprietary or otherwise wish to keep confidential; including, without limitation, customer lists, cost or profit figures and projections, credit information, information about current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, litigation documents and procurement requirements, and technical information included in or on tracings, flowcharts, software program code, drawings, field notes, calculations, specifications or engineering data. However, this confidentiality clause shall not apply to:

(1) information that is in the public domain,

(2) information that was previously known to Contractor before the engagement,

(3) information received from a third party having the right to lawfully possess and disclose such information without breaching this Agreement,

(4) information approved for release by prior written authorization of the person with proprietary rights to the information, or

(5) information required to be disclosed by a court of competent jurisdiction, but only to the extent expressly required and only after alerting SC/RP of such disclosure requirement.

Protection of Confidential Information. Contractor agrees to hold in strict confidence all Confidential Information that Contractor uses or to which Contractor gains access during the course of performing Services; and not to use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance of Contractor's engagement to a Client that has a legally justified interest in the Confidential Information. Contractor also agrees not to disclose, indirectly or directly, to SC/RP or any Client, any Confidential Information or other data the disclosure of which would constitute a violation of any obligation to, or infringe the rights of, any third party.

A. Definition of Client Intellectual Property. "**Client Intellectual Property**" means, with respect to a Client, any inventions, works of authorship and mask works, including without limitation improvements, discoveries, ideas, technologies, know-how, working product, concept, materials, disclosures, software programs, computer languages, programming aids, or documentation conceived, developed, originated, fixed or reduced to practice by Contractor (or under Contractor's direction), that relate in time and conception or reduction of practice to (1) the business of the Client or the Services performed for the Client, or (2) actual or demonstrably anticipated research or development of the Client.

B. Protection of Client Intellectual Property. Contractor agrees that any Client Intellectual Property shall be the sole and complete property of the applicable Client or its customer, as applicable, whether as a work made for hire or otherwise. Contractor hereby assigns and conveys Contractor's entire right, title and interest to any and all copyrights, patents and trade secrets included in any Client Intellectual Property to the Client or to its customer, as the case may be. Contractor agrees to execute all applications or registrations for patents and copyrights, and any other instruments deemed necessary or helpful for a Client to secure and enforce its rights under this provision. Contractor shall make no charge or claim for additional compensation or any other consideration for signing any such documents. Contractor shall promptly and fully, and without prior request, disclose any and all such Client Intellectual Property to the applicable Client and shall treat all such Client Intellectual Property as if it were Confidential Information furnished by such Client.

C. Obligations upon Termination of Client Engagement. Upon the termination of Contractor's engagement with any Client under this Agreement, Contractor shall immediately return to the Client all of the Client's Confidential Information and other documents, magnetically encoded materials and other materials supplied by, or obtained from such Client (including, but not limited to, software, drawings, flowcharts, structure charts, calculations, worksheets, documentation and magnetic media), along with all copies thereof in Contractor's possession and control. Contractor shall turn over to SC/RP all materials developed or written by Contractor in the performance of Contractor's Services unless otherwise specified in writing by SC/RP or unless such disclosure would violate a Client's rights with respect to Confidential Information or Client Intellectual Property. Contractor may retain copies of materials provided by a Client only if Contractor has received written permission of the Client. Contractor may retain copies of Contractor's own works, for Contractor's files, in compliance with the standards of Contractor's profession and the rights of each Client with respect to Confidential Information and Client Intellectual Property. Contractor agrees, upon request by SC/RP or a Client, to execute agreements as may be reasonably required to provide for the protection of

Confidential Information, and for the disclosure and assignments of rights in or to Client Intellectual Property.

D. Binding Obligation. Contractor agrees that the provisions of this Section 4 shall be binding upon not only on Contractor, but on Contractor's heirs, executors, administrators, successors and assigns; and that such provisions shall survive the termination of this Agreement for any reason.

**NON-SOLICITATION AND NON-COMPETITION**

**Non-Solicitation**

Contractor shall neither induce nor attempt to induce any SC/RP employee, independent contractor or Client to end his, her or its relationship with SC/RP during the term of this Agreement, nor during the first 12 months after the date of termination of this Agreement.

**Protection of SC/RP Relationships with Clients.**

While on an engagement with a Client, Contractor acknowledges and agrees that he or she is acting as an employee and agent of SC/RP. In that capacity, Contractor agrees to keep all of the Client's consulting, employment or staffing needs confidential and will only bring such needs to the attention of SC/RP. Contractor shall not, directly or indirectly, recommend to Client that it employ or consider for employment, whether on a temporary, permanent or contractual basis, either Contractor or any individual or independent contractor without prior written approval of SC/RP. Nor shall Contractor recommend to any individual or independent contractor that such person seek employment with any Client, whether on a temporary, permanent or contractual basis, without prior written approval of SC/RP.

Non-Competition.

During the term of this Agreement and for one year after the termination of Contractor's relationship with SC/RP for whatever reason, whether such termination was by SC/RP or Contractor, and whether with or without cause, Contractor agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:

1) Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:
    a. To which, within six (6) months prior to termination of Contractor's Agreement, Contractor has provided services in any capacity on behalf of SC/RP, or
    b. To which, within ninety (90) days prior to such termination of Contractor's Agreement, Contractor has been introduced or about which Contractor has received information through SC/RP or through any Client for which Contractor has performed Services in any capacity on behalf of SC/RP or;
2) Retain or attempt to retain, directly or indirectly, for Contractor or any other party, the Services of any person, including any of SC/RP's employees, who was providing services to or on behalf of SC/RP within ninety (90) day before the termination of Contractor's Agreement, and to whom Contractor has been introduced or about which Contractor has performed Services in any capacity on behalf of SC/RP. For purposes of this paragraph, the term "Client" includes any affiliates, customers and

clients of SC/RP's Clients for which Contractor performed or was assigned to perform Services under this Agreement.

**REMEDIES**

Arbitration. Any and all disputes and claims arising out of or relating to this Agreement, other than claims for specific performance or injunctive relief, shall be settled and determined by arbitration before the Commercial Panel of the American Arbitration Association in accordance with the Commercial Arbitration Rules. Any arbitration proceedings will be held in Minneapolis, Minnesota. Each party shall bear its own attorneys' fees and expenses in any such arbitration. However, in any arbitration proceeding arising under this Agreement, the arbitrators shall not have the power to change, modify or alter any express condition, term or provision of this Agreement. The arbitration award shall be final and binding upon the parties and judgment may be entered in any court of competent jurisdiction.

E. Equitable Remedies. Contractor acknowledges and agrees that (1) the disclosure of any Confidential Information or any other violation of the terms of Sections 5 or 6 would cause immediate and irreparable injury, loss and damage to SC/RP, the affected Client and/or its customers; (2) an adequate remedy at law for such injury, loss and damage may not exist; and (3) in the event of such disclosure or threatened disclosure, or any other such violation, SC/RP, the affected Client and/or its customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce any applicable provision of this Agreement, without the necessity of proof of actual damage or loss.

F. Attorneys' Fees and Other Costs. If SC/RP prevails in any such action for injunctive relief against Contractor, SC/RP shall be entitled to recover from Contractor any costs or expenses incurred in obtaining injunctive relief against such breach of this Agreement by Contractor, including, without limitation, attorneys' fees and costs. If any other dispute arises under this Agreement, the prevailing party in the dispute shall be entitled to collect its reasonable attorney's fees and expenses, in addition to any award to which the prevailing party may become entitled.

G. Choice of Law/Forum Selection and Consent to Personal Jurisdiction. This Agreement shall be governed, construed and determined according to the laws of the State of Minnesota without reference to principles of conflicts of law. Any claims for specific performance or injunctive relief relating to or arising out of this Agreement shall be heard solely in Hennepin County District Court in the State of Minnesota. Contractor and SC/RP consent to the exclusive jurisdiction of Hennepin County District Court for such claims. It shall be a violation of this Agreement for Contractor or SC/RP to bring any action in any other court if that action relates to or arises out of this Agreement in any manner.

Doc ID: be72699979a3549c4e4bfb1df366847267a9a344

**MISCELLANEOUS**

This Agreement may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this Agreement. Please keep in mind that we are not obligating ourselves to revise the results of any revision to these forward-looking statements in light of new information or future events.

This Agreement and the exhibits attached hereto constitute the entire agreement between the parties with respect to the matters contained herein; and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral and written, with respect to that subject matter.

This Agreement may be amended or modified only by written consent of the parties. This Agreement will be governed by the law of the state in which the Services are primarily performed.

Contractor may not assign his or her duties under this Agreement without the prior written consent of SC/RP which SC/RP may withhold in its sole and absolute discretion.

******************

IN WITNESS WHEREOF, the parties hereto have caused this Independent Contractor Agreement to be executed as of the date first written above.

**ACCEPTED AND AGREED:**

**CONTRACTOR**

By: Regan Felix Howell

Date: 11/21/2018

**STRIO CONSULTING/ROCKET POWER**

By: Robin Schooling

Its: Head of People Operations

Date: 11/20/2018

 # Audit Trail

| | |
|---|---|
| **TITLE** | Strio Consulting Statement of Work and Contractor Agreement |
| **FILE NAME** | Howell, Regan SoW and CA.pdf |
| **DOCUMENT ID** | be72699979a3549c4e4bfb1df366847267a9a344 |
| **STATUS** | Completed |

## Document History

| | | |
|---|---|---|
| SENT | **11/20/2018** 19:02:20 UTC | Sent for signature to Robin Schooling (robin.schooling@strioconsulting.com) and Regan Felix Howell (reganhowell@gmail.com) from caleb@strioconsulting.com IP: 73.5.171.109 |
| VIEWED | **11/20/2018** 19:03:37 UTC | Viewed by Robin Schooling (robin.schooling@strioconsulting.com) IP: 174.64.12.228 |
| SIGNED | **11/20/2018** 19:04:08 UTC | Signed by Robin Schooling (robin.schooling@strioconsulting.com) IP: 174.64.12.228 |
| VIEWED | **11/21/2018** 16:26:25 UTC | Viewed by Regan Felix Howell (reganhowell@gmail.com) IP: 24.10.212.147 |
| SIGNED | **11/21/2018** 16:30:09 UTC | Signed by Regan Felix Howell (reganhowell@gmail.com) IP: 24.10.212.147 |
| COMPLETED | **11/21/2018** 16:30:09 UTC | The document has been completed. |

# Exhibit C

Exhibit C

**Transcript of Text Message Exchange Between Mat Caldwell and Caleb Fullhart**:

Started Dec 14 @ 11:46AM Hawaii Time

**Caleb -** When are you back next week? I am coming out to SFO so we can chat face to face

**Mat -** Next week won't work. Is Doris contacting Byron.

**Caleb -**I already messaged him
if you aren't available face to face,  we need to talk soon.
You fucking pissing me off man. And you are fucknig with my money
Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you
want the nuclear option you will get it.

**Mat -** Dude - don't go there.
This is not what either of us wants.

**Caleb -** I am literally shaking I am so pissed
You are making calls without talking to me

When are you back next week? I am coming out to SFO so we can chat face to face
Next week won't work. Is Doris contacting Byron.
I already messaged him
If you aren't available face to face, we need to talk soon.
You fucking pissing me off man. And you are fucknig with my money
Do not forget who holds the paper on every single employee (except Jeff and Jackie). If you want the nuclear option you will get it.
Dude - don't go there
This is not what either of us wants.

# Exhibit D

Exhibit D

STATEMENT OF WORK
EMPLOYEE CONSULTANT ATTACHMENT

| CONSULTANT NAME | DATE OF CONSULTANT EMPLOYMENT AGREEMENT: |
|---|---|
| Paula-Anne Sherron | 7/10/2018 |

This Statement of Work is issued pursuant to the Consultant Employment Agreement between Consultant and Strio Consulting; and relates specifically to the following engagement:

| CLIENT/PROJECT NAME: Minted | |
|---|---|
| CONSULTANT START DATE (subject to change based on client needs): 7/11/2018 | CONSULTANT APPROXIMATE END DATE: |
| HOURLY PAY RATE: $85.00 | |
| DESCRIPTION OF WORK TO BE PERFORMED: Sr Technical Recruiter | |

**ACKNOWLEDGEMENT**

**CONSULTANT**

By: *Paula-Anne Sherron*
Signature

Date: 07/10/2018

**STRIO CONSULTING**

By: [signature]
Signature
STRIO REPRESENTATIVE

Date: 07/10/2018

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

**CONSULTANT EMPLOYMENT AGREEMENT**

The Consultant Employment Agreement (the "Agreement") is entered into as of 7/10/2018____ by and between Paula-Anne Sherron __("Consultant") and Strio Consulting.

1. NATURE AND SCOPE OF CONSULTING SERVICES
   A. Consultant agrees to provide, on an as needed basis, such professional financial obligations to provide Services as an independent contractor for one or more of its clients (each, a "Client"). Any Services to be performed by Consultant for a Client shall be described in greater detail on a Statement of Work attached hereto for that Client (a "**Statement of Work**"), subject to all terms and conditions of this Agreement.
   B. Except as otherwise explicitly provided in this Agreement (including but not limited to any project specifications or other desired results included in a Statement of Work for a Client), or as Strio and a Client may otherwise agree in a written agreement provided to Consultant, Strio shall have the right to direct and supervise all details and means used by Consultant in performing Services to achieve the results desired by a Client (1) each Client has the right to give direction and has the ultimate authority with regard to (a) any major policy decision relating to the Client's business, including without limitation any proposed merger, acquisition, recapitalization, financial strategy or restructuring; and (b) any products produced and services provided by the Client to its customers; (2) Strio does not maintain any such right; and (3) Consultant will not make any such decisions or assume any such authority.
   C. Consultant's Services will be reviewed by Strio. This review will be based primarily on reports by Clients about the performance of Services by Consultant; and also on the following reports by Consultant. Consultant agrees to promptly submit to Strio periodic written or oral reports that shall include time worked and may describe the progress of the work, as reasonably requested by Strio, to allow Strio to (1) exercise its right to direct and supervise details and means used by Consultant and (2) evaluate Consultant's performance of Services. Strio's evaluation shall be based on the standards stated in the following paragraph; and may also be based on standards specified by a Client and approved by Strio in the applicable Statement of Work or a separate written agreement between Strio and the Client.
   D. All Services provided by Consultant hereunder shall be of the highest professional standards, quality and workmanship. Consultant shall performance all Services in a timely manner and will exert his or her best efforts. Consultant shall immediately notify Strio if Consultant is asked to perform Services for a Client outside the scope of the description on the Statement of Work for the Client, or if Consultant is not qualified or capable of providing any of the Services required under the Statement of Work. Consultant is not authorized to render opinions on financial statements on behalf of Strio or any Client, nor is the Consultant authorized to affix either Consultant's name or the name of Strio to financial statements or tax returns.

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

E. Consultant shall abide by Strio's rules, policies, practices and procedures at all times. Consultant shall also abide by Client's rules, policies, practices and procedures at all times, t o the extent that they reasonably apply to the independent contractors providing Services, but not o the extent that they conflict with those of Strio; and Consultant shall promptly report to Strio any such conflict, which Strio will resolve with the Client.

F. Consultant represents and warrants that Consultant's execution and delivery of this Agreement and the performance of his or her duties hereunder do not, and will not, breach or conflict with any obligation of Consultant to a previous employer or any obligation to keep confidential any information acquired by Consultant prior to the date hereof. Consultant further represents and warrants that he or she will not make use of any proprietary information, ideas or material of others in connection with Consultant's employment by Strio.

G. Consultant acknowledges that (1) he or she is an employee of Strio, which is an independent contractor to each Client; (2) Consultant is not an employee or agent of any Client to whom Consultant may be assigned; and (2) Consultant shall not become an employee of any Client nor become eligible to participate in any Client's employment benefit plans, by performing Services for a Client under this Agreement.

H. This offer may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this offer. Please keep in mind that we are not obligating ourselves to revise the results of any revision to these forward-looking statements in light of new information or future events.

2. **COMPENSATION**

A. Consultant shall be paid $$85.00 per hour and for hours actually worked in performing Services for a Client, at the hourly rate indicated on the Statement of Work for that Client (which rate Consultant acknowledges is less than the rate charged by Strio to the Client) and such compensation shall be subject to application Federal, State and local withholding requirements. In order to be paid for Services performed for a Client, Consultant must submit to Strio, for each week of Services, a timesheet signed by an authorized representative of the Client. Consultant shall notify Strio prior to accepting or performing any overtime Services, at the end of each calendar year in which Consultant provides Services, Strio will issue to Consultant a Form W-2/1099 summarizing Consultant's compensation and providing other information required under applicable laws for that year.

B. Consultant shall also be entitled to participate in any employee fringe benefit programs as may be specifically designated as being available from time to time to consultants of Strio employed in the same professional category as Consultant. Except for any such programs, Consultant shall not be entitled to participate in any other employee benefit programs or fringe benefits that may

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

be offered by Strio or its affiliates to other employees. Strio reserves the right to change, unilaterally without notice, any and all employment policies, rules, regulations, practices, procedures and employee benefit programs applicable to Consultant at any time and for any legally permitted reason.

C. Consultant shall not divulge to a Client any information concerning Consultant's rate of pay from Strio.

D. Strio will reimburse Consultant for all ordinary business expenses incident to Consultant's performance of Services under this Agreement. Extraordinary business expenses will not be reimbursed unless approved in advance by Strio in writing.

3. **TERM**

A. Consultant's Services hereunder shall be "at will" and provided only on an as needed basis without any commitment as to minimum use by Strio or any Client. Consultant acknowledges and agrees that this Agreement may be terminated at any time by either party; and that nothing in this Agreement (including, without limitation, any attached Statement(s) of Work) or otherwise shall confer upon Consultant any riht to continue in the employ of Strio or restrict the right of Strio to terminate this agreement at any time.

4. **CONFIDENTIAL INFORMATION AND CLIENT INTELLECTUAL PROPERTY**

A. Definition of Confidential Information. Consultant acknowledges that in the course of Consultant's employment by Strio, Consultant may be provided with, or have access to, Confidential Information belonging to Strio, Clients or other parties with whom any of them has a business relationship. "**Confidential Information**" means any and all trade secrets and other information that any of those persons may consider proprietary or otherwise wish to keep confidential; including, without limitation, customer lists, cost or profit figures and projections, credit information, information about current, future or proposed products or services, plans and technology, business forecasts, financial records; accounting records, litigation documents and procurement requirements, and technical information included in or on tracings, flowcharts, software program code, drawings, field notes, calculations, specifications or engineering data. However, this confidentiality clause shall not apply to: (1) information that is in the public domain, (2) information that was previously known to Consultant before the engagement, (3) information received from a third party having the right to lawfully possess and disclose such information without breaching this Agreement, (4) information approved for release by prior written authorization of the person with proprietary rights to the information, or (5) information required to be disclosed by a court of competent jurisdiction, but only to the extent expressly required and only after alerting Strio of such disclosure requirement.

B. Protection of Confidential Information. Consultant agrees to hold in strict confidence all Confidential Information that Consultant uses or to which Consultant gains access during the course of performing Services; and not to use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

of Consultant's engagement to a Client that has a legally justified interest in the Confidential Information. Consultant also agrees not to disclose, indirectly or directly, to Strio or any Client, any Confidential Information or other data the disclosure of which would constitute a violation of any obligation to, or infringe the rights of, any third party.

C. Definition of Client Intellectual Property. "**Client Intellectual Property**" means, with respect to a Client, any inventions, works of authorship and mask works, including without limitation improvements, discoveries, ideas, technologies, know-how, working product, concept, materials, disclosures, software programs, computer languages, programming aids, or documentation conceived, developed, originated, fixed or reduced to practice by Consultant (or under Consultant's direction), that relate in time and conception or reduction of practice to (1) the business of the Client or the Services performed for the Client, or (2) actual or demonstrably anticipated research or development of the Client.

D. Protection of Client Intellectual Property. Consultant agrees that any Client Intellectual Property shall be the sole and complete property of the applicable Client or its customer, as applicable, whether as a work made for hire or otherwise. Consultant hereby assigns and conveys Consultant's entire right, title and interest to any and all copyrights, patents and trade secrets included in any Client Intellectual Property to the copyrights, patents and trade secrets included in any Client Intellectual Property t other applicable Client or to its customer, as the case may be. Consultant agrees to execute all applications or registrations for patents and copyrights, and any other instruments deemed necessary or helpful for a Client to secure and enforce its rights under this provision. Consultant shall make no charge or claim for additional compensation or provision. Consultant shall make no charge or claim for additional compensation or any other consideration for signing any such documents. Consultant shall promptly and fully, and without prior request, disclose any and all such Client Intellectual Property to the applicable Client and shall treat all such Client Intellectual Property as if it were Confidential Information furnished by such Client.

E. Obligations upon Termination of Client Engagement. Upon the termination of Consultant's engagement with any Client under this Agreement, Consultant shall immediately return to the Client all of the Client's Confidential Information and other documents, magnetically encoded materials and other materials supplied by, or obtained from such Client (including, but not limited to, software, drawings, flow charts, structure charts, calculations, worksheets, documentation and magnetic media), along with all copies thereof in Consultant's possession and control. Consultant shall turn over to Strio all materials developed or written by Consultant in the performance of Consultant's Services unless otherwise specified in writing by Strio or unless such disclosure would violate a Client's rights with respect to Confidential Information or Client Intellectual Property. Consultant may retain copies of materials provided by a Client only if Consultant has received written permission of the Client. Consultant may retain copies of Consultant's own works, for Consultant's files, in compliance with the

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

standards of Consultant's profession and the rights of each Client with respect to Confidential Information and Client Intellectual Property. Consultant agrees, upon request by Strio or a Client, to execute agreements as may be reasonably required to provide for the protection of Confidential Information, and for the disclosure and assignments of rights in or to Client Intellectual Property.

F. Binding Obligation. Consultant agrees that the provisions of this Section 4 shall be binding upon not only on Consultant, but on Consultant's heirs, executors, administrators, successors and assigns; and that such provisions shall survive the termination of this Agreement for any reason.

5. **NON-SOLICITATION AND NON-COMPETITION**

A. Non-Solicitation. Consultant shall neither induce nor attempt to induce any Strio employee, independent contractor or Client to end his, her or its relationship with Strio during the term of this Agreement, nor during the first 12 months after the date of termination of this Agreement.

B. Protection of Strio Relationships with Clients. While on an engagement with a Client, Consultant acknowledges and agrees that he or she is acting as an employee and agent of Strio. In that capacity, Consultant agrees to keep all of the Client's consulting, employment or staffing needs confidential and will only bring such needs to the attention of Strio. Consultant shall not, directly or indirectly, recommend to Client that it employ or consider for employment, whether on a temporary, permanent or contractual basis, either Consultant or any individual or independent contractor without prior written approval of Strio. Nor shall Consultant recommend to any individual or independent contractor that such person seek employment with any Client, whether on a temporary, permanent or contractual basis, without prior written approval of Strio.

C. Non-Competition. During the term of this Agreement and for one year after the termination of Consultant's employment relationship with Strio for whatever reason, whether such termination was by Strio or Consultant, and whether with or without cause, Consultant agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:

1) Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:

a. To which, within six (6) months prior to termination of Consultant's employment, Consultant has provided services in any capacity on behalf of Strio, or

b. To which, within ninety (90) days prior to such termination of Consultant's employment, Consultant has been introduced or about which Consultant has received information through Strio or through any Client for which Consultant has performed Services in any capacity on behalf of Strio or;

2) Retain or attempt to retain, directly or indirectly, for Consultant or any other party, the Services of any person, including any of Strio's employees, who was providing services to or on behalf of Strio within ninety (90) day before the termination of Consultant's employment,

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

and to whom Consultant has been introduced or about which Consultant has performed Services in any capacity on behalf of Strio. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of Strio's Clients for which Consultant performed or was assigned to perform Services under this Agreement.

6. **REMEDIES**

D. Arbitration. Any and all disputes and claims arising out of or relating to this Agreement, other than claims for specific performance or injunctive relief, shall be settled and determined by arbitration before the Commercial Panel of the American Arbitration Association in accordance with the Commercial Arbitration Rules. Any arbitration proceedings will be held in Minneapolis, Minnesota. Each party shall bear its own attorneys' fees and expenses in any such arbitration. However, in any arbitration proceeding arising under this Agreement, the arbitrators shall not have the power to change, modify or alter any express condition, term or provision of this Agreement. The arbitration award shall be final and binding upon the parties and judgment may be entered in any court of competent jurisdiction.

E. Equitable Remedies. Consultant acknowledges and agrees that (1) the disclosure of any Confidential Information or any other violation of the terms of Sections 5 or 6 would cause immediate and irreparable injury, loss and damage to Strio, the affected Client and/or its customers; (2) an adequate remedy at law for such injury, loss and damage may not exist; and (3) in the event of such disclosure or threatened disclosure, or any other such violation, Strio, the affected Client and/or its customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce any applicable provision of this Agreement, without the necessity of proof of actual damage or loss.

F. Attorneys' Fees and Other Costs. If Strio prevails in any such action for injunctive relief against Consultant, Strio shall be entitled to recover from Consultant any costs or expenses incurred in obtaining injunctive relief against such breach of this Agreement by Consultant, including, without limitation, attorneys' fees and costs. If any other dispute arises under this Agreement, the prevailing party in the dispute shall be entitled to collect its reasonable attorney's fees and expenses, in addition to any award to which the prevailing party may become entitled.

G. Choice of Law/Forum Selection and Consent to Personal Jurisdiction. This Agreement shall be governed, construed and determined according to the laws of the State of Minnesota without reference to principles of conflicts of law. Any claims for specific performance or injunctive relief relating to or arising out of this Agreement shall be heard solely in Hennepin County District Court in the State of Minnesota. Consultant and Strio consent to the exclusive jurisdiction of Hennepin County District Court for such claims. It shall be a violation of this Agreement for Employee or Strio to bring any action in any other court if that action relates to or arises out of this Agreement in any manner.

6. **MISCELLANEOUS**

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

A. This Agreement and the exhibits attached hereto constitute the entire agreement between the parties with respect to the matters contained herein; and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral and written, with respect to that subject matter.
B. This Agreement may be amended or modified only by written consent of the parties. This Agreement will be governed by the law of the state in which the Services are primarily performed.
C. Consultant may not assign his or her duties under this Agreement without the prior written consent of Strio, which Strio may withhold in its sole and absolutely discretion.

IN WITNESS WHEREOF, the parties hereto have caused this Consultant Employment Agreement to be executed as of the date first written above.

**ACCEPTED AND AGREED:**

| **CONSULTANT** | **STRIO CONSULTING** |
|---|---|
| By: *Paula-Anne Sherron* | By: [signature] |
| | Its: CEO |
| Date: 07/10/2018 | Date: 07/10/2018 |

Doc ID: 899ede3e0d6a662b1c1fa3de110b93da51982938

 # Audit Trail

| | |
|---|---|
| TITLE | Statement of Work/ Consultant Agreement |
| FILE NAME | Strio STATE...e2.docx.pdf and 1 other |
| DOCUMENT ID | 899ede3e0d6a662b1c1fa3de110b93da51982938 |
| STATUS | Completed |

## Document History

| | | |
|---|---|---|
| SENT | **07/10/2018**<br>21:32:00 UTC | Sent for signature to Caleb Fullhart (caleb@strioconsulting.com) and Paula-Anne Sherron (paulaanned@gmail.com) from caleb@strioconsulting.com<br>IP: 140.190.47.135 |
| VIEWED | **07/10/2018**<br>21:32:23 UTC | Viewed by Caleb Fullhart (caleb@strioconsulting.com)<br>IP: 140.190.47.135 |
| SIGNED | **07/10/2018**<br>21:33:25 UTC | Signed by Caleb Fullhart (caleb@strioconsulting.com)<br>IP: 140.190.47.135 |
| VIEWED | **07/10/2018**<br>21:39:18 UTC | Viewed by Paula-Anne Sherron (paulaanned@gmail.com)<br>IP: 73.162.26.120 |
| SIGNED | **07/10/2018**<br>21:44:36 UTC | Signed by Paula-Anne Sherron (paulaanned@gmail.com)<br>IP: 73.162.26.120 |
| COMPLETED | **07/10/2018**<br>21:44:36 UTC | The document has been completed. |

# Exhibit E

Exhibit E

STATEMENT OF WORK
EMPLOYEE CONSULTANT ATTACHMENT

| CONSULTANT NAME | DATE OF CONSULTANT EMPLOYMENT AGREEMENT: |
| --- | --- |
| Christine Covert | 1/29/2018 |

This Statement of Work is issued pursuant to the Consultant Employment Agreement between Consultant and Strio Consulting; and relates specifically to the following engagement:

| CLIENT NAME: Reflektive | |
| --- | --- |
| CLIENT CONTACT & PHONE NUMBER: Mat Caldwell 925-785-0368 | |
| CONSULTANT START DATE: 1/29/2018 | CONSULTANT APPROXIMATE END DATE: |
| HOURLY PAY RATE: 70 | |
| DESCRIPTION OF WORK TO BE PERFORMED: Recruiting | |

**ACKNOWLEDGEMENT**

**CONSULTANT**

By: *Margaret Christine Covert*

Signature
Margaret C Covert

Date: 01/29/2018

**STRIO CONSULTING**

By: [signature]

Signature
STRIO REPRESENTATIVE

Date: 01/29/2018

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

# CONSULTANT EMPLOYMENT AGREEMENT

The Consultant Employment Agreement (the "Agreement") is entered into as of 1/29/2018 by and between Christine Cover ("Consultant") and Strio Consulting.

1. NATURE AND SCOPE OF CONSULTING SERVICES
   A. Consultant agrees to provide, on an as needed basis, such professional financial obligations to provide Services as an independent contractor for one or more of its clients (each, a "Client"). Any Services to be performed by Consultant for a Client shall be described in greater detail on a Statement of Work attached hereto for that Client (a "**Statement of Work**"), subject to all terms and conditions of this Agreement.
   B. Except as otherwise explicitly provided in this Agreement (including but not limited to any project specifications or other desired results included in a Statement of Work for a Client), or as Strio and a Client may otherwise agree in a written agreement provided to Consultant, Strio shall have the right to direct and supervise all details and means used by Consultant in performing Services to achieve the results desired by a Client (1) each Client has the right to give direction and has the ultimate authority with regard to (a) any major policy decision relating to the Client's business, including without limitation any proposed merger, acquisition, recapitalization, financial strategy or restructuring; and (b) any products produced and services provided by the Client to its customers; (2) Strio does not maintain any such right; and (3) Consultant will not make any such decisions or assume any such authority.
   C. Consultant's Services will be reviewed by Strio. This review will be based primarily on reports by Clients about the performance of Services by Consultant; and also on the following reports by Consultant. Consultant agrees to promptly submit to Strio periodic written or oral reports that shall include time worked and may describe the progress of the work, as reasonably requested by Strio, to allow Strio to (1) exercise its right to direct and supervise details and means used by Consultant and (2) evaluate Consultant's performance of Services. Strio's evaluation shall be based on the standards stated in the following paragraph; and may also be based on standards specified by a Client and approved by Strio in the applicable Statement of Work or a separate written agreement between Strio and the Client.
   D. All Services provided by Consultant hereunder shall be of the highest professional standards, quality and workmanship. Consultant shall performance all Services in a timely manner and will exert his or her best efforts. Consultant shall immediately notify Strio if Consultant is asked to perform Services for a Client outside the scope of the description on the Statement of Work for the Client, or if Consultant is not qualified or capable of providing any of the Services required under the Statement of Work. Consultant is not authorized to render opinions on financial statements on behalf of Strio or any Client, nor is the Consultant authorized to affix either Consultant's name or the name of Strio to financial statements or tax returns.

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

E. Consultant shall abide by Strio's rules, policies, practices and procedures at all times. Consultant shall also abide by Client's rules, policies, practices and procedures at all times, t o the extent that they reasonably apply to the independent contractors providing Services, but not o the extent that they conflict with those of Strio; and Consultant shall promptly report to Strio any such conflict, which Strio will resolve with the Client.

F. Consultant represents and warrants that Consultant's execution and delivery of this Agreement and the performance of his or her duties hereunder do not, and will not, breach or conflict with any obligation of Consultant to a previous employer or any obligation to keep confidential any information acquired by Consultant prior to the date hereof. Consultant further represents and warrants that he or she will not make use of any proprietary information, ideas or material of others in connection with Consultant's employment by Strio.

G. Consultant acknowledges that (1) he or she is an employee of Strio, which is an independent contractor to each Client; (2) Consultant is not an employee or agent of any Client to whom Consultant may be assigned; and (2) Consultant shall not become an employee of any Client nor become eligible to participate in any Client's employment benefit plans, by performing Services for a Client under this Agreement.

2. **COMPENSATION**

A. Consultant shall be paid $70_____ per hour, and only for hours actually worked in performing Services for a Client, at the hourly rate indicated on the Statement of Work for that Client (which rate Consultant acknowledges is less than the rate charged by Strio to the Client) and such compensation shall be subject to application Federal, State and local withholding requirements. In order to be paid for Services performed for a Client, Consultant must submit to Strio, for each week of Services, a timesheet signed by an authorized representative of the Client. Consultant shall notify Strio prior to accepting or performing any overtime Services, At the end of each calendar year in which Consultant provides Services, Strio will issue to Consultant a Form W-2 summarizing Consultant's compensation and providing other information required under applicable laws for that year.

B. Consultant shall also be entitled to participate in any employee fringe benefit programs as may be specifically designated as being available from time to time to consultants of Strio employed in the same professional category as Consultant. Except for any such programs, Consultant shall not be entitled to participate in any other employee benefit programs or fringe benefits that may be offered by Strio or its affiliates to other employees. Strio reserves the right to change, unilaterally without notice, any and all employment policies, rules, regulations, practices, procedures and employee benefit programs applicable to Consultant at any time and for any legally permitted reason.

C. Consultant shall not divulge to a Client any information concerning Consultant's rate of pay from Strio.

D. Strio will reimburse Consultant for all ordinary business expenses incident to Consultant's performance of Services under this Agreement. Extraordinary

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

business expenses will not be reimbursed unless approved in advance by Strio in writing.

3. **TERM**
   A. Consultant's Services hereunder shall be "at will" and provided only on an as needed basis without any commitment as to minimum use by Strio or any Client. Consultant acknowledges and agrees that this Agreement may be terminated at any time by either party; and that nothing in this Agreement (including, without limitation, any attached Statement(s) of Work) or otherwise shall confer upon Consultant any riht to continue in the employ of Strio or restrict the right of Strio to terminate this agreement at any time.

4. **CONFIDENTIAL INFORMATION AND CLIENT INTELLECTUAL PROPERTY**
   A. Definition of Confidential Information. Consultant acknowledges that in the course of Consultant's employment by Strio, Consultant may be provided with, or have access to, Confidential Information belonging to Strio, Clients or other parties with whom any of them has a business relationship. "**Confidential Information**" means any and all trade secrets and other information that any of those persons may consider proprietary or otherwise wish to keep confidential; including, without limitation, customer lists, cost or profit figures and projections, credit information, information about current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, litigation documents and procurement requirements, and technical information included in or on tracings, flowcharts, software program code, drawings, field notes, calculations, specifications or engineering data. However, this confidentiality clause shall not apply to: (1) information that is in the public domain, (2) information that was previously known to Consultant before the engagement, (3) information received from a third party having the right to lawfully possess and disclose such information without breaching this Agreement, (4) information approved for release by prior written authorization of the person with proprietary rights to the information, or (5) information required to be disclosed by a court of competent jurisdiction, but only to the extent expressly required and only after alerting Strio of such disclosure requirement.
   B. Protection of Confidential Information. Consultant agrees to hold in strict confidence all Confidential Information that Consultant uses or to which Consultant gains access during the course of performing Services; and not to use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance of Consultant's engagement to a Client that has a legally justified interest in the Confidential Information. Consultant also agrees not to disclose, indirectly or directly, to Strio or any Client, any Confidential Information or other data the disclosure of which would constitute a violation of any obligation to, or infringe the rights of, any third party.
   C. Definition of Client Intellectual Property. "**Client Intellectual Property**" means, with respect to a Client, any inventions, works of authorship and mask works, including without limitation improvements, discoveries, ideas, technologies,

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

know-how, working product, concept, materials, disclosures, software programs, computer languages, programming aids, or documentation conceived, developed, originated, fixed or reduced to practice by Consultant (or under Consultant's direction), that relate in time and conception or reduction of practice to (1) the business of the Client or the Services performed for the Client, or (2) actual or demonstrably anticipated research or development of the Client.

D. Protection of Client Intellectual Property. Consultant agrees that any Client Intellectual Property shall be the sole and complete property of the applicable Client or its customer, as applicable, whether as a work made for hire or otherwise. Consultant hereby assigns and conveys Consultant's entire right, title and interest to any and all copyrights, patents and trade secrets included in any Client Intellectual Property to the copyrights, patents and trade secrets included in any Client Intellectual Property t other applicable Client or to its customer, as the case may be. Consultant agrees to execute all applications or registrations for patents and copyrights, and any other instruments deemed necessary or helpful for a Client to secure and enforce its rights under this provision. Consultant shall make no charge or claim for additional compensation or provision. Consultant shall make no charge or claim for additional compensation or any other consideration for signing any such documents. Consultant shall promptly and fully, and without prior request, disclose any and all such Client Intellectual Property to the applicable Client and shall treat all such Client Intellectual Property as if it were Confidential Information furnished by such Client.

E. Obligations upon Termination of Client Engagement. Upon the termination of Consultant's engagement with any Client under this Agreement, Consultant shall immediately return to the Client all of the Client's Confidential Information and other documents, magnetically encoded materials and other materials supplied by, or obtained from such Client (including, but not limited to, software, drawings, flow charts, structure charts, calculations, worksheets, documentation and magnetic media), along with all copies thereof in Consultant's possession and control. Consultant shall turn over to Strio all materials developed or written by Consultant in the performance of Consultant's Services unless otherwise specified in writing by Strio or unless such disclosure would violate a Client's rights with respect to Confidential Information or Client Intellectual Property. Consultant may retain copies of materials provided by a Client only if Consultant has received written permission of the Client. Consultant may retain copies of Consultant's own works, for Consultant's files, in compliance with the standards of Consultant's profession and the rights of each Client with respect to Confidential Information and Client Intellectual Property. Consultant agrees, upon request by Strio or a Client, to execute agreements as may be reasonably required to provide for the protection of Confidential Information, and for the disclosure and assignments of rights in or to Client Intellectual Property.

F. Binding Obligation. Consultant agrees that the provisions of this Section 4 shall be binding upon not only on Consultant, but on Consultant's heirs, executors,

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

administrators, successors and assigns; and that such provisions shall survive the termination of this Agreement for any reason.

5. **NON-SOLICITATION AND NON-COMPETITION**
   A. Non-Solicitation. Consultant shall neither induce nor attempt to induce any Strio employee, independent contractor or Client to end his, her or its relationship with Strio during the term of this Agreement, nor during the first 12 months after the date of termination of this Agreement.
   B. Protection of Strio Relationships with Clients. While on an engagement with a Client, Consultant acknowledges and agrees that he or she is acting as an employee and agent of Strio. In that capacity, Consultant agrees to keep all of the Client's consulting, employment or staffing needs confidential and will only bring such needs to the attention of Strio. Consultant shall not, directly or indirectly, recommend to Client that it employ or consider for employment, whether on a temporary, permanent or contractual basis, either Consultant or any individual or independent contractor without prior written approval of Strio. Nor shall Consultant recommend to any individual or independent contractor that such person seek employment with any Client, whether on a temporary, permanent or contractual basis, without prior written approval of Strio.
   C. Non-Competition. During the term of this Agreement and for one year after the termination of Consultant's employment relationship with Strio for whatever reason, whether such termination was by Strio or Consultant, and whether with or without cause, Consultant agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:
      1) Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:
         a. To which, within six (6) months prior to termination of Consultant's employment, Consultant has provided services in any capacity on behalf of Strio, or
         b. To which, within ninety (90) days prior to such termination of Consultant's employment, Consultant has been introduced or about which Consultant has received information through Strio or through any Client for which Consultant has performed Services in any capacity on behalf of Strio or;
      2) Retain or attempt to retain, directly or indirectly, for Consultant or any other party, the Services of any person, including any of Strio's employees, who was providing services to or on behalf of Strio within ninety (90) day before the termination of Consultant's employment, and to whom Consultant has been introduced or about which Consultant has performed Services in any capacity on behalf of Strio. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of Strio's Clients for which Consultant performed
      3) or was assigned to perform Services under this Agreement.

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

6. **REMEDIES**
   A. Arbitration. Any and all disputes and claims arising out of or relating to this Agreement, other than claims for specific performance or injunctive relief, shall be settled and determined by arbitration before the Commercial Panel of the American Arbitration Association in accordance with the Commercial Arbitration Rules. Any arbitration proceedings will be held in Minneapolis, Minnesota. Each party shall bear its own attorneys' fees and expenses in any such arbitration. However, in any arbitration proceeding arising under this Agreement, the arbitrators shall not have the power to change, modify or alter any express condition, term or provision of this Agreement. The arbitration award shall be final and binding upon the parties and judgment may be entered in any court of competent jurisdiction.
   B. Equitable Remedies. Consultant acknowledges and agrees that (1) the disclosure of any Confidential Information or any other violation of the terms of Sections 5 or 6 would cause immediate and irreparable injury, loss and damage to Strio, the affected Client and/or its customers; (2) an adequate remedy at law for such injury, loss and damage may not exist; and (3) in the event of such disclosure or threatened disclosure, or any other such violation, Strio, the affected Client and/or its customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce any applicable provision of this Agreement, without the necessity of proof of actual damage or loss.
   C. Attorneys' Fees and Other Costs. If Strio prevails in any such action for injunctive relief against Consultant, Strio shall be entitled to recover from Consultant any costs or expenses incurred in obtaining injunctive relief against such breach of this Agreement by Consultant, including, without limitation, attorneys' fees and costs. If any other dispute arises under this Agreement, the prevailing party in the dispute shall be entitled to collect its reasonable attorney's fees and expenses, in addition to any award to which the prevailing party may become entitled.
   D. Choice of Law/Forum Selection and Consent to Personal Jurisdiction. This Agreement shall be governed, construed and determined according to the laws of the State of Minnesota without reference to principles of conflicts of law. Any claims for specific performance or injunctive relief relating to or arising out of this Agreement shall be heard solely in Hennepin County District Court in the State of Minnesota. Consultant and Strio consent to the exclusive jurisdiction of Hennepin County District Court for such claims. It shall be a violation of this Agreement for Employee or Strio to bring any action in any other court if that action relates to or arises out of this Agreement in any manner.
7. **MISCELLANEOUS**
   A. This Agreement and the exhibits attached hereto constitute the entire agreement between the parties with respect to the matters contained herein; and supersede any and all prior and contemporaneous agreements,

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

negotiations, correspondence, undertakings and communications of the parties, oral and written, with respect to that subject matter.

B. This Agreement may be amended or modified only by written consent of the parties. This Agreement will be governed by the law of the state in which the Services are primarily performed.

C. Consultant may not assign his or her duties under this Agreement without the prior written consent of Strio, which Strio may withhold in its sole and absolutely discretion.

IN WITNESS WHEREOF, the parties hereto have caused this Consultant Employment Agreement to be executed as of the date first written above.

**ACCEPTED AND AGREED:**

| **CONSULTANT** | **STRIO CONSULTING** |
|---|---|
| By: *Margaret Christine Covert* | By: [signature] |
| | Its: Principle Consultant |
| Date: 01/29/2018 | Date: 01/29/2018 |

Doc ID: d699ba25d863ac0e1b384408adb73f8fc1fa2a47

 # Audit Trail

| | |
|---|---|
| **TITLE** | Statement of Work/ Consultant Agreement |
| **FILE NAME** | Strio STATE...ocx (1).pdf and 1 other |
| **DOCUMENT ID** | d699ba25d863ac0e1b384408adb73f8fc1fa2a47 |
| **STATUS** | • Completed |

## Document History

| | | |
|---|---|---|
| SENT | **01/29/2018**<br>19:49:31 UTC | Sent for signature to Christine Covert (christine.covert@gmail.com) and Caleb Fullhart (caleb@strioconsulting.com) from caleb@strioconsulting.com<br>IP: 68.59.33.154 |
| VIEWED | **01/29/2018**<br>19:49:46 UTC | Viewed by Caleb Fullhart (caleb@strioconsulting.com)<br>IP: 68.59.33.154 |
| SIGNED | **01/29/2018**<br>19:50:27 UTC | Signed by Caleb Fullhart (caleb@strioconsulting.com)<br>IP: 68.59.33.154 |
| VIEWED | **01/29/2018**<br>19:52:18 UTC | Viewed by Christine Covert (christine.covert@gmail.com)<br>IP: 174.17.176.10 |
| SIGNED | **01/29/2018**<br>19:53:15 UTC | Signed by Christine Covert (christine.covert@gmail.com)<br>IP: 174.17.176.10 |
| COMPLETED | **01/29/2018**<br>19:53:15 UTC | The document has been completed. |

# Exhibit F

Exhibit F



April 22, 2019

***VIA EMAIL & FEDEX***
Saki Kravitz
Minted
747 Front St #200
San Francisco, CA 9411
saki.kravitz@minted.com

***RE: Breach of Consultant Employment Agreement by Paula-Anne Sherron***

Dear Ms. Kravitz:

tHRive Law & Consulting represents Strio Consulting. This letter concerns Minted's hiring of Paula-Anne Sherron as Leadership Recruiter/Lead Technical Recruiter in March 2019. This hire was in violation of Ms. Sherron's Consultant Employment Agreement executed when she first came to perform work for you.

On July 10, 2018, Ms. Sherron entered into a Consultant Employment Agreement with Strio to serve as a Senior Technical Recruiter to work with Minted. (Please see the attached Statement of Work - Employee Consultant Attachment and Consultant Employment Agreement.) The Agreement included a provision that she would not directly work for any Strio client for six months after her employment ended with Strio.

On March 18, 2019, Ms. Sherron informed her Strio manager that you "moved over to Minted on Monday, March 11th." This meant that she started working directly for Minted and you. Ms. Sherron made no mention, request, or notification that this action to any member of Strio management. This "move" is in violation of the provision above. As such, Ms. Sherron is currently in breach of the Consultant Employment Agreement.

Ms. Sherron has alleged that the "move" was approved by Strio management, namely Mr. Caldwell. As I'm sure you are aware, Mr. Caldwell does not work for Strio. He has never been a member of Strio management and does not have the authority to approve such a waiver of a contractual provision like Ms. Sherron's. Accordingly, if there are any documents referencing Mr. Caldwell's assent to allowing Ms. Sherron to work directly for you, Strio requests copies of any and all documents that reference Ms. Sherron's employment with you.

Please contact me directly to discuss. If you have any of these documents, you can forward them to my attention immediately.

Sincerely,

*s/Kate Bischoff*

Kate Bischoff

Encl.
cc: Tyler Brimmer, Esq.

thrivelawconsulting.com
kbischoff@thrivelawconsulting.com
(612) 361-7707

# Exhibit G

Exhibit G



April 22, 2019

***VIA EMAIL & FEDEX***
Christine Covert
730 Ensenada Ct
San Diego, CA 92109
Christine.covert@gmail.com

***RE: Breach of Consultant Employment Agreement***

Dear Ms. Covert:

tHRive Law & Consulting represents Strio Consulting. This letter concerns the Consultant Employment Agreement you entered into on January 29, 2018 and your current breach of that Agreement. Please note, failure to adhere to the terms of the Consultant Agreement and this letter will result in a demand for arbitration within the terms of the Agreement.

On January 29, 2018, you entered into a Consultant Employment Agreement with Strio to serve as a Recruiter to work with Reflektive. (Please see the attached Statement of Work - Employee Consultant Attachment and Consultant Employment Agreement.) The Agreement included the following provision:

> During the term of this Agreement and for one year after the termination of Consultant's employment with Strio for whatever reason, whether such termination was by Strio or Consultant, and whether with or without cause, Consultant agreements that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity
>
> 1) Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:
>     a. To which, within six (6) months prior to termination if Consultant's employment, Consultant has provided services in any capacity on behalf of Strio

You were placed with Reflektive, Aptible, and Open Door through a client of Strio – Rocket Power. On February 5, 2019, Strio learned that you were currently working through Rocket Power at Gong as a Contract Recruiter. This is direct violation of the provision above and your Agreement with Strio.

Accordingly, you must cease and desist the breach, meaning stop working directly for Gong and Rocket Power immediately. Failure to do so will result in a demand for arbitration to be filed in accordance with the Consultant Employment Agreement.

thrivelawconsulting.com
kbischoff@thrivelawconsulting.com
(612) 361-7707

---

Please contact me directly to discuss. Failure to contact me by April 30, 2019 will signal your assent to arbitration.

Sincerely,

*s/Kate Bischoff*

Kate Bischoff

Encl.
cc: Tyler Brimmer, Esq.

# Exhibit H

# REDACTED

**From:** Robin Schooling <robin.schooling@strioconsulting.com>
**Sent:** Monday, May 6, 2019 9:24 AM
**To:** Jeff Baumgarten <jeff@rocketpower.io>
**Cc:** Regan Howell <regan.howell@strioconsulting.com>
**Subject:** Re: Christophe and Jaleel... next steps

Jeff -

as Christophe's employer we received a complaint as well and here was our response (pasted below):

RS

*****

Hello Christophe –

I received the emails that you sent regarding allegations of a violation of the Americans with Disabilities Act. Please note the Strio Consulting is an Equal Opportunity Employer and complies with all aspects on the ADA.

As required, when Strio became aware (April 18, 2019) that you had notified our client of a potential disability we entered into an interactive discussion as required under the ADA. Robin Schooling, Strio's Head of People, reached out to you on Friday April 19th requesting a conversation either Friday or Saturday before your final test/assessment on Monday April 22nd.  You did not respond to her email until after the final assessment; you subsequently spoke on the afternoon of April 22nd once you reached out to her.

During that conversation you requested additional training time even though Nuro had already provided you with enhanced/additional 1:1 training with an instructor, based on your notification to them of some potential learning needs, during your first 2 weeks of employment. Continuation in the role of an AVO is dependent upon successful completion of two testing assessments: CoDriver and Driver and individuals can take each of these 3 times in order to pass. You were unable to successfully pass the CoDriver assessment and received verbal and emailed feedback and results for these tests each time you took them.

There is not, and never has been, additional training offered to a previous training class nor are there any videos used to supplement additional training. A previous class of new hires was grounded for a period of time and not driving vehicles due to operational issues; this was not extended training time.

Please note that the ADA does not require an employer to change the job's essential functions, lower required standards such as successfully completing required training and testing, or any other changes that would pose an undue hardship.

You have been fully compensated for time worked and will not be receiving any additional pay. We will not be reinstating your employment and placing you at the client site due to the fact that you did not successfully complete the required testing/assessments for the position.

Caleb

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
Superior Court of California, County of San Francisco
05/14/2019
Clerk of the Court
BY: KALENE APOLONIO
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**DECLARATION OF LISA PETERSEN IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**

Date: May 14, 2019
Time: 11:00 a.m.
Dept: 302
Judge: Hon. Ethan P. Schulman

Complaint filed: April 30, 2019

I, Lisa R. Petersen, declare and say:

1. I am an attorney licensed to practice in the State of Utah and I represent RocketPower, Inc. ("RocketPower").

2. On April 17, 2019, I sent a letter on behalf of RocketPower to Strio Consulting, Inc. ("Strio"), and its counsel, regarding Strio's inappropriate contact with RocketPower's client, Nuro, and demanded that Strio cease and desist contacting RocketPower's clients without first obtaining RocketPower's express permission to have direct contact with RocketPower clients. I also further informed them that contacting RocketPower's clients directly interfered with RocketPower's contractual relationships. A true and correct copy of my April 17, 2019 letter to Strio is attached hereto as Exhibit "A."

3. On April 19, 2019, Strio's counsel responded. In its letter, Strio threatened to enforce the unenforceable Non-compete and Non-solicitation clauses in two RocketPower/Strio joint workers' agreements (Ms. Sherron and Ms. Covert), stating:

> any efforts by RocketPower to solicit, encourage, or entice Strio employees to work on [RocketPower client] projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

A true and correct copy of the April 19, 2019 letter is attached hereto as Exhibit "B."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of May, 2019, at Salt Lake City, Utah.

By */s/ Lisa Petersen*
Lisa Petersen

As the attorney e-filing this document, attorney Michael S. Dorsi attests that Lisa Petersen has concurred in the filing of this document. */s/ Michael S. Dorsi*

**INDEX OF EXHIBITS TO DECLARATION OF LISA PETERSEN**

Exhibit A: Letter to Strio re Interference
Dated April 17, 2019

Exhibit B: Response Letter from Counsel for Strio
Dated April 19, 2019

# Exhibit A

Exhibit A



Lisa R. Petersen
lpetersen@ck.law
Main Phone: 801.363.4300

111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Facsimile: 801.363.4378

April 17, 2019

**VIA EMAIL**

Robert R. Fafinski III
fafinski.robertIII@fmjlaw.com

Caleb Fullhart
caleb@strioconsulting.com

Robin Schooling
robin.schooling@strioconsulting.com

Re: Inappropriate Contact with RocketPower's Cleint Nuro

Dear Messrs. Fafinski and Fullhart and Ms. Schooling:

This firm represents RocketPower. I have been informed by my client that Ms. Schooling of Strio has recently contacted Nuro, a client of RocketPower's. It is unclear what the full nature of the conversation was, but it was reported that Ms. Schooling made at least the following statement to Nuro: "your drivers work for Strio." Strio has no contractual relationship with Nuro; thus, it is wholly improper for anyone from Strio to be contacting Nuro (or any other client of RocketPower's) for any purpose. Needless to say, this new Nuro executive (on his third day at Nuro) was very surprised by the phone call, did not even know who Ms. Schooling or Strio were, and has made clear that Nuro wants all executive communications on the Nuro engagement to go through Jeff Baumgarten of RocketPower ***only***.

To be clear, when it comes to any of RocketPower's contracted clients, including and especially Nuro, Strio internal employees not dedicated/billed to the account ***must not*** contact RocketPower's clients without RocketPower's express permission. If anyone from Nuro reaches out to Strio related to "everyday" HR issues, please immediately check with Mat Caldwell or Jeff Baumgarten of RocketPower to collaborate with one or both of them about your response to any such HR questions.

Please be advised that we believe this type of behavior on Strio's part directly interferes with RocketPower's contractual client relationships. We would hate to have to initiate legal action with regard to this type of activity going forward. This conduct is especially disappointing and counterproductive, as I understand that Strio and RocketPower are presently in

 discussions regarding potential contract renewal, negotiations, and handling sensitive co-employment issues.

I trust that Strio will cease and desist from this type of contact with RocketPower's clients going forward.

Very truly yours,

**COHNE KINGHORN, P.C.**

Lisa R. Petersen

cc: Bud Headman
Client

# Exhibit B

Exhibit B



775 Prairie Center Drive, Suite 400
Eden Prairie, MN 55344
P: 952.995.9500

700 North Minnesota Street, Suite B
New Ulm, MN 56073
P: 855.806.1525

April 19, 2019

**Via Email**

Lisa R. Petersen, Esq.
**COHNE KINGHORN**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
lpetersen@cohnekinghorn.com

Re: Strio Consulting and Rocket Power

Dear Ms. Petersen:

I am in receipt of your April 17, 2019 correspondence, which I understand contains some inaccurate information. Ms. Schooling did not have a conversation with Mr. Bourke. She sent him a LinkedIn invitation. Therein, she identified herself as the Head of People at Strio (the same position held by Mr. Bourke with Nuro), accurately indicated that Strio's employees work on-site with Nuro (a fact already known by Nuro), and stated she looked forward to speaking with him.

As your client is well aware, Strio's employees, especially HR personnel, have been in regular contact with Nuro personnel since Strio's employees started working on their projects. It is my understanding that Nuro personnel regularly contact Strio directly to seek guidance regarding matters that arise with Strio employees and Rocket Power has tasked Strio with handling such HR issues, thereby necessitating direct communications between those parties. Your client's claim that Ms. Schooling having direct contact with Nuro personnel is somehow improper, unusual, or untoward is inaccurate.

Ms. Schooling's request to Mr. Bourke was done in the usual course of her duties. Ms. Schooling has long been connected with two other Nuro employees via LinkedIn who work in HR, without objection from Rocket Power or Nuro, and was reaching out to Mr. Bourke as she had done before. Your client's claim that this request was improper or untoward, let alone an act of tortious interference, is legally and factually meritless and is contradicted by your client's actions, directives, and course of conduct during the past year and a half.

I also write regarding conduct undertaken by Rocket Power in interference with Strio's contractual relationships with its employees and contractors. As your client has long been aware, each of Strio's employees and contractors are subject to non-compete and non-solicitation agreements which, among other things, prohibit those employees from working directly with Strio's clients and business partners, including Rocket Power, independent of Strio.

Notwithstanding, my client has been made aware of multiple Strio employees and contractors who have been solicited by Rocket Power to work on non-Strio projects for which Strio is not being compensated. I have enclosed herewith copies of the contracts between Strio and two of its contractors, Paula-Anne Sherron and Christine Covert, who have been improperly solicited by Rocket Power to work on such projects. Be advised that any work performed by Strio employees or contractors on such projects constitutes a breach of their respective contracts with Strio and any efforts by Rocket Power to solicit, encourage, or entice Strio employees to work on such projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

Strio hereby demands Rocket Power cease and desist from any further unlawful conduct or tortious interference with Strio's contractual relationships. These agreements and the restrictive covenants contained therein are fully enforceable contracts, entered into under Minnesota law, which permit Strio to file suit in Minnesota to obtain all available injunctive and monetary relief, including recovery of its attorneys' fees. If Rocket Power undertakes any further efforts to solicit, encourage, or entice Strio's employees to violate their agreements, now or in the future, Strio will not hesitate to pursue all available remedies against Rocket Power as well as any violating employees.

Sincerely,

Tyler Brimmer

TPB:sb

Enclosures

CIV-130

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
David Nied (SBN 136413) / Michael S. Dorsi (281865)
Ad Astra Law Group, LLP
582 Market Street, 17th Floor
San Francisco CA 94104
TELEPHONE NO.: (415) 795-3579 FAX NO. *(Optional)*: (415) 276-1976
E-MAIL ADDRESS *(Optional)*: dnied@astralegal.com / mdorsi@astralegal.com
ATTORNEY FOR *(Name)*: RocketPower, Inc.

**FOR COURT USE ONLY**

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**05/14/2019**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: RocketPower, Inc.
DEFENDANT/RESPONDENT: Strio Consulting, Inc.

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

CASE NUMBER: CGC19575643

*(Check one):* ☑ **UNLIMITED CASE** (Amount demanded exceeded $25,000) ☐ **LIMITED CASE** (Amount demanded was $25,000 or less)

**TO ALL PARTIES :**

1. A judgment, decree, or order was entered in this action on *(date)*: May 14, 2019

2. A copy of the judgment, decree, or order is attached to this notice.

Date: **May 14, 2019**

Michael S. Dorsi
(TYPE OR PRINT NAME OF ☑ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)

[signature]
(SIGNATURE)

**Page 1 of 2**

Form Approved for Optional Use
Judicial Council of California
CIV-130 [New January 1, 2010]

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

www.courtinfo.ca.gov

CIV-130

| PLAINTIFF/PETITIONER: RocketPower, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Strio Consulting, Inc. | CGC19575643 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL

### NOTICE OF ENTRY OF JUDGMENT OR ORDER

***(NOTE: You cannot serve the* Notice of Entry of Judgment or Order *if you are a party in the action. The person who served the notice must complete this proof of service.)***

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Entry of Judgment or Order* was mailed:
   a. on *(date):*
   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:
   a. Name of person served:
      Street address:
      City:
      State and zip code:
   b. Name of person served:
      Street address:
      City:
      State and zip code:
   c. Name of person served:
      Street address:
      City:
      State and zip code:
   d. Name of person served:
      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached ______.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(TYPE OR PRINT NAME OF DECLARANT) (SIGNATURE OF DECLARANT)

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ENDORSED
FILED
Superior Court of California
County of San Francisco

MAY 14 2019

CLERK OF THE COURT
BY: JOSE RIOS MERIDA
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

| | |
|---|---|
| ROCKETPOWER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STRIO CONSULTING, INC., a Minnesota corporation,<br><br>Defendant. | CASE NO.: CGC-19-575643<br><br>**~~[PROPOSED]~~ ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**<br><br>Date: May 13, 2019<br>Time: 11:00 a.m.<br>Dept: 302<br>Judge: Hon. Ethan P. Schulman<br><br>Complaint filed: April 30, 2019 |

# ~~[PROPOSED]~~ ORDER TO SHOW CAUSE

On Monday, May 13, 2018, at 11:00 a.m. in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California, plaintiff RocketPower, Inc., by its attorneys, appeared and sought an order to show cause why a preliminary injunction should not be issued.

Having considered the evidence and arguments presented, the ex parte application for an order to show cause why a preliminary injunction should not issue is GRANTED.

Defendant Strio Consulting, Inc. is ordered to show cause why a preliminary injunction should not issue on June 11, 2019, at 9:30 a.m. in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California.

The preliminary injunction, if issued, may order Strio Consulting, by its own actions and/or by directing its agents, to refrain from:

(1) Misrepresenting the status of the workers' relationship with RocketPower;

(2) Disparaging and defaming Mat Caldwell, founder and Managing of RocketPower;

(3) Contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants in the Worker Agreements;

(4) Except as permitted under California law and procedure, seeking to enforce the invalid restrictive covenants in the Worker Agreements against RocketPower and the joint workers;

(5) Further interfering with RocketPower's current and prospective business relations; and

(6) From taking other actions that may undermine the injunction, to be enumerated by this Court as the Court may deem just and equitable.

RocketPower shall confirm service of this Order and their papers in support of a preliminary injunction no later than May ~~17~~ 14, 2019. Strio Consulting shall file opposition papers, if any, by May 29, 2019. RocketPower shall file reply papers, if any, by June 4, 2019.

Dated: May 14, 2019

By /S/ Ethan P. Schulman

Hon. Ethan P. Schulman
Judge of Superior Court
County of San Francisco

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
05/14/2019
Clerk of the Court
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED DIVISION

ROCKETPOWER, INC., a Delaware corporation,

Plaintiff,

v.

STRIO CONSULTING, INC., a Minnesota corporation,

Defendant.

CASE NO.: CGC-19-575643

**PROOF OF SERVICE**

## PROOF OF SERVICE

I am a citizen of the United States. My business address is 582 Market Street, 17th Floor, San Francisco, California, 94104. I am employed in the county of San Francisco where this service occurs. I am over the age of 18 years and am not a party to the within cause.

On May 14, 2019, I served the following document(s) described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**

**DECLARATION OF MATHEW CALDWELL IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**

**DECLARATION OF LISA PETERSEN IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION**

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

❖ **BY USPS PRIORITY MAIL EXPRESS (OVERNIGHT)**: I am readily familiar with my employer's normal business practice of collection and processing of correspondence for mailing. Under that practice, correspondence is deposited with the U.S. Postal Service that same day in a sealed envelope(s) with postage thereon fully prepaid at San Francisco, California, in the ordinary course of business.

❖ **BY ELECTRONIC SERVICE**: I served said document(s) by transmitting true and complete copies of same to each of the parties named below, sending the electronic files to the e-mail addresses below through their Internet Service Provider.

James D. McNairy
Boutin Jones Inc.
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
JMcNairy@boutinjones.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 14, 2019, at San Francisco, California.

Kate Morin

David Nied (SBN 136413)
Michael S. Dorsi, Esq. (SBN 281865)
**AD ASTRA LAW GROUP, LLP**
582 Market Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 276-1976
dnied@astralegal.com
mdorsi@astralegal.com

Attorneys for Plaintiff RocketPower, Inc.

FILED
Superior Court of California
County of San Francisco

MAY 14 2019

CLERK OF THE COURT

BY: ______
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

| | |
|---|---|
| ROCKETPOWER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STRIO CONSULTING, INC., a Minnesota corporation,<br><br>Defendant. | CASE NO.: CGC-19-575643<br><br>**~~[PROPOSED]~~ ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**<br><br>Date: May 13, 2019<br>Time: 11:00 a.m.<br>Dept: 302<br>Judge: Hon. Ethan P. Schulman<br><br>Complaint filed: April 30, 2019 |

# ~~[PROPOSED]~~ ORDER TO SHOW CAUSE

On Monday, May 13, 2018, at 11:00 a.m. in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California, plaintiff RocketPower, Inc., by its attorneys, appeared and sought an order to show cause why a preliminary injunction should not be issued.

Having considered the evidence and arguments presented, the ex parte application for an order to show cause why a preliminary injunction should not issue is GRANTED.

Defendant Strio Consulting, Inc. is ordered to show cause why a preliminary injunction should not issue on June 11, 2019, at 9:30 a.m. in Department 302, San Francisco Superior Court, 400 McAllister Street, San Francisco, California.

The preliminary injunction, if issued, may order Strio Consulting, by its own actions and/or by directing its agents, to refrain from:

(1) Misrepresenting the status of the workers' relationship with RocketPower;

(2) Disparaging and defaming Mat Caldwell, founder and Managing of RocketPower;

(3) Contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants in the Worker Agreements;

(4) Except as permitted under California law and procedure, seeking to enforce the invalid restrictive covenants in the Worker Agreements against RocketPower and the joint workers;

(5) Further interfering with RocketPower's current and prospective business relations; and

(6) From taking other actions that may undermine the injunction, to be enumerated by this Court as the Court may deem just and equitable.

RocketPower shall confirm service of this Order and their papers in support of a preliminary injunction no later than May ~~17~~ 14, 2019. Strio Consulting shall file opposition papers, if any, by May 29, 2019. RocketPower shall file reply papers, if any, by June 4, 2019.

Dated: May 14, 2019

By: [signature]
Hon. Ethan P. Schulman
Judge of Superior Court
County of San Francisco